# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, § § § Plaintiff, § § v. § § NEORA, LLC, SIGNUM BIOSCIENCES, § SIGNUM NUTRALOGIX, and JEFFREY § OLSON, § Defendants. § § | Civil Action No. 3:20-cv-01979-M |

# BRIEF OF AMICUS CURIAE
## THE DIRECT SELLING ASSOCIATION

Anne M. Johnson
State Bar No. 00794271
ajohnson@tillotsonlaw.com
Charles T. Rice
State Bar No. 24126599
crice@tillotsonlaw.com
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
(214) 382-3041 (Telephone)
(214) 292-6564 Facsimile

Brian Bennett (*pro hac vice* forthcoming)
John W. Webb (*pro hac vice* forthcoming)
**DIRECT SELLING ASSOCIATION**
1667 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 452-8866 (Telephone)

**Counsel for Amicus Curiae**
**Direct Selling Association**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Amicus Curiae Direct Selling Association ("DSA") makes the following disclosures. DSA is a nonprofit, tax-exempt organization incorporated in the State of Delaware and is a 501(c)(6) business association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock. No publicly held corporation or its affiliate that is not a party to this case or appearing as amicus curiae has a substantial financial interest in the outcome of this litigation by reason of insurance, a franchise agreement, or an indemnity agreement. Defendant Neora, LLC is a member of the Direct Selling Association. The Direct Selling Association is in no way assisting any party with the costs of this litigation.

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

DSA is a 112-year-old national trade association headquartered in Washington, D.C. that represents companies that sell their products directly to consumers through an independent, entrepreneurial salesforce. Direct sellers are perhaps best known to the public as person-to-person, door-to-door, or home party plan sellers. Through the efforts of direct salespersons that provide personal demonstration, home delivery, and a variety of other sales-related services, direct-selling companies can offer quality products and services to consumers without substantial advertising or other barriers to entry found in other distribution systems, like brick-and-mortar stores.

DSA, its over 100 member companies, and the millions of independent contractor salespeople for those companies support the prosecution of illegal pyramid schemes which masquerade as legitimate companies, thus confusing the marketplace for the public, salespeople, customers, and negatively impacting the credibility of legitimate companies. DSA also supports a consistent, accurate, effective, and long-established definition of an illegal pyramid scheme that allows for direct selling companies to operate within the current legal framework while providing law enforcement with the tools necessary to prevent fraudulent activities.

DSA is committed to the highest ethical business standards for the direct selling channel and to the customers our member companies serve every day. The DSA Code of Ethics is a robust series of policies that every DSA member agrees to follow as a condition of membership. It holds member companies accountable to policies that protect independent salespeople and consumers and encourages the entire marketplace for direct selling to meet these high standards. DSA's own Code of Ethics prohibits pyramid schemes, large up-front payments, compensation based primarily

---

[1] DSA certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than DSA and its members and DSA's counsel contributed money intended to fund the brief's preparation or submission.

3

on salesforce recruitment, and large mandatory inventory purchases. DSA also affirmatively mandates that DSA member companies must repurchase inventory from departing salespeople.[2]

Notwithstanding our vigorous endorsement of the prosecution of illegal pyramids, DSA is concerned that an incorrect or overly broad definition of an illegal pyramid scheme would have significant adverse consequences for DSA's over 100 companies and a chilling effect on the direct selling business channel which provides quality products to its millions of customers and salespeople, while also offering those same independent contractor salespeople the opportunity to earn modest supplemental income to help their families or to otherwise engage in a personally satisfying activity.

In 2021, 7.3 million people[3] in the U.S. were involved in direct selling, collectively generating over $42.7 billion in estimated retail sales value and servicing 35.7 million preferred customers and 8.9 million discount buyers not including other buyers that don't have a contractual relationship with the company. *See* Direct Selling Association: Direct Selling in 2021: An Overview Fact Sheet.[4]

DSA has worked for decades to help develop clear and reasonable standards which law enforcement officials, legislators, legitimate businesses, and the public may use to distinguish unlawful pyramid schemes from legitimate direct selling companies. Over the last thirty years, DSA has worked with state legislatures to support bills that legally define unlawful pyramid schemes in a way that mirrors past FTC and federal judicial guidance. For example, in 2003, DSA

---

[2] The DSA Code of Ethics is administered independently of the Association by the Direct Selling Self Regulatory Council, under the Better Business Bureaus National Programs, pursuant to a structure recommended by and developed in consultation with the Federal Trade Commission.

[3] By some estimates over twenty million Americans are involved. *See* Maureen K. Ohlhausen, Opening Remarks for the 2017 DSA Fall Conference, FTC Website, at 4 (Nov. 2017), https://www.ftc.gov/public-statements/2017/11/opening-remarks-2017-dsa-fall-conference (also available at 2017 WL 5202554, at *3 (Nov. 7, 2017)).

