# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-01979-M |
| | ) | |
| v. | ) | |
| | ) | |
| NEORA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## JOINT PRE-TRIAL ORDER

Pursuant to Federal Rule of Civil Procedure 26(a)(3), Local Civil Rule 16.4, and the

Court's scheduling order (Dkt. 38), the parties submit the following Joint Pre-Trial Order.

## A.     SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY

## I.     FTC'S SUMMARY OF CLAIMS THAT REMAIN TO BE DECIDED

This case concerns alleged violations of the Federal Trade Commission Act ("FTC Act"),

15 U.S.C. §§ 41 *et seq.*, arising from the business practices of Defendants Neora, LLC, formerly

known as Nerium International, LLC ("Neora"); Signum Biosciences, Inc. and Signum

Nutralogix ("Signum"); and Jeffrey Olson ("Olson") (collectively, "Defendants"). Neora is a

multi-level marketing company ("MLM") that sells supplements, skin creams, and other

products. Neora enlists consumers as "Brand Partners" or "BPs" to sell Neora's products and

recruit other people to do the same. Neora and Signum also market and sell dietary supplements

containing EHT, a coffee extract ("Neora EHT"). Defendants claim that EHT and Neora EHT

are scientifically proven to prevent, reduce the risk of, or treat a host of brain injuries and

diseases, including concussions, chronic traumatic encephalopathy ("CTE"), Alzheimer's, and

Parkinson's. Olson is Neora's founder and CEO.

At the same time it filed its Complaint, the FTC settled with Signum, which stipulated to

a permanent injunction prohibiting them from making misleading statements regarding the health

benefits of EHT. Dkt. 10. Accordingly, the two remaining defendants are Neora and Olson.

### A.  Count I (Illegal Pyramid)

Count I alleges that Defendants engage in a deceptive act or practice in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45, by operating an unlawful pyramid scheme. The

FTC will show that BPs pay money to Defendants in return for which they receive: (1) the right

to sell products, and; (2) in return for recruiting other participants into the program, the right to receive rewards which are unrelated to the sale of products to the ultimate users.

**B.  Count II (False Earnings)**

Count II alleges that Defendants engage in a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45, by misrepresenting that consumers who participate in Defendants' business opportunity—serving as BPs who recruit other BPs and sell Neora products—are likely to earn substantial income. The FTC maintains that, in training and marketing materials and at recruiting and other events, Defendants promise consumers the prospect of substantial income if they became Neora BPs. In reality, however, most BPs are unable to earn any profit—in fact, the vast majority lose money. The FTC will show that (1) Defendants represent that consumers are likely to earn substantial income from Neora's business opportunity; (2) those representations are likely to mislead reasonable consumers because they are false or unsubstantiated; and (3) those representations are material.

**C.  Count III (False or Unsubstantiated Efficacy)**

Count III alleges that Defendants engage in a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45, and disseminate false advertisements in violation of Section 12 of the FTC Act, 15 U.S.C. § 52, by misrepresenting the efficacy of EHT and/or Neora EHT. In particular, Defendants mispresent that EHT and/or Neora EHT prevent, reduce the risk of, or treat Chronic Traumatic Encephalopathy ("CTE"), concussions, Alzheimer's disease, or Parkinson's disease. The FTC will show that (1) Defendants represent that EHT and/or Neora EHT can prevent, reduce the risk of, or treat those brain injuries and diseases; (2) those representations lack adequate substantiation and are thus likely to mislead reasonable consumers; and (3) those representations are material.

2

### D.  Count IV (False Establishment)

Count IV alleges that Defendants engage in a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45, and disseminate false advertisements in violation of Section 12 of the FTC Act, 15 U.S.C. § 52, by misrepresenting that the effectiveness of EHT and/or Neora EHT has been scientifically established. The FTC will show that (1) Defendants represent that the above claims about EHT and/or Neora EHT are scientifically proven; (2) those representations are false and therefore likely to mislead reasonable consumers; and (3) those representations are material.