[4] Available at https://www.dsa.org/docs/default-source/industry-fact-sheets/dsa-2021g-ofactsheetv3.pdf?sfvrsn=51c6d6a5_3%27

successfully worked with legislators in South Dakota to pass an anti-pyramid promotional scheme law. The Council of State Governments (CSG), one of the preeminent state public policy organizations, adopted legislative language in its 2004 Volume of Suggested State Legislation. *See* 63 CSG, Suggested State Legislation 111 (2004). As discussed in more detail below, these laws consistently define an illegal pyramid scheme as an operation that provides compensation derived primarily from recruitment rather than sale of products.

DSA has participated as amicus curiae in other litigation involving direct selling issues. *See*, *e.g.*, *FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996); *State ex rel. Miller v. American Prof'l Mktg., Inc.*, 382 N.W.2d 117 (Iowa 1986); *In re Ger-Ro-Mar, Inc.*, 84 F.T.C. 95 (1974). DSA submits this brief as part of its ongoing efforts to stop unlawful pyramid schemes. Additionally, to ensure the public continues to enjoy the benefits that legitimate direct selling companies offer and further demonstrate confidence to the public and those who participate in direct selling companies that they are engaging with legitimate, lawful, direct selling businesses by ensuring these companies can continue to look to well established law.

DSA takes no position on the merits of this case. Instead, it will focus solely on the ramifications of what could happen if this Court issues a ruling regarding the legality of a pyramid scheme inconsistent with longstanding law and other jurisprudence. In particular, any ruling deeming practices that were previously determined to be legitimate to be suddenly illegitimate would jeopardize consumer confidence and goodwill that legitimate companies have strived so hard to build. Amicus and the businesses (large and small) it represents across the country have relied upon case law and other guidance developed over several decades to build and invest in a national industry which has successfully served its customers and salespeople in a legitimate way that conforms with the law.

## I. THE COURT SHOULD NOT DEPART FROM LONGSTANDING LAW DEFINING A PYRAMID SCHEME.

A significant percentage of DSA members utilize multi-level model compensation plans whereby participants may sell products to their customers for commissions or other awards based on those product sales, and those same participants may also earn commissions or rewards if their customers choose to make product sales to their own customers too. Any suggestion by either party that the law does not permit compensation for product sales by all individuals in the business would be antithetical to longstanding precedent and current guidance by the Federal Trade Commission and other regulators.

Since at least 1975, federal and state courts, and the Federal Trade Commission itself, have recognized the legitimacy of direct selling and multi-level marketing business models, while providing clear distinction between these legitimate operations and illegal pyramid schemes. The seminal authority in drawing this distinction is a 1975 FTC opinion, *In the Matter of Koscot Interplanetary, Inc., et al*, 86 F.T.C. 1106 (1975), which was affirmed in *Turner v. FTC*, 580 F.2d 701 (D.C. Cir. 1978), *Webster v. Omnitrition*, 79 F.3d 776, and most recently in *FTC v. Burnlounge, Inc.*, 753 F.3d 878 (9th Cir. 2014). In *Koscot*, the FTC explained an illegal pyramid scheme may be found in a system that distributes rewards unrelated to the sale of products to ultimate users:

> [Pyramid schemes] are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

86 F.T.C. at 1180. The FTC affirmed this definition in January 2018 by stating "the most widely-cited description of an unlawful MLM structure appears in the FTC's *Koscot* decision." 2018

6

Federal Trade Commission Business Guidance Concerning Multi-Level Marketing.[5]

Compensation systems that distribute rewards unrelated to the sale of products instead focus on the recruitment of participants "at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." *Omnitrition*, 79 F.3d at 782 (citing *Koscot*, 86 F.T.C. at 1181). Accordingly, in the decades since *Koscot*, judicial and administrative authorities have assessed whether compensation is paid "**primarily for recruitment**" at the expense of a connection to the sale of products. *Id.* at 781-83 (emphasis added); *see also BurnLounge*, 753 F.3d at 887-88 (explaining the legitimacy of compensation systems in which "the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture." (quoting FTC Staff Advisory Opinion – Pyramid Scheme Analysis, dated January 14, 2004)).[6]

The Federal Trade Commission has publicly applied the same analysis over the past four decades. In *Matter of Amway Corp., Inc.*, the FTC recognized the propriety of compensating independent representatives primarily on the basis of product sales rather than recruitment. *See* 93 F.T.C. 618, 1979 WL 198944, at *62 (1979) ("The Amway system does not create the potential for massive deception present in a pyramid distribution scheme which relies primarily on the profits to be made from recruiting new distributors rather than from ultimate sales to consumers."). And in a 2004 FTC Staff Advisory Opinion to the Direct Selling Association the FTC stated that, "[t]he critical question for the FTC is whether the revenues that *primarily* support the commissions paid to all participants are generated from purchases of goods and services." FTC Staff Advisory

---

[5] Available at https://www.ftc.gov/business-guidance/resources/business-guidance-concerning-multi-level-marketing
[6] Available at https://www.ftc.gov/system/files/documents/advisory_opinions/staff-advisory-opinion-pyramid-scheme-analysis/040114bizopp-pyramid.pdf

7

Opinion to DSA (Jan. 14, 2004), at 1 (emphasis added).