### E.  Count V (Means and Instrumentalities)

Count V alleges that Defendants engage in a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45, by furnishing consumers with the means and instrumentalities to mislead others. The FTC will show that Defendants disseminated materials that contain misrepresentations concerning (1) BPs' ability to earn substantial income from joining Neora's business opportunity (as described in Count Two); or (2) the efficacy and scientific basis of EHT and/or Neora EHT (as described in Counts Three and Four). The FTC will also show that (1) the misrepresentations in those materials are likely to mislead consumers; (2) the misrepresentations are material; and (3) Defendants placed those materials in the hands of others who could use them to mislead.

## II.   DEFENDANTS' SUMMARY OF DEFENSES

The FTC seeks a permanent injunction, pursuant to 15 U.S.C. § 53(b), to prevent an imminent violation of the Act. To obtain it, the FTC must prove the defendant "is violating, or is about to violate" the Act. *See* 15 U.S.C. § 53(b). But there are no ongoing violations, and regardless of whether the FTC can establish sporadic, isolated violations of the Act by Neora and Olson in

the past, these were not so egregious or extensive as to indicate that a "cognizable danger of recurrent violation" exists. The FTC's evidence itself establishes that Neora and Olson (a) operate under a business plan that cannot reasonably be deemed a "pyramid scheme" under even a liberal application of precedent, and (b) use substantial, effective efforts to ensure that agents, employees, and independent contractors operating as Brand Partners do not misrepresent Neora's business or the efficacy of its products.

The FTC alleges that consumers "are suffering, have suffered, and will continue to suffer substantial injury" as a result of violations of the Act by Neora and Olson, and asserts that, absent such relief, these defendants "are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest" (Doc. 1 ¶ 145).

There is no evidence of that. There is no evidence that Neora or Olson are currently injuring consumers through current violations of the Act, or are likely to do so. Nor can the FTC show such extensive past violations of the Act as to allow a reasonable inference that current or future violations by Neora or Olson may be reasonably expected. Past violations that one might infer from the evidence are either too remote—as far back as 2014; or were violations by BPs (primarily those of Nerium); or were so sporadic and isolated as to prove nothing about the likelihood, today, of further violations by these defendants. Nor can the FTC show that defendants engage in violations of the Act by furnishing BPs with the means and instrumentalities to mislead others, or that a company officer's potential control is dispositive of such officer's liability for any such violations.

Neora cannot be deemed a pyramid scheme—even given some of the FTC's own assumptions. The $20 one-time fee to enroll as a BP is insufficient to be considered a "consideration" used to pay upline commissions and bonuses. In addition, all income earned by

4

BPs is linked to product sales, and Neora awards no compensation for mere recruitment without regard to sales. According to FTC calculations, in each year between 2012 and 2019, the revenue from product sales to Preferred Customers and Retail Customers was sufficient to cover every cent Neora paid its BPs in cash commissions and bonuses; revenue from product sales to BPs was not sufficient to pay the compensation in any year. So not only is Neora's compensation related to the sales of products to ultimate users, but it also can be funded entirely by those sales.

Finally, there is insufficient evidence of an agency relationship between BPs and the defendants—whether actual or ostensible agency—to hold the defendants responsible for the representations the BPs are alleged to have made. In addition, Neora's Policies & Procedures Manual communicates rules regarding income and product claims that largely reflect FTC guidance. Neora has developed and maintained an extensive FTC compliance program, publishing income and product disclosures and requiring specific disclaimers in training and promotional materials. Neora also has developed and maintained extensive monitoring and enforcement of its rules and has provided income and product claim training to BPs. These are reasonable, appropriate measures to prevent foreseeable illegal acts by BPs and avoid consumer injury therefrom; defendants thus cannot be said to be providing the means and instrumentalities by which BPs could pursue fraudulent schemes as the defendants' surrogates.

Courts may issue injunctions where the alleged misconduct is likely to recur. *FTC v. Southwest Sunsites*, 665 F.2d 711, 723 (5th Cir. 1982). There is no such evidence here. There is no evidence of ongoing violations of the Act by either defendant, and evidence of alleged violations in the past are too remote and attenuated to suggest future violations of the Act by either defendant will occur. There is thus no need for an injunction.