The FTC has repeatedly acknowledged—and courts have similarly held—that whether compensation is based primarily on recruitment or sales is a highly-fact specific question that requires consideration of how the compensation plan operates in practice and whether the company has promulgated, and effectively enforced, policies to prevent inventory loading. *See*, *e.g.*, Fed. Trade Comm'n. Mot. for Summary Judgment as to Liability, *FTC v. Noland, et al.*, No. CV-20-00047-DWL (D. Ariz. Mar. 12, 2021), ECF No. 285 (citing *Omnitrition*, 79 F.3d at 783; *Fed. Trade Comm'n v. Vemma Nutrition Co.*, No. CV-15-01578-JJT, 2015 WL 11118111, at *4 (D. Ariz. Sept. 18, 2015); *Bostick v. Herbalife Int'l of Am., Inc.*, 2013 WL 12131732, at *4 (C.D. Cal. Oct. 11, 2013)). It is this data that helps determine if compensation mostly from product sales to ultimate users, as opposed to recruitment-generated revenues.

Moreover, all fifty states have enacted laws defining and prohibiting pyramid schemes in a similar manner, evaluating whether the company's compensation plan makes payments to the participants based on recruitment rather than the sale of actual products to actual consumers.[7] One example is Texas, which defines a "pyramid promotional scheme" as:

> a plan or operation by which a person gives consideration for the opportunity to receive compensation that is derived primarily from a person's introduction of other persons to participate in the plan or operation rather than from the sale of a product

---

[7] See Ala. Code § 8-19-5(19); Alaska Stat. § 45.50.471(b)(19); Ariz Rev. Stat.§ 44-1731; Ark. Code §4-88-109; Cal. Penal Code § 327; Colo Rev. Stat. §§ 6-1- 102(9), 6-1-105(1)(q); Conn. Gen. Stat. § 42-145; Del. Code Title 6, §§ 2561-2564; Fla. Stat. § 849.091(2); Ga. Code § 16-12-38; Haw. Rev. Stat. § 480-3.3; Idaho Code § 18-3101; Ill. Comp. Stat. ch. 815 para. 505/1(g), 505/2A; Ind. Code§ 24-5-0.5; Iowa Code § 714.16.2.b; Kan. Stat. § 21-5838; Ky. Stat. § 367.830; La. Rev. Stat. § 51:361(6); Me. Rev. Stat. Tit. 17, § 2305; Md. Code Crim. Law § 8- 404; Mass. Laws Ch. 93 § 69; Mich. Comp. Law § 445.1528; Minn.Stat. § 325F.69(2); Miss. Code §§ 75-24-51–75-24-53; Mo. Stat. §§ 407.400–407.405; Mont. Code §§ 30-10-324–30-10-325; Neb. Rev. Stat. §§ 87-301–87-302; Nev. Rev. Stat. §§ 598.100-598.130; N.H. Rev. Stat. § 358-B; N.J.S.A. 2C:20-39 and 2A:32-2; N.M. Stat. § 57 Art. 13; N.Y. Gen. Bus. Law § 359-fff; N.C. Gen. Stat. § 14-291; N.D.C.C. § 51-16.1.01; Ohio Rev. Code §§ 1333.91-1333.94; Okla. Stat. tit. 21, § 1071; Or. Rev. Stat.§ 646.609; Penn. Stat. Tit. 73, § 201-2(4)(xiii); R.I. Stat. §§ 6-29-1–6-29-3; S.C. Code § 39-5-710-730; S.D. Cod. Law § 37-33-3; Tenn. Code § 39-17-506(3)(b); Tex. Bus. & Commerce Code § 17.461; Utah Code § 76-6a(4); Vt. Stat. 9 § 2453; Va. Code § 18.2-239; Wash. Rev. Code §§ 19.275.010-19.275.030; W.V. Code § 47- 15; Wis. Stat. § 945.12; Wyo. Stat. §§ 40-3-102 – 40-3-107.

by a person introduced into the plan or operation.

Tex. Bus. & Commerce Code § 17.461(a)(6). Many states, geographically and otherwise diverse, utilize a form of the well-established primarily test described in more detail below. That they do so is not of course controlling on the Court, but it reflects the widespread acceptance of how to determine whether an enterprise is an illicit pyramid.