**B.     STIPULATIONS AND UNCONTESTED FACTS**

The parties believe the following facts should be stipulated:

1.      Defendant Neora, LLC ("Neora") is a direct selling, multi-level marketing company ("MLM").

2.      Neora is a Texas LLC that is based in Farmers Branch, Texas.

3.      Before January 2019, Neora was known as Nerium International, LLC ("Nerium"), which was founded in 2011.

4.      Defendant Jeffrey Olson is Neora's founder and CEO.

5.      Neora sells beauty and wellness products in the categories of skin care, hair care, wellness, and weight management through independent distributors called "Brand Partners" or "BPs."

6.      Once enrolled, a BP is authorized to sell Neora's products and recruit, train, and mentor other "downline" BPs.

7.      BPs are independent contractors of Neora.

8.      "Preferred Customers" or "PCs" and "Retail Customers" or "RCs" are customers who purchase Neora products and do not participate in Neora's business opportunity.

9.      Signum Biosciences, Inc. and Signum Nutralogix ("Signum") developed "ME Sports," a dietary supplement containing EHT, a coffee extract.

10.     Neora received a Civil Investigative Demand from the FTC in June 2016.

**C.     CONTESTED ISSUES OF FACT**

The parties were unable to reach agreement on a description of the issues of fact that remain to be litigated at trial. The parties' separate statements of the issues to be litigated are listed below.

I.   **FTC'S CONTESTED ISSUES OF FACT**

    A.  **Count I (Illegal Pyramid)**

1.      Whether BPs pay Neora for the right to receive, in return for recruiting other participants into the program, rewards which are unrelated to the sale of product to ultimate users.

    B.  **Count II (False Earnings)**

2.      Whether Defendants represent that consumers could earn substantial income from joining Neora's business opportunity as BPs.

3.      Whether those representations are false or unsubstantiated.

4.      Whether those representations are material.

    C.  **Count III (False or Unsubstantiated Efficacy)**

5.      Whether Defendants represent that EHT and/or Neora EHT prevents or treats concussions, CTE, Alzheimer's, or Parkinson's.

6.      Whether those representations are unsubstantiated.

7.      Whether those representations are material.

    D.  **Count IV (False Establishment)**

8.      Whether Defendants represent that there is scientific proof for their claims that EHT and/or Neora EHT prevents or treats concussions, CTE, Alzheimer's, or Parkinson's.

9.      Whether those representations are false and/or unsubstantiated.

10.      Whether those representations are material.

    E.  **Count V (Means and Instrumentalities)**

11.      Whether Defendants place misleading materials into the hands of BPs concerning either: (1) the income potential of Neora's business opportunity; or (2) the efficacy or scientific

basis of EHT or Neora EHT regarding concussions, CTE, Alzheimer's, or Parkinson's.

### F.  Individual Liability for Defendant Olson

12.  Whether Defendant Olson, in addition to participating directly in the above conduct, also had the authority to control Neora's policies and practices as a corporate officer of Neora.

### G.  Injunctive Relief

13.  Whether Defendants' violations of the FTC Act (discussed above for Counts I-V) are ongoing or likely to recur.

## II.  DEFENDANTS' CONTESTED ISSUES OF FACT

● Count I – Illegal Pyramid Scheme ●

1.  Does Neora operate an illegal pyramid scheme in violation of the Act—i.e., by focusing on recruitment and not sales, are its operations structured in such a way as to ensure its eventual collapse because BPs receive, in return for recruiting other BPs, rewards that are unrelated to the sale of Neora products to ultimate users?

2.  Does Neora operate an illegal pyramid scheme in violation of the Act—i.e., by having BPs pay Neora for the right to receive, in return for recruiting other BPs, rewards that are unrelated to the sale of Neora products to ultimate users?

3.  Does a one-time (i.e., non-recurring) $20 expense that covers costs incurred by Neora for educational and business materials required for a new Neora BP constitute consideration paid to Neora in return for which a BP receives the right to sell Neora products?