While there are some differences between jurisdictions regarding the degree to which a court must find that compensation is based on recruitment, law and courts uniformly require that the compensation be at least *primarily* tied to recruitment and not sales to support the find of a pyramid scheme. For example, in the Fifth Circuit, the "primary factor" in finding a pyramid scheme is whether an operation "exclusively or almost exclusively on *recruiting* as opposed to *sales*." *Torres v. S.G.E. Mgmt.*, 805 F.3d 145, 153 (5th Cir. 2015), *on reh'g en banc*, 838 F.3d 629 (5th Cir. 2016).

Responsible businesses require fairness and predictability from a regulatory framework. DSA does not endorse compensation tied primarily to recruitment rather than product sales, but encourages this Court to apply settled law, as departing from well-established precedent would unfairly prejudice law-abiding, legitimate direct-sales businesses.

**II.    COMPENSATION TO A DIRECT SELLER FOR PERSONAL USE IS LAWFUL.**

Individuals become salespeople for many reasons, but one common reason is the desire to purchase and use the company's products at wholesale or discount prices. *See* DSA, 2019 National Salesforce Survey.[8] 44.6 million Americans are preferred customers and discount buyers of direct

---

[8] Available at https://www.dsa.org/docs/default-source/research/dsa-2019successisdifferentfactsheet.pdf?sfvrsn=e261c0a5_2%27http://%27

9

selling companies. *See* DSA 2022 Growth & Outlook Survey.[9] It is not unusual and would be expected that if you are selling a product or service that you are a user and even purchaser of that product or service. Indeed, this is true for small businesses who occupy brick and mortar retail spaces as well, such as service providers, restaurants, salons, florists, and any number of local businesses. It would not make good business sense to purchase products or services from a competitor when you also sell the same product or service at your own business. This concept is true from a customer's perspective as well. When consumers are considering whether to purchase a new product or service, they are far more likely to make a purchase if the seller uses the product or service themselves. NERA Economic Consulting, *An Economic Analysis of the Criteria Used to Distinguish Legitimate Direct Sellers from Pyramid Schemes*, October 2015.[10]

The legal support for the business practice that product purchases by business participants is legitimate has been affirmed for decades by the Federal Trade Commission and Courts.

The Ninth Circuit affirmed this in *FTC v. BurnLounge, Inc.*, when the court plainly endorsed the principle that "the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make BurnLounge a pyramid scheme." 753 F.3d at 887. The court went on to acknowledge that "[w]hether the rewards are related to the sale of products depends on how BurnLounge's bonus structure operated in practice." *Id*. Ultimately, the Court concluded that BurnLounge was an illegal pyramid scheme after noting evidence of orchestrated and high-volume purchases, known as "inventory loading" and concluding under the facts of the case that rewards were tied primarily to recruitment and merchandise purchases were "simply incidental." *Id*. at 888. DSA likewise does not endorse orchestrated manipulation tactics such as inventory loading, but

---

[9] Available at https://www.dsa.org/docs/default-source/industry-fact-sheets/dsa-2021g-ofactsheetv3.pdf?sfvrsn=51c6d6a5_3%27

[10] Available at www.nera.com/content/dam/nera/publications/2015/NERA%20DSA%20Report.pdf

rather encourages this Court to recognize that direct-selling participants can and do purchase products as "ultimate users." A ruling to the contrary would be contrary to both law and economic reality.

## CONCLUSION

For all the foregoing reasons, Amicus Curiae Direct Selling Association respectfully requests that this Court issue a ruling consistent with longstanding law, precedent and business practices distinguishing between legitimate direct selling companies and unlawful pyramid schemes. Any ruling inconsistent with such precedent would have a profound impact on the state of the law and negatively impact operations of a sizeable portion of the United States economy.

Dated: September 15, 2022        Respectfully submitted,

/s/ *Anne M. Johnson*
Anne M. Johnson
State Bar No. 00794271
*ajohnson@tillotsonlaw.com*
Charles T. Rice
State Bar No. 24126599
*crice@tillotsonlaw.com*
**TILLOTSON JOHNSON & PATTON**
1807 Ross Ave., Suite 325
Dallas, Texas 75201
(214) 382-3041 (Telephone)
(214) 292-6564 Facsimile

Brian Bennett (*pro hac vice* forthcoming)
John W Webb (*pro hac vice* forthcoming)
**DIRECT SELLING ASSOCIATION**
1667 K Street, N.W.
Suite 1000
Washington, D.C. 20006
(202) 452-8866

Counsel for Amicus Curiae
Direct Selling Association

### CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Texas using the CM/ECF system and served on all counsel herein on September 15, 2022.

*/s/ Anne M. Johnson*
Anne M. Johnson

12