4.  In the past, did Neora continuously, persistently operate an illegal pyramid scheme in violation of the Act?

● Count II – False Earnings ●

5.      Are Neora or Olson currently making material misrepresentations regarding the likely income of someone joining Neora as a BP—in such a way as probably will mislead consumers acting reasonably under the circumstances?

6.      Did either defendant do so in the past in a continuous, sustained pattern?

7.      Are any such misrepresentations by BPs attributable to either defendant as a result of agency or through lack of BP training, monitoring, and enforcement programs?

● Count III – False/Unsubstantiated Efficacy ●

8.      Do Neora or Olson make material false or unsubstantiated claims that EHT and/or Neora EHT prevent, reduce the risk of, or treat Chronic Traumatic Encephalopathy, concussions, Alzheimer's disease, or Parkinson's disease—in such a way as probably will mislead consumers acting reasonably under the circumstances?

9.      Did either defendant do so in the past in a continuous, sustained pattern?

10.     Are any such misrepresentations by BPs attributable to either defendant as a result of agency or through lack of BP training, monitoring, and enforcement programs?

● Count IV – False Establishment ●

11.     Are the defendants making material misrepresentations that the effectiveness of EHT and/or Neora EHT has been scientifically established—in such a way as probably will mislead consumers acting reasonably under the circumstances?

12.     Did either defendant do so in the past in a continuous, sustained pattern?

13.     Are any such misrepresentations by BPs attributable to either defendant as a result of agency or through lack of BP training, monitoring, and enforcement programs?

● Count V – Means/Instrumentalities ●

9

14.     Does either defendant, by disseminating promotional/marketing materials or information to BPs, provide BPs with the means and instrumentalities for violating the Act as alleged in Counts II-IV?

15.     Did either defendant do so in the past in a continuous, sustained pattern?

16.     Is injury to consumers a predictable consequence of those actions?

● Permanent Injunction ●

17.     Is there sufficient evidence of an agency relationship—whether it be actual or ostensible agency—between BPs and the defendants so as to hold the defendants liable for representations that BPs are alleged to have made in violation of the Act?

18.     Is there evidence of ongoing violations, by either defendant, of section 5(a) or section 12 of the Act, by the means alleged in Counts I-V?

19.     Is there evidence of continuous and sustained violations in the past, by either defendant, of section 5(a) or section 12 of the Act, by the means alleged in Counts I-V, such as to evidence a cognizable, imminent danger of recurrent violations of the Act—i.e., something more than the mere possibility of future violations?

20.     Is the proposed permanent injunctive relief in the public interest—i.e., is it needed to protect consumers from harm due to probable recurring violations of the Act?

21.     Did Olson have sufficient control of Neora, and sufficient knowledge of and participation in any violations of the Act by Neora, such that an injunction should issue against him for violations of the Act by Neora?

22.     What is the appropriate scope of any injunction?

**D.     CONTESTED ISSUES OF LAW**

The parties were unable to reach agreement on a description of the remaining contested issues of law. The parties' separate statements are listed below.

**I.     FTC'S CONTESTED ISSUES OF LAW**

   **A.  Count I (Illegal Pyramid)**

1.      Whether the second element of *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1182 (1975), which supplies the governing test for an illegal pyramid scheme, considers factors such as whether (1) defendants misrepresent the prospects of the business opportunity; (2) the compensation plan rewards recruiting more richly than sales to ultimate users; (3) the company's focus is on recruitment rather than retail; (4) there is a lack of meaningful retail sales opportunities for participants; (5) most participants lose money; and (6) the success rate of new participants is low.

2.      Whether the second element in *Koscot* requires only that that the company pay rewards *primarily* for recruitment rather than for "the sale of product to ultimate users." 86 F.T.C. at 1180.

3.      Whether the value of a company's products or whether those products are "shams" are relevant to whether the company is a pyramid scheme.

4.      Whether a plaintiff must prove a company's eventual collapse to establish that it is a pyramid scheme.

5.      Whether rewards "paid for recruiting" are those for which recruiting is a "necessity." *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 887 (9th Cir. 2014).

6.      Whether BPs' own purchases of product constitute "the sale of product to ultimate users" under the *Koscot* test. 86 F.T.C. at 1180.

11

**B.  Count II (False Earnings)**

7.      Whether a company's express misrepresentations about participants' anticipated earnings from a business opportunity are presumed material.

8.      Whether a company's implied misrepresentations about participants' anticipated earnings from a business opportunity are presumed material.

9.      Whether a participant testimonial reflecting an atypical outcome is still misleading even if it is literally true.

10.      Whether a company's compliance efforts to prevent or remove earnings misrepresentations are relevant to its liability for such misrepresentations.

**C.  Count V (Means and Instrumentalities)**

11.      Whether a company's compliance efforts to prevent or remove BPs' earnings misrepresentations are relevant to a means and instrumentalities claim.

**II.      DEFENDANTS' CONTESTED ISSUES OF LAW**

● Count I (Pyramid Scheme) ●

1.      Whether—based on *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975), and *Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629, 639-40 (5th Cir. 2016) ("*Torres II*")—a multi-level marketing program is a pyramid scheme only if it is "destined to collapse."

2.      Whether a finding that a multi-level marketing program constitutes an illegal pyramid scheme requires proof of "recruiting saturation" under *Ger-Ro-Mar, Inc. v. FTC*, 518 F.2d 33, 37-38 (2d Cir. 1975).

3.      Whether real and substantial marketplace consumer demand for products of a multi-level marketing program is relevant to determining its ability to avoid saturation.

4.     Whether—contrary to *In re Amway Corp.*, 93 F.T.C. 618 (1979) —a reward that Neora pays for ultimate user sales is, as the FTC contends, a reward based solely upon non-participant purchases for which no recruiting is necessary.

5.     Whether the "pyramid scheme" determination involves (a) the Fifth Circuit's inquiry into whether an enterprise focuses exclusively or almost exclusively on recruiting (as opposed to sales) as set forth in *Torres v. S.G.E. Management, L.L.C.*, 805 F.3d 145, 153 (5th Cir. 2015) ("*Torres I*"), *rev'd on other grounds by Torres II*, or (b) whether, as the FTC and the Ninth Circuit recognized in *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 887-88 (9th Cir. 2014), the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture.

6.     Whether the harm to consumers from a pyramid arises from matters such as misrepresentations made in connection with the enterprise or, as indicated in *Torres II*, 838 F.3d at 639, from "the ultimate collapse of the scheme" as a "direct and foreseeable consequence" of the business's structure, particularly given the FTC's ability to separately police matters such as misrepresentations under Section 5 of the FTC Act.

7.     Whether the reference in *BurnLounge*, 753 F.3d at 887, to "a reward for which recruiting is necessary" transforms its directive that rewards for recruiting need not be "completely unrelated" to product sales to be improper into a requirement that a reward for sales to ultimate users be "'completely' unrelated" to recruiting.

8.     Whether distributors that join a multi-level marketing program for personal consumption of its products are properly considered "ultimate users of products purchased for their own consumption" as noted in *Bostick v. Herbalife International of America, Inc.*, No. CV 13-

2488 BRO, 2015 WL 12731932, at *15 (C.D. Cal. May 14, 2015), and as suggested by *BurnLounge*, 753 F.3d at 887 (agreeing that "when participants bought packages in part for internal consumption . . . the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make BurnLounge a pyramid scheme").

● Count II (Earnings Claims) ●

9.      Whether a multi-level marketing company can avoid enforcement action if it has "a reasonable training, monitoring and compliance program in place" for the company's independent distributors as the FTC indicates in its "Endorsement Guide" issued in 2017.

10.     Whether a multi-level marketing company's creation and maintenance of a rigorous training, monitoring, and compliance program for independent distributors should be considered in the context of any earnings claim-based injunction given the numerous instances in which key FTC figures have urged such companies to take such steps.

11.     Does the FTC's current rulemaking process regarding income claims, stating that "a rule also may further clarify for businesses what constitutes a deceptive earnings claim and what it means to have substantiation for an earnings claim" (87 C.F.R. 13952) limit the proper scope of an injunction regarding alleged deceptive income claims?

12.     Can a company's effective compliance monitoring program preclude finding deceptive practices, as implied by *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719-FMC-FFMx, 2009 WL 7844076, at *12 (C.D. Cal. Nov. 17, 2009)?

13.     Must the FTC show a "probable, not possible, deception ('likely to mislead,' not 'tendency and capacity to mislead')" and that representations are likely to cause injury to "consumers acting reasonably in the circumstances"—as per *Southwest Sunsites v. FTC*, 785 F.2d 1431, 1436 (9th Cir. 1985)?

14

14.     Can appropriate disclaimers defeat the deceptive income claims by impacting the "net impression" of consumers as to the meaning of a representation—as is reflected in numerous cases: *FTC v. Vemma Nutrition Co.*, No. 2:15-cv-01578, 2015 WL 11118111, at *6 (D. Ariz. Sept. 18, 2015); *FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262 (E.D.N.Y. 1998); *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989), and also in the FTC's own statements or resources, including, among others, its "Guides Concerning the Use of Endorsements and Testimonials in Advertising Federal Acquisition Regulation; Final Rule" 74 Fed. Reg. 53140 n.105 (October 15, 2009)?

15.     To hold the company liable for distributors' representations, must the FTC: (a) prove a distributor is an agent of the company under standard agency law principles, *see Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir. 1957) or *FTC v. Stefanchik*, 559 F.3d 924, 930-31 (9th Cir. 2009), or (b) show that the company provided distributors the "means and instrumentalities" for their deceptive acts, that consumer injury was predictable, and the company took no reasonable and appropriate measures to prevent the foreseeable illegal acts or practices—as per *FTC v. Neovi*, 604 F.3d 1150, 1156 (9th Cir. 2010); *F.T.C. v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786 (D. Wyo. Sept. 28, 2007); *FTC v. Windward Marketing*, No. 1:96-CV-615, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997)?

16.     Does the law of "ostensible agency" apply in this regard—*see* Restatement (Second) of Agency § 267 (1958), and *Baptist Memorial Hospital System v. Sampson*, 969 S.W.2d 945, 949 (Tex. 1998)?

● Count III (Product Efficacy) ●

17.     What is the FTC's burden to establish "whether . . . [the referenced product materials] made the claims [in the way] asserted by the FTC" when, as per "what exactly a defendant's products claims may have been is "fundamentally a question of fact"?

15

18.     Must the FTC show evidence of consumer perceptions where the evidence only "faintly implies" an efficacy claim—as per *FTC v. National Urological Group*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008)?

19.     May adequate disclaimers "such as a statement that 'evidence in support of this claim is inconclusive'" defeat alleged improper efficacy claims such as referenced in *POM Wonderful LLC v. FTC*, 777 F.3d 478 (D.C. Cir 2015)?

20.     To hold the company liable for distributors' representations, must the FTC: (a) prove a distributor is an agent of the company under standard agency law principles, or (b) show that the company provided distributors the "means and instrumentalities" for their deceptive acts, that consumer injury was predictable, and the company took no reasonable and appropriate measures to prevent the foreseeable illegal acts or practices (see above)—and does the law of "ostensible agency" apply in this regard (see above)?

● Count IV (Product Establishment) ●

21.     Does the FTC have the burden of establishing a defendant's product claims lack adequate substantiation given that under *FTC v. Wellness Support Network*, No. 10-CV-04879-JCS, 2014 WL 644749, at *16 (N.D. Cal. Feb. 19, 2014), an advertiser "must have the level of substantiation referenced in the claim itself" and under *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994), courts need to know what level of substantiation the advertiser is required to have for his advertising claims so that they can determine whether the advertiser possessed that level of substantiation?

22.     To hold the company liable for distributors' representations, must the FTC: (a) prove a distributor is an agent of the company under standard agency law principles, or (b) show that the company provided distributors the "means and instrumentalities" for their deceptive acts,

that consumer injury was predictable, and the company took no reasonable and appropriate measures to prevent the foreseeable illegal acts or practices (see above)—and does the law of "ostensible agency" apply in this regard (see above)?

● Count V (Means & Instrumentalities) ●

23.     Under cases such as *Neovi*, 604 F.3d at 1156, does the FTC have to prove that any injury resulting from a multi-level marketing company's placing "into the hands of another a means of consummating a fraud . . . in violation of the Federal Trade Commission Act" was a "predictable consequence of those actions" and that the multi-level marketing company failed to take reasonable and appropriate measures to prevent the foreseeable illegal acts or practices?

● Individual Liability for Olson ●

24.     Is a corporate officer ipso facto liable for the company's violations of the Act, or must the FTC instead show that the person, with knowledge of the deceptive nature of the scheme, either participates directly in the practices or acts or has authority to control them—as per *FTC v. Moses*, 913 F.3d 297, 306 (2d Cir. 2019)?

● Injunctive Relief ●

25.     Do standard principles of agency—as set forth, e.g., in Restatement (Second) of Agency § 267 (1958), and *Baptist Mem.*, 969 S.W.2d at 949—determine whether Neora and Olson are properly held responsible under the FTC Act for representations by BPs?

26.     Can a company's effective compliance monitoring program for independent distributors limit the scope of any injunction regarding claims made by them, as suggested by *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015), and *FTC v. Nudge, LLC*, No. 2:19-CV-867-DBB-DAO, 2022 WL 2132695, at *51 (D. Utah June 14, 2022)?

27.     Can the court find that a party "is violating, or is about to violate" the Act, as per 15 U.S.C. § 53(b), based merely upon past violations and "a vague and generalized likelihood of

17

recurrent conduct," absent evidence of "some cognizable danger of recurrent violation, something more than the mere possibility" of a future violation or some ongoing or imminent violation? *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 157-59 (3d Cir. 2019) (citing *U.S. v. W.T. Grant Co.*, 345 U.S. 629 (1953))?

## E.     ESTIMATED LENGTH OF TRIAL

On August 5, 2022, the Court ordered that each party shall have 20 hours for trial, including opening statements, direct and cross examinations, and closing arguments. Dkt. 183.

The parties respectfully request that, rather than setting a specific time for opening and closing, the Court allow each side to choose how much time to allocate for opening and closing from their 20 hours of trial time.

## F.     ADDITIONAL MATTERS

In addition to an oral closing statement, the parties respectfully request the opportunity to submit a 25-page post-trial brief within 30 days of the end of trial.

18

Respectfully Submitted,

Dated: September 19, 2022

/s/ *Katharine Roller*
KATHARINE ROLLER
GUY G. WARD
LISA W. BOHL
RACHEL SIFUENTES
SAMANTHA DENNY
Federal Trade Commission, Midwest Region
230 S. Dearborn, Suite 3030
Chicago, Illinois 60604
Tel: (312) 960-5605
Fax: (312) 960-5600
Email: kroller@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

**FOLEY & LARDNER LLP**

/s/ *Craig B. Florence*
**Craig B. Florence**
Texas Bar No. 07158010
cflorence@foley.com
**Michelle Y. Ku**
Texas Bar No. 24071452
mku@foley.com
2021 McKinney, Suite 1600
Dallas, Texas 75201
Tel: 214.999.3000
Fax: 214.999.4667

**Edward D. ("Ed") Burbach**
Texas Bar No. 03355250
eburbach@foley.com
**Robert F. Johnson**
Texas State Bar No. 10786400
rjohnson@foley.com
**Kristina W. Silcocks**
Texas Bar No. 00795930
ksilcocks@foley.com
600 Congress Avenue, Suite 3000
Austin, TX 78701
Tel: 512.542.7000
Fax: 512.542.7100

19

**Jay N. Varon**
District of Columbia Bar No. 236992
jvaron@foley.com
(admitted *pro hac vice*)
3000 K St. NW
Washington, DC  20007
Tel: 202.672.5300
Fax: 202.672.5399

**COUNSEL FOR DEFENDANTS
NEORA, LLC and JEFFREY OLSON**

Signed: _____, 2022.

_____
**JUDGE BARBARA M. G. LYNN**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**