UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 3:20-CV-01979-M |
| | ) | |
| NEORA, LLC; a Texas limited liability | ) | |
| company formerly known as | ) | |
| Nerium International, LLC; et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |


MOTION FOR SUMMARY JUDGMENT HEARING
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT COURT JUDGE
SEPTEMBER 28, 2022
DALLAS, TEXAS


FOR THE PLAINTIFF:

     KATHARINE A. ROLLER
     GUY G. WARD
     FEDERAL TRADE COMMISSION
     230 South Dearborn Street, Suite 3030
     Chicago, IL  60604
     (312) 960-5612


FOR THE DEFENDANTS:

     CRAIG B. FLORENCE
     GARDERE WYNNE SEWELL
     2021 McKinney Avenue, Suite 1600
     Dallas, TX  75201
     (214) 999-4667

     MICHELLE YOUN KU
     FOLEY & LARDNER, LLP
     2021 McKinney Avenue, Suite 1600
     Dallas, TX  75201
     (214) 999-3000


     EDWARD D. BURBACH

```
         ROBERT F. JOHNSON, III
         FOLEY & LARDNER, LLP
         600 Congress Avenue, Suite 3000
         Austin, TX  78701
         (512) 542-7070


         Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.
_____

                 DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                     Federal Official Court Reporter
                    1100 Commerce Street, 15th Floor
                          Dallas, TX  75242
                            (214) 753-2325
```

1                               <u>**INDEX**</u>

2   Oral Argument by FTC, Ms. Roller . . . . . . . . . . .    6

3   Oral Argument by Neora, Mr. Florence . . . . . . . . .   12

4   Rebuttal Argument by FTC, Ms. Roller . . . . . . . . .   53

5   Oral Argument by FTC, Mr. Ward . . . . . . . . . . . .   63

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (PROCEEDINGS BEGAN AT 1:00 PM.)

 2                    COURT SECURITY OFFICER:  All rise.

 3                    The United States District Court for the Northern

 4  District of Texas is now in session.  The Honorable United States

 5  District Judge Barbara M.G. Lynn is presiding.

 6                    THE COURT:  Be seated, please.

 7                    All right.  The Court has a number of matters set for

 8  this afternoon in connection with FTC versus Neora.

 9                    Can I have appearances, please, first for the FTC?

10                    MS. ROLLER:  Your Honor, Katharine Roller for the

11  Federal Trade Commission.

12                    THE COURT:  Okay.

13                    MR. WARD:  Your Honor, Guy Ward for the Federal Trade

14  Commission.

15                    THE COURT:  All right.  And for the Defendants?

16                    MR. FLORENCE:  Your Honor, Craig Florence and

17  Michelle Ku on behalf of the Defendants are at the table for the

18  Defendants.  I'm also joined by Ed Burbach and Rob Johnson.

19                    Also in the courtroom are representatives of Neora

20  including Amber Rourke who is the Chief Marketing Officer of

21  Neora, Deb Heisz who is the Co-CEO, and Gail Lane who is the

22  general counsel.

23                    THE COURT:  Okay.  All right, very good.

24                    All right.  The Court is assuming that we can conclude

25  the argument by 3:30 at the very latest, so I'm not going to run
```

```
 1   past that.  So modify your time accordingly.

 2           It seems to me, given what's cued up here, that you all

 3   have in mind to start with the summary judgment.  I don't care

 4   where we start, but there are, obviously, some issues with

 5   respect to the some of the declarations and whether they are to

 6   be considered by the Court in connection with the summary

 7   judgment.

 8           So where do you all want to begin?

 9           MS. ROLLER:  Your Honor, if you would like to hear from

10   the Federal Trade Commission first, we would begin with the

11   summary judgment motions, if that is pleasing to the Court.

12           THE COURT:  Okay.  Do you all have a suggestion about

13   where we start?

14           MR. FLORENCE:  Your Honor, we're fine with that as

15   well.

16           THE COURT:  Okay.  All right, very good.

17           Okay.  I'm -- I'm just telling you all when we're going

18   to be done.  So have you all discussed the timing so that you

19   leave time for each side to be arguing?

20           MR. FLORENCE:  We have not, Your Honor.

21           THE COURT:  Okay.  Why don't you do that now.  I don't

22   want to be the timekeeper.  It's distracting for me to have to do

23   it.

24           MR. FLORENCE:  Your Honor, tough negotiations.  50/50.

25           THE COURT:  Okay.  All right.  There will be -- I mean
```

```
 1   we've got more to do than just the summary judgment, so that's my
 2   point, and I may have some questions.  So how much time do you
 3   anticipate for your argument on the summary judgment?
 4           MS. ROLLER:  Your Honor, we only have ten minutes of
 5   affirmative presentation because we wanted to make sure to
 6   leave --
 7           THE COURT:  Okay.
 8           MS. ROLLER:  -- plenty of time for questioning.
 9           THE COURT:  Okay.  All right.  Then I don't think we'll
10   have any trouble.  All right.  Thank you.
11           MS. ROLLER:  Okay.  May I begin?
12           THE COURT:  Yes.
13           MS. ROLLER:  Thank you, Your Honor.
14           THE COURT:  And if you've been fully vaccinated, you
15   can take your mask off when you're standing at the lectern.
16           MS. ROLLER:  Thank you.  I will do that.
17           THE COURT:  I'm not very good at predicting what people
18   look like without their mask on.  It's always a big surprise.
19   But I've seen you, I think, before, so I'm not really surprised.
20           MS. ROLLER:  I hope it's not an unpleasant one.
21           THE COURT:  Oh, no, not at all.
22           MS. ROLLER:  Neora is a business rife with dishonesty.
23   Defendants lied to BPs about how much money they would make.
24   They lied about EHT.  And the entire structure of their
25   compensation scheme is the embodiment of a lie because it is
```

1    impossible for the majority of BPs to achieve any real success.

2            In the words of the Fifth Circuit speaking en banc in

3    *Torres versus S.G.E. Management*, quote, "Its very structure

4    conceals the fact that those at the bottom of the pyramid will be

5    unable to recoup their investment."

6            That is what separates a legitimate MLM where

7    participants can succeed by retailing alone from a pyramid scheme

8    like Neora.  When the only way to succeed is by recruiting a

9    large downline, then most recruits will be trapped in one of

10   those downlines, someone else's downline, without enough recruits

11   themselves to succeed.

12           Thus, the vast majority will inevitably lose money as

13   96 percent of Neora BPs indisputably do.  That is why pyramid

14   schemes are illegal, and that is why summary judgment should be

15   granted in the FTC's favor.  There is no genuine dispute of

16   material fact about any of the FTC's five counts or about

17   individual and injunctive liability.

18           On Count One, illegal pyramid scheme, Defendants do not

19   raise a dispute of fact but, instead, ask the Court to invent a

20   new legal test contrary to *Koscot* and utterly unsupported by

21   federal law.  Defendants cite no federal case applying their

22   purported "primarily" test, whether based on money in or money

23   out and, indeed, there are none.

24           Neither do Defendants cite any case requiring proof of

25   a company's inevitable collapse, whatever that would look like.

1        Instead, courts apply the *Koscot* test, asking whether

2   participants pay money for the right to receive recruitment

3   rewards unrelated to the sale of product to ultimate users.  And

4   the word "right" is important there.  *Koscot* asks whether

5   participants have a right to receive recruitment awards unrelated

6   to ultimate user sales, not whether participants, in fact,

7   receive such rewards.  That is why courts begin their analysis,

8   not with data on rewards paid but with a company's compensation

9   plan which lays out the rewards participants have a right to

10  receive, and the Court should do the same here.

11       It is undisputed that the vast majority of rewards in

12  Neora's Compensation Plan require recruitment; often massive

13  recruitment.  Indeed, Neora's Corporate Representative admitted

14  as much at the company's deposition.

15       And it is undisputed that the recruitment rewards in

16  Neora's Compensation Plan are vastly more lucrative than the

17  handful of low-paying rewards that can be earned for retail sales

18  alone.  And although Defendants claim that rewards paid on BPs'

19  own purchases should be considered ultimate user sales, *Vemma* is

20  very clear that participant purchases are not ultimate user sales

21  where a company trains and incentivizes participants to buy

22  product to be eligible for rewards, thereby poisoning the well.

23       Defendants do not dispute the FTC's evidence that they

24  do exactly that.  Indeed, individual Defendant Olson is at the

25  forefront of this training, personally telling BPs that they

1    might buy product to be eligible for rewards, training BPs to

2    focus on recruitment rather than sales, and personally telling

3    BPs that they can make six-figure incomes if they just try hard

4    enough.  He is also the Founder and CEO of the company.  By his

5    own admission, he has, quote, "the final say," end quote at

6    Neora.

7         To be individually liable for an FTC Act violation,

8    Olson must have either direct participation in the conduct at

9    issue or authority to control it.  Here, by his own admission,

10   Mr. Olson has both.  There is, thus, no disputed fact as to his

11   individual liability.

12        There is also no dispute of material fact about Count

13   Two, Defendants' deceptive earnings claims.  An FTC Act deception

14   claim has three elements.

15        First, was the representation made?

16        Second, was it false or unsubstantiated?

17        And third, was it material, which is to say important

18   to consumers' decisions.

19        Working backward, Defendants have implicitly conceded

20   the third element, that their claims of substantial income were

21   material to consumers by failing to argue that the claims are not

22   important to consumers deciding whether to join their business.

23   That is appropriate since the case law and common sense

24   incontestably establishes that income claims are material to a

25   consumer's decision as to whether to pursue or stay with a

10

1    business opportunity.

2          Defendants have also implicitly conceded the second

3    element, that their claims of lavish lifestyles and substantial

4    incomes are false.  They do not dispute that most BPs pay more

5    money into the scheme than they get out.  Indeed, Neora's own

6    data establishes that fact.

7          As to the first element, whether Defendants, in fact,

8    represent that BPs will likely make substantial income,

9    Defendants assert that they did not make such representations,

10   but they do not challenge the vast majority of the FTC's hundreds

11   of examples of their misleading income claims.  Indeed, by

12   Defendants own count, the FTC's brief cites 204 examples of

13   misleading income claims by Defendants of which they challenge

14   only 19.  Mere *ipse dixit* is not enough to overcome the

15   overwhelming weight of the FTC's evidence.

16         With regard to Counts Three and Four, the deceptive

17   efficacy and establishment claims regarding Defendants' EHT

18   product, the story is the same.  Defendants do not challenge the

19   vast majority of the FTC's examples of their deceptive claims

20   that EHT can cure, treat or prevent Alzheimer's, Parkinson's,

21   concussions and CTE.  There is, thus, no genuine dispute of fact

22   as to whether those representations were made.

23         As to the second element, substantiation, Defendants do

24   not, in fact, argue that they can substantiate the claims about

25   Alzheimer's, Parkinson's, CTE or concussions.  Instead, they

1   claim to have the scientific evidence to support other claims not

2   at issue in this lawsuit.  They are irrelevant to the question

3   before the Court.

4           And with regard to the third element, materiality,

5   again, Defendants present no argument on it and, thus, concede

6   that it is met.

7           Thus, there is no genuine dispute of material fact with

8   regards to Counts One through Four.  And because Defendants do

9   not dispute that they placed those deceptive representations in

10  the hands of BPs who could use them to mislead, instead invoking

11  an irrelevant assisting and facilitating standard from a totally

12  separate line of cases and disputing that, summary judgment is

13  also appropriate on Count Five, means and instrumentalities.

14          Finally, injunctive relief is indisputably proper and

15  necessary to prevent Defendants from continuing to run their

16  illegal pyramid scheme and lie about BP income and EHT.  Those

17  violations are ongoing.  Neora is a pyramid scheme today, and the

18  FTC's largely unchallenged exhibits show numerous examples of

19  deceptive income and EHT claims made during the pendency of this

20  litigation.  And even if Defendants' conduct were not ongoing,

21  the *Cornerstone Wealth* factors, which Defendants do not dispute,

22  show that that conduct is likely to recur and, therefore, an

23  injunction should issue.

24          The FTC, therefore, respectfully requests that the

25  Court enter the proposed order attached to its Motion for Summary

```
1    Judgment.  The provisions of that order are well accepted in FTC

2    cases going back decades and appropriate for a company that has

3    demonstrated it cannot be trusted to run a legitimate MLM.

4          Defendants raise no specific objection to any provision

5    of the FTC's proposed order.  They have, thus, waived any

6    objection to entry of the order if the Court rules in the FTC's

7    favor on liability on any count.

8          If the Court has any questions about the FTC's

9    requested relief or any other issue in the case, it would be our

10   pleasure to answer them.

11         My colleague, Mr. Ward, will be glad to answer any

12   questions the Court may have about Counts Three and Four or about

13   Dr. Mindy Kurzer.  I will be happy to address any other questions

14   the Court may have.

15         THE COURT:  Okay.  All right.  Thank you.

16         Go ahead.

17         MR. FLORENCE:  Your Honor, we previously provided the

18   Court with a PowerPoint presentation.  Do you have a copy of

19   that?

20         THE COURT:  Yes.

21         MR. FLORENCE:  I hope that the PowerPoint presentation

22   will facilitate our discussion because there's a lot to unpack in

23   the context of the claims being made in this lawsuit and the

24   nuance associated with that.  And so I would like to start with

25   the pyramid claim allegations that are made.  And on this one,
```

1    Your Honor, there are cross motions for summary judgment as

2    relates to that point.

3         And the starting point of any discussion of a pyramid

4    scheme is, of course, the *Koscot* case cited by numerous courts

5    and by both parties in their briefs.  And it's worth thinking

6    about the *Koscot* test and particularly the second prong which

7    I've highlighted on the fourth page of our PowerPoint here and in

8    terms of understanding what were the facts that led the FTC

9    Administrative Judge in that case to pronounce this test.

10        In that particular case, this was a late '60s, early

11   '70s case and at that particular time, the company, the defendant

12   in that matter, had a situation where it paid -- where it charged

13   distributors $5000 to join the company.  Of that $5000, half was

14   paid to the upline sponsoring distributor and half was paid to

15   the company.

16        So when we look at the second prong of the *Koscot* test,

17   that's the factual predicate that was before the Court at that

18   time.  In fact, they refer to those payments for distributorship

19   as "headhunter fees."  As we get in, we'll show there are

20   subsequent cases that this test has evolved and that the

21   circumstances in *Koscot* bear no relationship to what's happening

22   at Neora today.

23        The second major administrative action which informs,

24   we believe, the pyramid scheme is the *Amway* decision.  And

25   whereas *Koscot* was found to be a pyramid scheme, *Amway* was not.

1   And so there are initial decision findings followed by the

2   Commission, and I'll talk about both of those, Your Honor.  And

3   I've pulled out a few of the initial findings that were made by

4   the AL Judge because I believe they inform our look at what

5   happens at Neora.

6           The first one is it talks about the manner in which

7   Amway sells its products.  What it would do is it would sell

8   products to a distributor who would then sell those products

9   either to a consumer or to a sponsoring distributor that they

10  signed up.  That created a threat of what's sometimes called

11  "inventory loading" or "garage qualifying" because what it meant

12  was that distributors were holding a lot of product, and that

13  creates potential problems for those people if they can't sell

14  it.

15          Neora, on the other hand, has a much superior system.

16  Neora drop-ships its products directly to the customers.

17  Therefore, its Brand Partners, who are the distributors in the

18  Neora system, are simply not in the situation where they have to

19  both purchase or hold large amounts of inventory.

20          It also creates something of a unique circumstance

21  compared to a lot of the cases that are cited by the parties.

22  Because there is a drop-shipping methodology for delivering that

23  product, Neora has data regarding who it sells to that dates back

24  to its founding in 2011.

25          Finding 36, Amway charged a fee of $26.25 for its Sales

15

1   Kits when you started as a distributor.  Neora charges $20.  It

2   covers the cost and it is not included in any commission

3   calculation.  So that if a Brand Partner goes and signs up a new

4   Brand Partner, the mere act of recruiting that person means

5   there's no compensation paid to the sponsoring distributor in

6   that circumstance.

7        Finding 53 talks about the fact that all of the

8   compensation paid in Amway required a sale to be made at some

9   point in the chain.  And, in fact, it talked about the payments

10   to upline as corresponding to the compensation that would be paid

11   by manufacturers to wholesale.

12        The idea there is if you build a sales team, that's a

13   valuable part of the distribution channel in a direct selling

14   marketing company.  And multi-level marketing allows you to

15   recognize the work that's invested by the persons who are

16   building that team.  Building that team helps the -- helps the

17   company because it allows the reach of those persons to consumers

18   to be greater and, therefore, allows for greater sales.

19        Finding 57 in the *Amway* decision identified the fact

20   that 25 percent of the Amway distributors sponsored new

21   distributors.  Interestingly enough, according to the Defendants'

22   expert, Dr. Bosley, they calculated that 26 percent of Neora

23   Brand Partners between 2012 and 2020 sponsored new distributors.

24        That's important because what that's going to -- what

25   that shows us is that not everyone who joins a multi-level

1    marketing company, like Neora, does so because they want to

2    create an upline or create a business.  There are a variety of

3    reasons, and I'll address that in more detail as we get further

4    in.

5         Turning to the next page, Your Honor, Amway had a role

6    that required distributors to sell at least 70 percent of the

7    products so as to avoid inventory loading.

8         They noted in Finding 106 that successful direct

9    reselling companies have quality products, money-back guarantees,

10   and the ability to train and motivate a sales force.

11        Amway also talked about the relatively -- relative high

12   turnover which is something that the FTC criticizes us in their

13   brief.  And Amway noted in that particular matter that recruiting

14   is essential in a multi-level marketing company.  It is not a sin

15   to recruit.  It is a part of that sales channel.

16        And it's easy to understand why there is turnover.  The

17   barrier for entry, a $20 fee, is very low.  It's not everyone's

18   cup of tea.  People decide they want to do it for a period.  They

19   drop out.  There can be any number of reasons why there can be

20   turnover but which would be unrelated to whether it's a pyramid

21   scheme.

22        Your Honor, turning next to Page 7, I've asserted here

23   some of the policies and procedures that have been put in place

24   by Neora, and you'll see, as we go through those, turning to Page

25   8, that a number of them echo exactly the things that were found

1   to be approved by Amway in connection with its -- its being found

2   not to be a pyramid scheme.

3          Section 9.01 points out the fact that at Neora there

4   are no purchase requirements for Brand Partners.  In fact, one of

5   the reasons you might join -- might want to be a Brand Partner

6   but not build an upline is the fact that you get an additional

7   ten percent break on your product.

8          Turning next to Page 9, there's a prohibition on

9   stockpiling, one of the hallmarks or problematic aspects of some

10  pyramid schemes.  In fact, the fact that Neora drop-ships

11  severely limits the risks associated with that.

12         Page 10, you'll see there's a 70 Percent Rule for

13  Neora's policy and procedure just like we saw in *Amway*.

14         Page 11, Retail Sales Rule.  In order to be active --

15  and by "active" in this context, we're talking about the right to

16  seek commissions and rewards -- you have to make sales.  And

17  that's, of course, important in determining whether or not, as

18  the FTC says, Neora is an entity that overemphasizes recruiting

19  at the expense of sales.

20         Turning next to Page 12, there's prohibitions on

21  selling products outside the channel, such as Amazon.

22         Turning to Page 13, there's a provision here that

23  allows a Brand Partner to be -- to return product, just as we saw

24  in Amway.  The Court there, the Administrative Judge, emphasized

25  the importance of being able to return product.  Neora allows to

1    you return product for 90 percent of the cost you paid if you

2    terminate your Brand Partnership.

3            All of this leads back to what the ultimate opinion of

4    the Commission was in the *Amway*.  And on Page 14, we have a quote

5    which we think is very important in terms of framing what the

6    true issues are in this case.

7            In there it says, "A sponsoring distributor receives

8    nothing from the mere act of sponsoring.  It is only when the

9    newly-recruited distributor begins to make wholesale purchases

10   from his sponsor and sales to consumers that the sponsor begins

11   to earn money from his recruit's efforts."

12           In other words, if you are an upline Brand Partner, you

13   only make money in Amway when there is a sale made by someone who

14   is downline from you.  That was held not to be a pyramid scheme,

15   and Neora is the same way.

16           In this case, we're going to show you some of the

17   positions being taken in this case to show you that, in fact,

18   what's occurring here is that the FTC wants to reverse what the

19   ruling was in *Amway* and not allow any commissions to be paid

20   upline unless that person made the actual sale themselves.

21           Turning next to Page 15, Your Honor, this is a quote

22   out of a District Court out of Utah that recognized the *Amway*

23   decision.  "A structure that allows commissions on downline

24   purchases by other distributors does not, by itself, render a

25   multi-level marketing scheme an illegal pyramid."

19

1          And then the Court goes on to note that if that were,

2     in fact, the rule, Amway would have been a pyramid scheme.  There

3     are other courts -- And it cites *Amway*.  There are other courts,

4     Your Honor, that are in accord.  We cited these in our brief,

5     including *U.S. versus Gold* and the *Omnitrition* case out of the

6     Ninth Circuit.

7          Your Honor, the next page on Page 16 is testimony from

8     David Givens.  He is the FTC staff economist, and he was asked

9     questions to the effect of:  Are there any sales that are made in

10    the Neora compensation system -- Let me rephrase that.  I

11    misspoke there, Your Honor.

12         He was asked questions to the effect of:  Are there any

13    commissions paid unless a sale is made at somewhere in the line?

14    And he agreed that that was, in fact, the way it's worked.

15         That's contrary, Your Honor, to what was at issue in

16    the *Koscot* case where the *Koscot* case was focusing on what they

17    called the "headhunter fees."  The idea that just merely signing

18    up a distributor, you get paid for that.

19         When you have that type of environment, Your Honor, you

20    have a system that truly is a pyramid scheme, and *Koscot* talked

21    about that.  In other cases, *Amway* and others have talked about

22    that, too, because it's not a sustainable model.  If all the

23    revenue of a company is tied to the fact that you're just signing

24    up people for the right to be distributors, that's not

25    sustainable.  It's like a chain letter is what the courts

1    referred to it as because it's -- eventually you're going to run

2    out of people to recruit.

3          On the other hand, if you have an organization that is

4    structured in a fashion that emphasizes sales, then you're just

5    like any other retail company.  You can sustain yourself so long

6    as there is a market for the products that you want to sell.

7          In this case, Your Honor, and I've taken a couple of

8    quotes but there's a lot of quotes because I think it helps to

9    frame how what the FTC is claiming in this case as it relates to

10   pyramid schemes is different than what's happening in the *Amway*

11   and *Koscot* cases.

12         First, I'm quoting from their Motion for Partial

13   Summary Judgment:  "Although Neora may point to those rewards in

14   the Compensation Plan that require both recruiting and sales,

15   those rewards are still unrelated to the sale of product to

16   ultimate users under the law."

17         They're referring to the second prong of *Koscot* there.

18   And they're saying that if you pay any compensation to someone

19   upline, that is automatically an improper recruiting payment.

20         Your Honor, that's essentially -- they're essentially

21   saying by assuming only legitimate compensation is paid to the

22   person who makes the sale, that if you compensate someone upline,

23   that that is overemphasizing recruiting and that makes you a

24   pyramid scheme.  That's contrary to *Koscot*.  That's contrary to

25   Amway, and we believe it's contrary to the law which we will

1    develop further in this presentation.

2            But it's also important because that finding, that --

3    that approach, if this Court were to induce -- to endorse that,

4    would mean that no multi-level marketing company could exist

5    because all multi -- the nature of a multi-level marketing

6    company is that you compensate the person who makes the sale as

7    well as the sponsoring distributor who recruits, trains,

8    motivates and -- and promotes the team, just as it was in *Amway*.

9    It's a critical change and one that we believe would mean the end

10   of multi-level marketing.  Companies like Tupperware, Mary Kay,

11   even Amway itself would not survive under that analysis.

12           Here's another quote that we have from their Motion for

13   Partial Summary Judgment:  "A reward paid for all or ultimate

14   user sales is a reward based solely upon new participant

15   purchases and for which no recruiting is necessary."

16           Your Honor, this next page is an FTC Advisory Opinion

17   that was issued in 2004.  This would have been in place at the

18   time Neora was found.  Actually it was Nerium at that -- at that

19   point.  And this Staff Advisory point addresses a couple issues

20   that we believe are critical in terms of analyzing whether Neora

21   is a pyramid scheme.

22           The first quote that we pulled out talks about, "The

23   amount of internal consumption in any multi-level compensation

24   business does not determine whether or not the FTC will consider

25   the plan a pyramid scheme."  "Internal consumption" in this

1    context refers to Brand Partners who may purchase product for

2    their own consumption.  And what this Advisory Opinion from the

3    FTC is saying:  That's okay.

4            In fact, we pointed out earlier that 26 percent, only

5    26 percent of the Brand Partners of Neora actually go and recruit

6    another Brand Partner.  That means there's 74 percent of the

7    Brand Partners who are Brand Partners for a different reason.

8    And we have a substantial amount of evidence, and I'll highlight

9    some of that later, that explains why they do that.  And so to

10   the extent that a Brand Partner consumes product and buys

11   product, that doesn't mean it's a pyramid scheme.

12           The next quote turns to what we believe is the law.

13           THE COURT:  Mr. Florence, let me interrupt you.  This

14   isn't terribly germane to your argument, but I thought I heard

15   you say something that I didn't understand.

16           I thought the FTC's Motion for Summary Judgment was on

17   all claims.

18           MR. FLORENCE:  It is on all claims, Your Honor.

19           THE COURT:  Okay.  I think you said "partial summary

20   judgment."

21           MR. FLORENCE:  I misspoke on that.

22           THE COURT:  Okay.  Okay.

23           MR. FLORENCE:  They have -- You know what, that was our

24   motion that was partial.

25           THE COURT:  Okay.

1          MR. FLORENCE:  We only moved on the pyramid scheme.

2          THE COURT:  Yes, I know you did.  I just wanted to make

3     sure.

4          MR. FLORENCE:  Thank you, Your Honor.

5          THE COURT:  I may have misheard you, what you were

6     saying.  Okay.  Pick up where you were.

7          MR. FLORENCE:  Picking back up with the Advisory

8     Opinion, the 2004, here we see the FTC is focusing, just like we

9     would have -- did -- would have seen in *Koscot* and Amway, that

10    the critical question on a pyramid scheme is, quote, "whether the

11    revenues that primarily support the commissions paid to all

12    participants are generated from purchases of goods."

13         And that's what we were talking about earlier.  If

14    you're a company whose revenues are primarily attributable to

15    sales, you're a company that can sustain itself.

16         If, on the other hand, you're a company who makes

17    revenues from selling your distributorships, just like *Koscot*

18    did, where all you get for buying the distributorship is the

19    opportunity to participate, if that's the source of your revenue,

20    then you are a pyramid scheme and you will fail.

21         So here we see the FTC focusing on the source of

22    revenues.  We'll show you our evidence on that in -- in a few

23    slides from now.

24         The next one, there's, yet, another quote from the

25    Advisory Opinion, again noting that if it primarily depends on

1    continual recruitment of Brand Partner, then that is a pyramid

2    scheme.  If it's primarily made for payments to participate, then

3    that is not sustainable.

4         And finally, another quote that says the same thing.

5    Absent sufficient sales of goods, then you're hinging on nothing

6    more than recruitment.  Exactly what *Koscot* was concerned about,

7    but also what Amway was able to distinguish because it was able

8    to show that it's a company that focused on sales.

9         Your Honor, the idea -- We disagree with the FTC when

10   they contend that there is no -- there are no other courts that

11   have endorsed this "primarily" provision, and we would cite in

12   that regard proposed conclusions of law in the *BurnLounge* case.

13   And I'm quoting here from the conclusions of law in the District

14   Court action there.  And you see there that there, again, it's

15   referencing *Koscot* and that the inquiry is whether sales to

16   ultimate users are the primary basis for funding the rewards; the

17   same thing that was said in the Advisory Opinion.

18        The next proposal shows that the source of that

19   position can be traced to the expert that was sponsored by the

20   FTC in the *BurnLounge* case.  Dr. Vander Nat has been -- was an

21   expert in many cases on behalf of the FTC in their pyramid scheme

22   cases.  He was an FTC economist, and he's the one who provided

23   the testimony that was relied upon by the Court to the effect

24   that you have to look at what is the primary source of revenue.

25   The Court, in fact, accepted Dr. Vander Nat's testimony that that

1    primary basis of where the revenues come from is the basis upon

2    which to determine if it's a pyramid or not.  And, in fact, the

3    Ninth Circuit opinion on appeal also referred to the "primarily"

4    test which is the source of that evidence, and advocacy was the

5    FTC's own expert.

6          Your Honor, moving forward, there's also been FTC

7    Business Guidance.

8          THE COURT:  Mr. Florence, can you hold your thought for

9    one moment?  I got to respond to something here.  It will take me

10   15 seconds.

11         (Pause)

12         THE COURT:  Have a swig of water for a minute.

13         MR. FLORENCE:  Thank you, Your Honor.  I have a

14   tendency to get on a roll and need to hydrate.

15         THE COURT:  Okay.  I'm going to have to step into my

16   office for just a moment.

17         MR. FLORENCE:  Thank you, Your Honor.

18         THE COURT:  It will be two minutes.

19         COURT SECURITY OFFICER:  All rise.

20         (Court recessed from 1:44 PM until 1:48 PM.)

21         COURT SECURITY OFFICER:  All rise.

22         THE COURT:  My apologies.  Go ahead.

23         MR. FLORENCE:  Thank you, Your Honor.

24         Your Honor, during the FTC's presentation, one of the

25   things that they said, and its repeated throughout their briefs,

1    is that an overwhelming percentage of Neora's Brand Partners fail

2    economically by being a part of the process.

3         When they make that calculation, what they do is they

4    assume that all purchases for product made by Brand Partners is

5    an expense.  And, of course, that's why I previously cited the

6    2004 Business Guidance saying that internal consumption does not

7    make you a pyramid scheme.  I now have in front of you the 2018

8    Business Guidance which confirms that.  And, in fact, our expert,

9    Dr. Vandaele, has done a number of calculations that relate to

10   this subject.

11        One of the things that he calculated was that over the

12   years, between 20 and 30 percent of the persons who become Brand

13   Partners with Neora were formerly what are referred to as

14   "Preferred Customers."  And a Preferred Customer is a person who

15   buys Neora products but does not participate in the business

16   opportunity.  The only purposes to being a Preferred Customer is

17   to buy product, and a Preferred Customer gets a 25 percent

18   discount.  A Brand Partner gets a 35 percent discount.

19        And so what Dr. Vandaele did was he calculated what

20   percentage of the former Preferred Customers become Brand

21   Partners because it highlights for us that just because you're a

22   Brand Partner and you consume product doesn't mean you're not

23   consuming it for your own use.

24        According to the FTC, the day before when you are a

25   Preferred Customer, you are buying product because you consumed

1    it.  And then the day after you became a Brand Partner,

2    presumably because you got an additional discount, then it

3    constitutes an expense.  That's between 20 and 30 percent of the

4    Brand Partners of Neora fit into that category, and it highlights

5    the impropriety of the assumption that all product bought by a

6    Brand Partner isn't -- should be considered an expense.

7          In fact, the calculations by Dr. Vandaele, which are

8    all undisputed, Your Honor, show that by 2019 and 2020, over 50

9    percent of the Brand Partners in Neora only buy product.  That's

10   the only -- They don't participate trying to build a downline or

11   anything.  And so we think the evidence that's being put forward

12   in terms of economic failure by Brand Partners is significantly

13   flawed and unreliable for that reason.

14         The next page ---

15         THE COURT:  Let me interrupt you for a moment.  I

16   thought you told me at the beginning of your presentation that to

17   be an active Brand Partner, you had to make sales.

18         MR. FLORENCE:  I'm sorry, Your Honor?

19         THE COURT:  You had to make sales of product.

20         MR. FLORENCE:  You have to make sales of product in

21   order to earn commissions.

22         THE COURT:  Okay.

23         MR. FLORENCE:  You do not have to make sales of product

24   to get the discount.

25         THE COURT:  So you're saying that a Preferred Customer

1    who, as I understand it, is sort of on automatic delivery, --

2              MR. FLORENCE:  Correct.

3              THE COURT:  -- that recognizing the difference between

4    25 percent and 35 percent, they may switch to become a Brand

5    Partner.  But apart from that renaming, they're not changing the

6    mechanics of what they're doing.

7              MR. FLORENCE:  Their consumption behavior is not

8    changing.

9              THE COURT:  Okay.

10             MR. FLORENCE:  The reason they would switch is because

11   they get an additional discount for being a Brand Partner.

12             THE COURT:  And what do they -- what do they expend for

13   getting that additional?

14             MR. FLORENCE:  They don't ---

15             THE COURT:  "Expend" is a poor choice of words.

16             MR. FLORENCE:  Oh.

17             THE COURT:  What additional obligation do they assume

18   to become a Brand Partner?

19             MR. FLORENCE:  The only additional obligation is the

20   one time fee of $20.

21             THE COURT:  Okay.

22             MR. FLORENCE:  That's it.

23             THE COURT:  The Sales Kit.

24             MR. FLORENCE:  The Sales Kit.  And so if you consume

25   two months of Neora night cream, which is the No. 1 product that

1    Neora sells, you very quickly make that up.

2            THE COURT:  Okay.

3            MR. FLORENCE:  Your Honor, Page 25 is additional

4    argument or additional guidance from the FTC in which they're

5    again repeating the guidance that was put in place in 2004 that

6    internal consumption is not problematic.

7            Your Honor, all of that is background, and I want to

8    shift now to what I think is probably the most important in terms

9    of this Court, and that is the Fifth Circuit authority that has

10   dealt with pyramid schemes.  And I want to talk about the *Torres*

11   case that was mentioned by FTC counsel and which is mentioned

12   throughout our briefing.

13           Your Honor, we refer to it as *Torres I* and *Torres II*.

14   Both of them are Fifth Circuit opinions.  *Torres I* was the

15   original opinion that was reversed by the en banc ruling of the

16   Fifth Circuit.  We call that *Torres II*, and it was reversed in

17   the context of whether or not class certification was proper.

18           THE COURT:  Okay.  But my understanding of the rules of

19   the Fifth Circuit is en banc -- If I'm mistaken, remind me,

20   because I sit as a visiting judge in the Ninth Circuit.  But my

21   recollection is that the rule in the Fifth Circuit is that if

22   en banc is granted, that that original opinion is of no effect.

23           MR. FLORENCE:  Your Honor, I would not -- My

24   understanding was slightly different, but I don't want to subject

25   my understanding is superior to yours.

1           THE COURT:  Okay.  All right.  We'll find out.

2           MR. FLORENCE:  It was my understanding ---

3           THE COURT:  We'll find out.  That's my recollection but

4     I may be mistaken.

5           MR. FLORENCE:  I may be mistaken it on that as well and

6     I don't want to overstate.  It was reversed on other grounds.

7           THE COURT:  Okay.

8           MR. FLORENCE:  And -- And so that's why we think it's

9     worth looking at *Torres I* but we'll also talk about *Torres II*.

10          THE COURT:  Okay.

11          MR. FLORENCE:  Both of them, in any event, we believe,

12    inform this Court in terms of how to treat pyramid schemes.

13          Now that was a class action, not an FTC action.  It

14    involved a RICO claim, and the question in that case was in

15    connection with the Stream company, Your Honor.  There were quite

16    a few articles in the *Dallas Morning News* back in the day about

17    Stream that used a multi-level marketing company structure to go

18    out and sell electricity for your house.  And so the question was

19    whether or not Stream was a multi-level -- excuse me -- whether

20    it was a pyramid scheme.  And that's what *Torres I* and *Torres II*

21    addressed to some degree, and I'll cover that now.

22          In *Torres I*, the original panel ruling, Your Honor, was

23    that pyramid schemes will collapse because such schemes are

24    designed to produce income from the continuous recruitment of new

25    members and not upon sales revenues from a legitimate product to

1    consumers in a normal market.

2          That's exactly what *Koscot* and *Amway* and *BurnLounge*

3    were all dealing with.  Are you an organization that focuses and

4    sustains itself through true sales, like any business, or are you

5    in the business of selling distributorships, which is not a

6    sustainable enterprise.

7          The next quote that we have is that in the application

8    of -- Actually it's -- it's the proposed -- The ruling on *Torres*

9    *I* was that in determining whether a business is a pyramid scheme,

10   the focus is whether exclusively or almost exclusively on

11   recruiting as opposed to sales.

12         That's a dramatic extension of the "primarily" rule

13   that we cited in both the FTC Guidance and in the *BurnLounge*

14   District Court and in the *BurnLounge* Circuit Court decision as

15   well.

16         Your Honor, I'll turn next to *Torres II*.  As I

17   mentioned, it was reversed on other grounds, and the reason it

18   was reversed on other grounds is because for class certification

19   purposes, the en banc court determined that to look at whether

20   there are individual facts or not, you have to look at the way in

21   which a company is structured.  And the en banc court, as

22   distinguished from *Torres I*, ruled that, in fact, it's the

23   structure itself.  And if you look at the structure, you can

24   determine whether it's a pyramid scheme.

25         And so, again, *Torres II* looks at it from the point of

1   view of whether or not the structure focuses on recruitment of

2   people, not products, and that if you have a focus on recruitment

3   on people, quote, "it inevitably causes the scheme to collapse

4   when participants run out of individuals to recruit."

5           And that's, again, the notion that we see in *Koscot*;

6   that there is not -- there are not an unlimited number of people

7   that you can recruit to be distributors.  That's a chain letter,

8   and it's distinguishing that type of structure from a structure

9   which focuses on sales.

10          *Torres II* goes on to say that "Those who lose money by

11  reason of the fraud," referring to the pyramid scheme structure,

12  "because the fraud is necessary to temporarily sustain the

13  scheme."  What this is talking about there is that when you sell

14  distributorships for $5000 to a new person, well, that's a

15  one-time payment.  And not only are you going to run out of

16  people that you can sell that distributor to but that's only a

17  one-time payment and ultimately you're not going to be able to

18  sustain the company, and that's what that quote is talking about.

19          Your Honor, I next want to turn to some of the evidence

20  that we believe is the basis upon which we're asking for summary

21  judgment on the pyramid scheme.

22          And the first chart that we prepared was undisputed,

23  uncontroverted evidence regarding how Neora actually operates.

24  And, Your Honor, you'll recall that I mentioned that the fact

25  that Neora has drop-shipping, well, that allows it to maintain

1   records over the years so that we can see who we're selling to

2   and how much we're selling, too.  That's different than a lot of

3   the companies that are -- have been sued in other actions.

4           This particular chart takes a look at who buys Neora

5   products.  Preferred Customers who are indisputably ultimate

6   users, retail customers.  Then there's a category called "Retail

7   Customers."  Those are also customers who buy the product only to

8   consume it but they don't get an automatic order.  And you can

9   see that it's a very, very small percentage of Retail Customers

10  that buy product.  And then you can see the number of persons who

11  are Brand Partners.

12          THE COURT:  I'm a little bit color blind.  Are these

13  two different colors of blue?

14          MR. FLORENCE:  Your Honor, I'm a lot color blind.  So

15  let me -- let me make it ---

16          THE COURT:  Are these two different colors of blue?

17          MR. FLORENCE:  I believe so, Your Honor.

18          THE COURT:  Okay.  That -- You should take judicial

19  notice of how unbelievably old the judge is.

20          MR. FLORENCE:  Your Honor, no one is more sympathetic

21  to color blind than I am, and so let me give a ---

22          THE COURT:  I'm going to go off the record for a

23  minute.  I'm just going to tell you a funny story I can't resist.

24          (An off-the-record discussion was held between the

25  Court and counsel.)

1          THE COURT:  So your littler lines are royal blue and

2   the others are something else.

3          MR. FLORENCE:  I wouldn't venture a guess as to the

4   actual colors, but I can tell you that the bar chart showing the

5   highest number of persons correlates with Preferred Customers who

6   buy product.

7          THE COURT:  Okay.  Okay.

8          MR. FLORENCE:  The smallest one in the middle, yellow,

9   gold, something like that, --

10         THE COURT:  Retail Customers.

11         MR. FLORENCE:  -- are retail customers.  And then the

12  other one, the one on the right which appears to be blue to me,

13  that's Brand Partners.  And so what you can see, and you see the

14  percentages across the top, is that between 79 and almost 84

15  percent of the people who buy Neora products are Preferred

16  Customers.  Retail customers are people who don't participate in

17  the Neora business opportunity.

18         Your Honor, the next chart, again, breaks down Neora

19  sales but this time it looks at it from revenue.  When we say:

20  Is Neora sustainable, does it meet the "primarily" test or is it

21  sustainable from a pyramid scheme analysis, this is the

22  undisputed evidence.  The one that's -- We have the percentages

23  there which are in the seventies, almost to eighty percent.  It

24  shows that almost eighty percent by 2021 of the dollar amount

25  associated with purchases of product from Neora are tied to

1    Preferred Customers and that the dollar amounts associated with

2    purchases by Brand Partners is a much, much smaller percentage of

3    the -- of the equation.

4          This is why we believe this is a company that's been in

5    business since 2011; has proven over the test of time that it is

6    not ultimately doomed to collapse; that it is not structured in a

7    fashion that it's going to fail; that it does not rely on

8    recruiting fees; that it does not sustain itself by the $20

9    payments made by new Brand Partners.

10         The next chart speaks to that issue as well.  And this

11   is a -- This chart breaks it down from the perspective of what

12   are the sources of revenue.  And the overwhelming percent ranging

13   between 95 and 98 percent come from product sales.

14         The other two categories that are much, much smaller

15   relate to Enrollment Packs.  If you're a Brand Partner who signs

16   up initially, you can, for a steep discount, buy an Enrollment

17   Pack, and that's a small percentage of the sales, but that's a

18   one-time sale.  What you see in this is that by 2021, almost 98

19   percent of the revenue that's received by the company is

20   associated by sales of product.

21         And, of course, the third category, it just captures

22   miscellaneous revenue sources; very, very small; two or three

23   percent in the most recent years.

24         Your Honor, not only are we able to rely on the

25   calculations being done by our own expert, which are -- none of

1    which are disputed, Your Honor, but if you go to Page 33, we also

2    cite some of the calculations that were prepared by the FTC staff

3    economist, Mr. Givens -- excuse me -- Dr. Givens in the course of

4    his work.

5           And in this particular chart, they calculated who do

6    the Brand Partners enroll?  And here we're talking about:  Do

7    they enroll Preferred Customers?  Do they enroll Retail

8    Customers?  Or do they enroll Brand Partners?

9           If we're going to say that Neora overemphasizes

10   recruiting of Brand Partners, this charts shows you what actually

11   happens which is an overwhelming percentage of the new parties

12   who are brought to the table are Preferred Customers.  And that's

13   the -- the biggest part of the bar chart, and you see the

14   associated numbers that are superimposed on top -- on top of

15   that.

16          We believe that it is the manner in which a company

17   actually operates that demonstrates whether or not it's a pyramid

18   scheme.  The FTC cites a number of different factors, including

19   the income misrepresentations.  We acknowledge that the FTC has

20   the right to sue us for income misrepresentation, and I'll turn

21   to that in just a second.

22          But at least as it relates to pyramid scheme, _Torres_

23   makes clear that it is the manner in which it is structured that

24   determines whether it's a pyramid scheme and whether it will

25   collapse or not and that misrepresentations are not considered in

 1    that context.

 2          Your Honor, we also have -- The next chart addresses

 3    whether a Brand Partner who makes the sale makes more money

 4    selling to a Preferred Customer versus selling to a Brand

 5    Partner.  And this hypothetical, which is drawn from information

 6    in Dr. Coughlan's -- she's one of our experts, but this is drawn

 7    from that.  And it shows that a Brand Partner is motivated

 8    financially to make sales to new Preferred Customers.  And it

 9    walks through the potential commissions that a Brand Partner can

10    be -- be paid which would total -- In this hypothetical, this --

11    this assumes that you sign up nine new people.  If you sign them

12    up as Preferred Customers, you would make potentially the $388,

13    plus product credit, versus if you sign them up as a Brand

14    Partner, you would make $178.

15          What that shows us is that the system, the compensation

16    system, is structured in a fashion to encourage sales to

17    Preferred Customers as opposed to making sales to people who are

18    part of the business opportunity.

19          The next slide, Your Honor, again, emphasizes that

20    Brand Partners who build a team, an upline, if you will, that the

21    way the compensation system is structured is structured around

22    sales.  As I mentioned earlier, if there is not a sale made, then

23    there is no commission paid upline.

24          Your Honor, turning to Page 37, this is a slide that

25    sets forth what happens if you have a new Preferred Customer who

1    purchases the night cream for $92, who makes money from that.

2    And what this shows is that a Brand Partner who actually makes

3    the sale makes substantially more than anyone in the upline.  If

4    you're in the upline, you make between 0 and $3.45 on that one

5    sale.  If you are the Brand Partner who made the sale, depending

6    on which commissions that you are entitled to, you make a low of

7    $18.40 and a high potentially of $48.87, plus product credit.

8         Your Honor, I'm happy to answer any questions on that

9    or, with the Court's permission, I'll turn next to the claim --

10   the income earnings claims.

11        THE COURT:  Okay.

12        MR. FLORENCE:  Your Honor, first, the -- these are

13   elements that, I'm sure, are familiar to the Court in terms of

14   what the proof has to be.  If you turn to Page 40, there's case

15   law that we've cited.  I believe both sides have cited this, and

16   we believe that these create inherent fact-intensive inquiries.

17        It's the common sense net impression.  You're not

18   allowed to pull out a small snippet of a large document and

19   ignore the rest of the document.  When you have to look at the

20   document or the video or the presentation as a whole, that's what

21   drives what constitutes a common sense net impression.  You have

22   to prove that it's probable, not just possible; that there's a

23   deception, and also it's not just any consumer.  You have to

24   consider who your audience is.

25        So there's a lot of -- there's a lot to these various

1    steps.  And in the chart on Page 41, what we did was we broke it

2    down in categories to try to determine:  Who are the parties that

3    are being claimed to have made the misrepresentations?

4         And that falls into three different entities.  They

5    talk about misrepresentations by Neora; misrepresentations by

6    Mr. Jeff Olson, the CEO and Founder; and misrepresentations by

7    Brand Partners.  And we broke it down between representations

8    made before February 1, 2019, and after February 1, 2019.  And

9    the reason we did that, Your Honor, is because it was at that

10   point in time that Neora changed its name.  It was previously

11   known as "Nerium."  And there was a lawsuit with one of the

12   business owners.  And as a part of that lawsuit, Neora had to

13   change its name.  It could no longer use "Nerium."  So it's a --

14   To us, it was an effective way to do two things.

15        Number one, anyone who goes on the Internet now and

16   finds something relating back to 2015, for example, that's going

17   to reference Nerium, not Neora.  If you go to Neora's website

18   today and you look at it, you're not going to see anything

19   relating to Nerium on it because of the lawsuit.

20        It's also an effective device to us because we think

21   it's relevant that when this Court sits in equity and determines

22   what is the proper injunctive relief, if any, to grant, it's

23   worth looking at what happened in the past and what's -- what's

24   happening today and to try to understand:  Is this a company that

25   is truly a bad actor?  Or, as we would posit, is this a company

1    that always started out with good intent but over time has

2    actually improved its processes and reduced substantially the

3    number of complaints that are associated with this?

4         What this particular chart shows is that 75 percent of

5    the representations at issue were made before 2019.  Many of them

6    can be traced to an investigation that was done by an entity by

7    the name of TINA.  It's "Truth In Advertising."

8         It's interesting sort of how this thing bubbled up.

9    Neora received an award from the Direct Selling Association.  And

10   as a result of that, TINA did an investigation, and they began to

11   look for what they believe were income representations.  They

12   eventually provided it to the FTC.  And if you actually compare

13   what TINA found with what the FTC is complaining about, and I

14   don't want to overstate this, but a lot of them trace back to

15   TINA.  And what's interesting is that when TINA brought this to

16   the attention of Neora, what they immediately did was they went

17   and pulled down all those posts, contacted every single one of

18   those Brand Partners and said, "You need to pull these down."

19        What that suggests, Your Honor, we respectfully submit,

20   is that this is an organization that doesn't need to be told to

21   do the right thing.  If they see a Brand Partner who is posting

22   something that they shouldn't, they don't argue about it.  They

23   go and do something about it.

24        It's -- This chart also highlights something

25   significant as it relates to the injunctive relief that's sought

41

1    against the Founder, Mr. Jeff Olson.  What it shows is that since

2    2011, they've identified only nine allegations that they assert

3    against Mr. Olson and only two in three plus years since February

4    of 2019.

5           THE COURT:  Well, their position is that Mr. Olson is

6    responsible for the -- at least for the 116 that are the total

7    pre and post made by the entity.

8           MR. FLORENCE:  Our position is, Your Honor, that ---

9           THE COURT:  Their position.

10          MR. FLORENCE:  Their position, yes.  Their position is

11   that.  Our position is that if you look at the conduct made to

12   Mr. Olson, particularly where you're talking about a circumstance

13   where you're looking at conduct dating back to 2011 -- that's an

14   extraordinarily long period of time in which to examine what has

15   happened -- that there are relatively few that are associated

16   with Mr. Olson individually.

17          THE COURT:  Okay.  I think my math was off.

18          MR. FLORENCE:  That's not to suggest that they're not

19   important.

20          THE COURT:  Yeah, I hear you.

21          MR. FLORENCE:  Just that it's part of what you

22   determine -- look at, we believe, in terms of sitting in equity.

23          Your Honor, we broke ---

24          THE COURT:  Just for the record, I think I said 116.

25   It's actually 106.

```
1              MR. FLORENCE:  Thank you, Your Honor.

2              THE COURT:  All right.

3              MR. FLORENCE:  One of the things that we break down in

4    that chart, and I'm turning to Page 42 now, is that a substantial

5    number of these income earning claims are attributable to Brand

6    Partners.  And when you're reading the FTC's briefs, they don't

7    say this language, but they treat it as if Neora is strictly

8    liable for everything done by a Brand Partner or said by a Brand

9    Partner.  In fact, they advocate two theories to bridge the gap

10   there.

11             The first is the "Means and Instrumentalities," and

12   I've cited a standard there which is the same standard cited by

13   the FTC.  We would submit that it is a fact-intensive inquiry in

14   order to causally connect a particular instrument that was

15   prepared by Mr. Olson, for example, or by Neora to the Brand

16   Partner conduct which is being complained about.  And we don't

17   believe that they have tried to bridge that gap with anything

18   specific except for a very small few instances which we address

19   in our brief, and I'll try to talk about that a little bit later.

20             Also, the second theory they use is a theory that they

21   didn't plead but which they argue is "agency."  And, again, we

22   believe there's no evidence to show that, in fact, there's

23   agency.  And agency is -- In that regard they cite the

24   Restatement (Third) of Agency, Section 1.01, and I recited that.

25   And maybe this has changed since I was in law school, but I was
```

1    surprised to see that when you have an agency, that that creates

2    a fiduciary relationship.

3            What the FTC is asking you to do in the context of

4    ruling that Neora is liable for anything done by a BP is to

5    create a fiduciary relationship.  And I'm going to show you lots

6    of documentation which suggests that that's not the way it

7    actually operates, nor is it consistent with the expectations of

8    the Brand Partners who might be surprised to see that there's a

9    fiduciary relationship.

10           In addition, they cite another provision of the

11   Restatement as it relates to "apparent authority" which is the

12   power, of course, to bind the legal relationship of Neora.

13           If you turn to the actual evidence, the very first

14   thing you do as a Neora Brand Partner is you fill out an

15   application.  And that application -- the Application &

16   Agreement, that's on Page 45.

17           And by the way, I should just note, Your Honor:  We

18   tried to cite the exhibit numbers throughout so that you'd know

19   where -- where they were.  These are all to the Motion for

20   Partial Summary Judgment -- No.

21           MS. ROLLER:  The Motion for Summary Judgment Response

22   Appendix, Your Honor.

23           MR. FLORENCE:  I wanted to make that note because

24   there's different numbering, Your Honor.

25           So here you have -- The first thing an independent

1  Brand Partner agrees with is that they are an independent

2  contractor and not a legal representative of Neora.  The policies

3  and procedures, again, make clear repeatedly that issue.

4          If you turn to Page 47, you see the provision that says

5  that you're an independent contractor.  It says affirmatively you

6  are not an agent; that you're not authorized to bind Neora.

7          If you turn to Page 7.09, it's the Social Media policy,

8  and it emphasizes that you're not to hold yourself out as Neora

9  and that you have to represent yourself as an independent

10  business.

11          So we would say from an Agency perspective, that those

12  are -- that's evidence for the Court to consider that none of

13  those Brand Partner statements should be attributed to Neora.

14  Certainly, it's a fact issue.

15          Next, there are a variety of defenses to these.  Page

16  49 is one of the income and product claim disclosure documents

17  that are used -- that is used by Neora.  The disclaimers have

18  evolved over time.  If you look at the way disclaimers were done

19  in the past, I think you would see that Neora has actually

20  improved its processes over time.  We believe that's relevant in

21  terms of whether there was a misrepresentation when a disclaimer

22  was used, but it's also evidence of:  Is this a company that

23  needs an injunction to tell it to do the right thing?  And we

24  think the answer to that is "no."

25          Our Policies and Procedures, again, address income and

1     earning claims and leave no ambiguity about what the policies of

2     the company are.

3             Turning to Page 51 and specifically referencing income

4     claims, Brand Partners are told that you're not to make any

5     guarantees.  You're not to make any projections to prospects.  No

6     ideal projections are proper.  You can't represent your income.

7     You can't use commission checks to show people that that's how

8     much money you make.  You can't even make income or expense

9     estimates.

10            Turning to Page 52, if you do violate it, the company

11    has the right to suspend and terminate you.  There's substantial

12    evidence in the record from the Compliance Director talking about

13    exactly how that works.  Part of that process, as Ms. Davis

14    explains in her deposition, is that they use instances where they

15    identify something that violates the policies as an opportunity

16    to train Brand Partners, "This is the right way to do it."  In

17    other words, substantial efforts are undertaken to make sure a

18    Brand Partner knows what's proper and what's not.

19            Turning back to Page 53 again, the Social Media policy

20    requires you to not post anything that's inconsistent with --

21    make any income claims whatsoever.

22            And finally on Page 54, the Code of Ethics for Brand

23    Partners is they agree they will make no income representations

24    regarding the Compensation Plan of Neora.

25            Your Honor, we -- we deposed the expert of the FTC in

1   this case regarding the Policies and Procedures, and we asked the

2   expert, having reviewed those Policies and Procedures, "Can you

3   identify any flaws?  Is there anything in their Policies and

4   Procedures that you think could be improved?"  She was unable to

5   identify anything that was problematic.

6        Your Honor, the next, the injunction factors, of

7   course, are familiar with this Court, but they highlight that in

8   this particular circumstance, there are multiple levels to

9   consider in terms of whether a summary judgment is proper,

10  including whether there's assurance of future violations or a

11  likelihood of future violations, and we believe important

12  probative evidence can be seen in terms of the training and

13  compliance efforts of the company.

14       In fact, turning to Page 56, Your Honor, that's also

15  been the position of the FTC.  We're citing here remarks by the

16  FTC Chairwoman, Deborah Ramirez, to the Direct Selling

17  Association in which she says that "Multi-Level Marketing

18  Companies should take reasonable steps to monitor and ensure that

19  participants are not misleading about the business opportunity."

20       She's not taking the position that you have to be

21  perfect.  She's stating you have to take reasonable steps.

22       Page 57, there's the FTC's Endorsement Guidelines that

23  speak to the same thing.  Quote, "It's unrealistic to expect you

24  to be aware of every single statement."

25       In the case of Neora, it currently has in the range of

1    34,000 current BPs, and it's not uncommon for multi-level

2    marketing companies to have a substantial number of distributors.

3    And the FTC Guidelines at least recognize the reality that when

4    you're thinking about income representations, you're talking

5    about a very large universe of potential representations,

6    particularly as it relates to Neora when we're being judged

7    according to all the representations made for a period since

8    2011.

9         The guidelines say you need to make a reasonable

10   effort; that there needs to be reasonable training, monitoring

11   and compliance programs, and we -- we believe that that is

12   correct, and we do everything that we can, in fact, to meet those

13   expectations, all of which would be relevant in terms of the

14   Court's determination of whether an equity injunction relief --

15   injunctive relief would be appropriate.

16        We have gone through the Policies and Procedures

17   Manual.  We haven't talked as much about compliance efforts.  We

18   cited the *FTC versus John Beck* case for the fact that the

19   Compliance Department in terms of income and earnings, that it is

20   probative of whether the company should be held liable to look at

21   the compliance efforts.

22        We cited the *FTC versus Nudge* decision which stands for

23   the proposition that it be probative of whether individual

24   liability should be imposed on Mr. Olson for what's done; that

25   you need to look at the Compliance Department.  And I've listed

1    here, and I'm not going to go through all of these, the various

2    ways that are described by Ms. Davis, who's the Director of

3    Compliance for Neora, the various ways and techniques they use to

4    train and monitor Brand Partners in order to try to avoid these

5    circumstances.  Over time it's certainly evolved, and we believe

6    it's certainly improved.

7         One of the things that's allowed for improvement was

8    the use of a monitoring program sponsored by -- called

9    "FieldWatch."  This is a third-party company, and what they do is

10   they go out and scroll the Internet.  So if, for example, there

11   is a term that's identified in a particular case as problematic,

12   then you add that search term.  It goes onto the Internet and it

13   searches everywhere it can to try to find problematic posts.

14   Does it catch all of them?  I don't think it catches all of them.

15   Sometimes certain social media you can't get access to, but it is

16   unquestionably -- Even TINA recognizes that it is state of the

17   art in terms of the efforts that should be undertaken by a

18   company.  And Neora not only utilizes that but also utilizes the

19   same company, Momentum Factor, I believe is the name, to help it

20   with its remediation efforts.

21        On top of that we've talked about the training program.

22   The expert of the FTC was not familiar with any of the testimony,

23   didn't review Ms. Davis' testimony in those efforts and was

24   unfamiliar with what, I think, is fairly described as a vast

25   training program and efforts taken by Neora to ensure and avoid

1    these kind of problems.

2              THE COURT:  All right.  Mr. Florence, I'm sensitive to

3    the time.  So I'd say in the next five minutes you should wrap

4    up.

5              MR. FLORENCE:  Your Honor, I will briefly just ask the

6    Court to take into consideration some of the fact issues that we

7    have identified on Page 60 as it relates to the various issues

8    that come up in that regard.  And with the remaining time, I want

9    to talk about product.

10             Now all of the -- all of the things -- all of the

11   argument that we've made concerning Brand Partners, agency,

12   training, compliance, all of that applies equally to the product

13   claims that are being made to the FTC.

14             And, Your Honor, just to follow along, I'm moving on to

15   Page -- starts at Page 61.

16             THE COURT:  Yes, that's where I am.

17             MR. FLORENCE:  We believe that, again, that this is

18   another very fact-intensive inquiry.  And in that regard, there

19   is a difference between being a drug.  If you're a drug, you're

20   entitled to make representations regarding whether you treat,

21   prevent or cure Alzheimer's, Parkinson's or anything else.

22             If you're a dietary supplement, on the other hand,

23   you're subject to the Dietary Supplement Health and Education Act

24   that was passed in the Clinton administration.  It's a different

25   set of rules.  And those rules allow you to make what are

1    categorized as general well-being and structure function claims

2    that are described on Page 63.

3              Calcium builds good bones; improved energy, things like

4    that fall within those categories.

5              There are different rules for a dietary supplement, and

6    they are more liberal than a drug.  And, in fact, our expert has

7    gone through and looked at all the representations that are

8    actually made by Neora to determine whether or not they comply

9    with DSHEA.  And she's determined that they are; that all of the

10   ingredients that are used in the Neora EHT product have been

11   tested on human subjects except for EHT itself.

12             She testified that every single representation made,

13   that every single one of them are consistent with DSHEA and that

14   they're backed by peer-reviewed scientific evidence.  She

15   testified -- She offered an opinion that it's not required to

16   have randomized placebo-controlled double-blind tests for a

17   dietary supplement.  And what she does is to draw a line between

18   claims that are actually made by Neora versus some of the things

19   that Brand Partners may have made.

20             If we turn to Page 66, we broke down the claims at

21   issue as it relates to product representations.  And what you can

22   see there is that almost all of the claims that are at issue here

23   date back to when EHT was introduced in 2015.  And there are a

24   few in 2017, but you see in the last three-and-a-half years that

25   there are no product misrepresentation claims being asserted

1    against Neora or Mr. Olson.  And we believe that's because the

2    company has improved its processes and the company has also --

3    that it reflects the reflectiveness of its income -- excuse me --

4    of its compliance and training programs.

5           There are a lot -- The position that seems to be taken

6    by the FTC is that if the word "Alzheimer's" is mentioned, that,

7    in fact, that means it's automatically an improper disease claim.

8    And we think it's a lot more nuanced than that, and I can show

9    you quickly.

10          But the next few pages, Your Honor, are actually the

11   training guides that were prepared back when EHT was rolled out

12   in 2015, and you'll see -- I'm not going to go through all of

13   them -- but in every instance, they make claims that are

14   consistent with being a supplement.  And in every instance they

15   make clear that it is not -- it is not disease -- that it's not a

16   treat -- it's not to treat, cure or prevent disease.

17          There are actual FAQs that were prepared for the Brand

18   Partners to train them that you cannot say, "EHT treats, cures,

19   or prevents Alzheimer's, Parkinson's," any of those type of

20   things.

21          Starting at Page 70 is a more current updated product

22   guide which says the same thing.

23          We also, starting at Page 72 -- I'm not going to go

24   through those -- but it highlights, again, the same Policies and

25   Procedures.  All of this evidences a serious undertaking by the

1    company to ensure that its Brand Partners talk about this product

2    and to do so in a proper fashion.

3            I'm going to focus on one more slide.  I'm mindful of

4    the Judge -- of the Court's suggestion that I wrap this up, and I

5    very much appreciate the time given today.

6            But on Page 76 is an example of one of the things that

7    the FTC is complaining about.  It's actually a press release, not

8    by Neora; a press release by Signum, the party who discovered

9    EHT, and it's referencing a peer-reviewed article that was

10   published in 2017.  And as the highlighted part makes clear, it

11   makes clear that that research was conducted in rodents, not

12   humans, and it has a link to the actual research.  It has the

13   extract which mentions rodents, mice and animals multiple times.

14           If you look at the posts that are being complained

15   about, there are about 95 posts.  The FTC assumes that all of

16   them are Brand Partners.  For some of them, that may be true.

17   And the FTC complains about two of the 95 posts.  I think if you

18   look at those two posts, we would agree.  We don't like the way

19   they're phrased, and they should be taken down.

20           But if you look at it from the net impression, you have

21   an article conducted -- posted by an entity that conducts

22   research out of Princeton and describes exactly what's going on.

23   We think that's a good example of why Neora shouldn't be held

24   responsible for the fact that two people read this and

25   misunderstood it.

1     Balanced against that is a substantial amount of

2  evidence regarding the efforts that are undertaken by Neora to

3  enforce its product and income rules.

4     Exhibit 35 talks about -- Ms. Davis talks about

5  providing an income and product claim distribution guide to all

6  Brand Partners when there's a problem that's discovered.

7     Exhibit 69 and 70 are representative examples of

8  enforcing the enforcement policy.

9     Exhibit 26 is -- are the templates that are used to

10  deal with this.  So you can see how they routinely do it, and it

11  goes on and on.

12     Your Honor, I have gone on long enough.  I appreciate

13  your patience.  We could talk about this endlessly.  I'm happy to

14  answer any questions or to yield the floor.

15     THE COURT:  Okay.  Thank you.

16     I'll hear from the FTC in response.

17     So I'd like to -- You may respond -- They spoke much

18  longer than you did, so you can respond as you like.  I

19  particularly want to hear from you on the issue of recruitment as

20  opposed to sales of products, representations by BPs and whether

21  those are attributable to the Defendants, and the injunction as

22  it relates to EHT -- an injunction as it would relate to EHT,

23  given the date of the representations upon which you rely.

24     MS. ROLLER:  Thank you, Your Honor.

25     So I will address the issues related to the other

1    counts, and then I'll ask my co-counsel to come up and discuss

2    Counts Three and Four.

3              So, first of all, in rebuttal, we would like to object

4    to Defendants' unauthorized surreply brief in the form of this

5    PowerPoint which contains numerous citations to the record and to

6    law that are not in Defendants' briefing and that are raised here

7    for the first time.  And I'll go through those briefly and also

8    respond to them.

9              Defendants' presentation began by discussing the *Amway*

10   decision.  There are a few citations to *Amway* in their briefing

11   but not for the propositions that were discussed today.

12             The various *Amway* factors that they discussed, such as

13   the 70 Percent Rule, the Retail Sales Rule, product returns, if

14   those had been raised in Defendants' brief, the FTC would have

15   had the opportunity to introduce to Your Honor deposition

16   testimony from the company's Corporate Representative stating

17   that those policies are not enforced at Neora and, indeed, that

18   at least one of those rules has actually been removed from the

19   company's Policies and Procedures specifically because it was not

20   enforced.

21             Furthermore, Defendants argued today that only a

22   quarter succeed at recruiting, and they say that that proves that

23   only a quarter want to succeed at recruiting.  I hope the illogic

24   of that statement is pretty manifest.  Unfortunately, the

25   consumer complaint cited in the FTC's summary judgment brief show

1   that many, many people make an honest effort to succeed at Neora

2   and fail through no fault of their own.  The fact that many BPs

3   don't succeed in recruiting even a single other BP, that is not

4   an exonerating factor.  That is an indictment.

5          Defendants ---

6          THE COURT:  Well, I think -- I think what they were

7   arguing is that they don't want to recruit others, not that

8   they're unsuccessful at doing so, but they're not trying to do

9   so.  That's relating to this issue that I asked the question

10  about where Preferred -- I'm simplifying this grossly; I

11  understand that, but you'll understand the point -- that a

12  Preferred Customer pays 20 bucks to get an additional ten percent

13  discount and that's all they want.  They don't -- They have no

14  aspiration to create a network of recruits.  They're not trying

15  to do that.  They just want the greater discount for their own

16  consumption of products.

17         MS. ROLLER:  Absolutely, Your Honor.  I understand the

18  Defendants' argument is that these people are not trying, but the

19  only evidence they have for that is the proof that they are not

20  succeeding; right?

21         Their evidence that people are not trying to recruit is

22  statistics showing that people don't recruit, but that doesn't

23  necessary follow.

24         And to -- I hesitate to detour, but since Your Honor

25  mentioned the BPs who started out as PCs, there's two things that

1    I would say about that.

2           First of all, it does not follow that because someone

3    becomes a BP from being a PC, their motivations necessarily stay

4    the same, and Defendants have no evidence that that is true.

5    Indeed, I want to be careful.  Defendants do not have any

6    evidence that those people's behavior stays the same.

7           Mr. Florence said something about midway through the

8    presentation that indicated that that's true.

9           THE COURT:  Yes, he said that.

10          MS. ROLLER:  Yet, there's not -- Defendants' expert,

11   that's not the evidence.  They just have the numbers showing that

12   those people started out as PCs and now they're BPs.  What their

13   behavior is after that is unknown.  But the fact that now their

14   purchases qualify them for rewards, including these very

15   lucrative rewards that are promised, how could that not change

16   their behavior?

17          The second thing that I would say about that population

18   of BPs who started as PCs is that Defendants do not dispute the

19   FTC's evidence from Defendants' own survey of Preferred

20   Customers, which is cited in our brief, that even Preferred

21   Customers' purchasing may not be based on legitimate retail

22   demand.  Thirty-three percent of PCs say that the product is not

23   fairly priced.  Fourteen percent of them admit that they felt

24   obligated to sign up as PCs but have no intention of continuing.

25   And their continued purchase behavior is strongly correlated with

1    the strength of their social relationship with the person from

2    whom they're buying the product.

3            So I'll circle back now to a few more items that were

4    mentioned in Defendants' presentation that were not mentioned in

5    their briefing.

6            The testimony from the FTC's consultant, David Givens,

7    also not cited in their brief and a violation of the Protective

8    Order in this case that prohibits Defendants from asking

9    Dr. Givens about his opinions rather than about the facts

10   underlying the documents he provided to the testifying expert,

11   Dr. Bosley.

12           The charts on Page 35 through 37, these are all new,

13   and Defendants make no representation that these scenarios that

14   they depict are in any way typical.  And, indeed, they are not

15   because the scenarios they're -- the Defendants expound there

16   presume that, for example, the Brand Partner will recruit nine

17   BPs or will enroll nine Preferred Customers when the undisputed

18   evidence shows that the majority of Brand Partners never enroll

19   even a single PC.  So nine is really a wild assumption.

20           THE COURT:  But I think this was -- I may have

21   misunderstood, but I thought this was being utilized for a pretty

22   simple purpose which was to demonstrate that there is not a

23   financial incentive to enroll new BPs as opposed to new PCs.  I

24   thought that was the point.

25           MS. ROLLER:  That's the purpose for which they're using

58

```
 1    it, but that evidence does not for support that because it uses

 2    such an "out there" scenario.

 3          To look at what the Compensation Plan actually

 4    incentivizes -- And here I'll go to Your Honor's concern about

 5    recruitment versus sales.  So if you look at the recruiting

 6    rewards in the Compensation Plan, they are really hard to

 7    achieve.  And that's Defendants' choice, right?

 8          They structured that plan in that way.  So, for

 9    example, the personal sales commission, which is the first of the

10    rewards for selling, you get nothing unless you make at least

11    $300 per month in sales which is more than most PCs buy in their

12    entire lifetime with the company.

13          THE COURT:  Okay.  But doesn't that go to income

14    misrepresentation and not necessarily pyramid?

15          MS. ROLLER:  No, Your Honor.  I strongly disagree with

16    that because what makes a company a pyramid scheme is whether you

17    can succeed by retail alone or whether you have to recruit.  So

18    this goes to the difference between a legitimate multi-level

19    marketing company and a pyramid scheme.  They're both shaped the

20    same way; right?

21          And there's recruiting in both and sales in both.  The

22    question is:  Can you succeed at any part of that structure?

23          In a legitimate multi-level marketing company, some

24    people will recruit a lot, and they'll succeed by doing that but

25    some people won't.  The people at the bottom, they can still
```

1    succeed because you can make money by selling product alone.

2    That's enough.  Whereas in a pyramid scheme, just as in Neora,

3    the only people who make money are the people at the top.  The

4    people at the bottom have no chance to succeed.  And this is what

5    makes a pyramid scheme illegal.

6           As laid out in *Koscot*, as laid out in *Torres II*, the

7    problem with a pyramid scheme is that inherently, by virtue of

8    its structure, the vast majority are doomed to fail.  If you have

9    to have a big downline to succeed, then most people can't succeed

10   because for every person who has a hundred people in their

11   downline, that's a hundred people who are failing.  So whether

12   you can make money just by selling product is extremely relevant

13   to whether or not Neora is a pyramid scheme.

14          A few other points that were raised by Defendants for

15   the first time, going to the income misrepresentations, the

16   provisions in their Policies and Procedures, that's being raised

17   for the first time.  And the problem with the Policies and

18   Procedures provision is that they are not enforced.  And, again,

19   if this had been raised in Defendants' briefing, the FTC would

20   have had the opportunity to show Your Honor deposition testimony

21   indicating that they are not enforced.

22          A few -- So now to turn to the issues that Your Honor

23   wanted to hear about just real briefly on the pyramid and on

24   earnings, and then I will turn it over to Mr. Ward.

25          So why is Neora responsible for BPs' statements?  Four

 1    reasons.

 2            First, because BPs are Defendants' agents.  They now

 3    argue that they are not.  They now cite agency law.  That's new;

 4    didn't do that in their briefs as, in fact, we pointed out in our

 5    Reply Brief.  But Defendants' BPs are their salespeople.  That is

 6    the whole point of having BPs.  In a multi-level marketing

 7    company, you don't have employees.  Your salespeople go out and

 8    sell your product by word of mouth.  That is the whole point of

 9    multi-level marketing and it is the whole point of having a BP.

10            Second, Defendants model this behavior.  If Defendants

11    in their official videos, if Mr. Olson in his official

12    appearances makes these claims and then BPs imitate that,

13    Defendants are responsible for that conduct.

14            Third, Defendants in many cases told the BPs to make

15    these statements.  We have citations in our brief to numerous

16    instances in which Defendants told BPs at conferences or in

17    training videos, "Tell people how much money you make.  Post

18    pictures of your Lexus online.  Tell everyone about what EHT can

19    do for Alzheimer's and Parkinson's and CTE."

20            When Defendants tell BPs to make these representations,

21    they cannot later then disclaim them.

22            Finally, fourth, is a legal matter.  The law is very

23    clear that an FTC Act defendant is responsible for the

24    misrepresentations made by its salespeople, even if they made

25    efforts, honest efforts, well calculated to prevent that.  That's

1    from *Standard Distributors*.  Even if the representations were

2    condemned and discouraged.  That's from *Goodman*.

3           When you use your salespeople to sell the business

4    opportunity, to sell the products and they make positive

5    statements about the business opportunity and about the products,

6    Defendants should not be heard to later wash their hands of those

7    statements.

8           As far as recruitment versus sales, I did discuss that

9    a little bit previously related to the fact that you cannot make

10   money from sales.  But I also want to hit the other side of that

11   which is that recruitment is very, very lucrative at Neora, and

12   Defendants do not dispute that.  I -- You know, Mr. Florence had

13   a lot to say about pyramid, but one thing he didn't say:

14   Defendants don't claim that you can make money by sales alone at

15   Neora because they know they do not have the data to back that

16   up.

17          The top five percent -- Sorry.  The top five people,

18   the top five BPs in terms of income, and this is from PX-98, made

19   ten percent of the rewards while Defendants' own Income

20   Disclosure Statement states that 76.3 percent of active BPs made

21   nothing.  That's just active BPs.  And although Defendants argue

22   that 96 percent of BPs who paid in more to the scheme than they

23   got out, they got something of value.  The evidence just doesn't

24   bear that out and neither does the law.

25          *Vemma*, which is a case that Defendants themselves cite,

1    states that when you train BPs to purchase product to qualify for

2    rewards, when you incentivize BPs in your Compensation Plan to

3    purchase product to qualify for rewards, you can't unring that

4    bell.  Defendants have poisoned the well as far as figuring out

5    what BPs' motivations are.

6            Defendants want to place the responsibility on the FTC

7    to prove what percentage of BPs' motivations came from a genuine

8    desire for the product versus a desire to qualify for rewards,

9    but that's like dumping a cup of bleach into the well and then

10   asking the FTC:  What percentage of that water is safe to drink?

11           None of it.  None of it is safe to drink.  The well has

12   been poisoned.

13           For that reason, Your Honor, Neora cannot say that BPs

14   buy product just because they like it so much.  They have trained

15   in the videos that we presented examples of and incentivized in

16   their Compensation Plan BPs to purchase product and, indeed,

17   their Compensation Plan, as Defendants do not dispute, allows BPs

18   to buy rank.  For at least $2000 a month they can count toward

19   advancement in rank.

20           I will now, if Your Honor is amenable, turn it over to

21   Mr. Ward.

22           THE COURT:  Okay.  Thank you.

23           MS. ROLLER:  Thank you.

24           MR. WARD:  Good afternoon, Your Honor.

25           THE COURT:  Good afternoon.

1          MR. WARD:  The representations about EHT and EHT

2    products started even before the company had acquired the rights

3    from Signum to sell this product.  And so they had a big

4    marketing push before they even began selling the product.  And

5    even -- And during that period and afterwards, the Defendants

6    made representations themselves.  So I think that it was a little

7    bit incorrect for Defense counsel to focus so much on the Brand

8    Partners because I think the first order of business is to look

9    at what the -- the Defendants themselves did.

10         And what they did was they -- they issued a press

11   release.

12         THE COURT:  This is back in 2015.

13         MR. WARD:  That's right, Your Honor, in 2015.  As soon

14   as they got the rights to sell the product, just a few days after

15   that, they issued a press release.  They had their PR firm draft

16   it.  They paid the PR firm to draft it, and it linked these --

17   this substance, EHT, to being something that would help prevent

18   Alzheimer's and Parkinson's and -- and other neurological

19   diseases and injuries.  That was the press release they issued.

20         Then they had an event for Brain Injury Awareness Month

21   in March of 2015 where they had ex-NFL players come and talk

22   about concussions and how they were going to donate their brains

23   to science.

24         And then in the meantime, Neora was promoting the ME

25   Sports website that we show images of in our Complaint.  They

1    were promoting that to build the buzz around EHT for when they

2    began selling the product later in the spring.  And the website,

3    as we've shown in our evidence, included a page devoted to

4    Alzheimer's disease, a page devoted to Parkinson's disease, and a

5    page devoted to CTE.

6         And then at the "Get Real" event in April when they --

7    when they actually began selling the product, they had Max Stock

8    get up on stage and talk about Junior Seau, an NFL player who had

9    CTE and ended up tragically taking his own life.  He suggested

10   that this -- this product would be of special interest to

11   football coaches and -- and -- and the -- He mentioned in that

12   and a speech that he made at the September "Get Real" conference

13   that it would be important to people, you know, such as were --

14   were shown on the Signum website who had suffered brain injury or

15   those kind of conditions.

16        So -- So in other words, the Defendants were pushing

17   this theme of Alzheimer's, Parkinson's, CTE and concussions all

18   along.  They were -- They had a blog post in -- in -- appealing

19   to parents of -- excuse me -- children who were playing contact

20   sports, to protect their kids by having them take EHT.

21        And the company also created flyers.  They created

22   flyers linking EHT to brain injuries and saying in one flyer that

23   EHT was the solution to brain damage.  And they had one of those

24   that was directed toward soldiers who had suffered traumatic

25   brain injury on the battlefield, and they had one that was

65

 1  directed to try and sell this product to cage fighters in the

 2  Ultimate Fighting Challenge which is a league that involves a lot

 3  of contact and that the suggestion was "This pill will protect

 4  you.  You can go ahead and do these things, and it's going to

 5  protect you," or it's going to ameliorate the conditions.

 6          So these are things that the Defendants themselves did.

 7  And then they handed the baton off to their Brand Partners, and

 8  the Brand Partners ran with it, Your Honor.  And they posted all

 9  over social media, all over Facebook and Instagram about how

10  EHT -- excuse me -- was going to help prevent Alzheimer's, was

11  going to protect you from Parkinson's, was going to protect you

12  and your children from concussions and from CTE.  And so that

13  went on, and our -- our evidence has over a hundred examples of

14  those posts, and that's in Exhibit 168.

15          Plaintiff's Exhibit 168, Your Honor, shows over a

16  hundred representatives' examples of these posts.  And the posts

17  went on from, you know, when this started in 2015 right up until

18  2020.  I mean they were -- they were -- There were posts showing

19  up even while this case was pending.  So this was a very big part

20  of how this product was promoted to the public, and the

21  Defendants made 160 million dollars as a result of that course of

22  conduct.

23          THE COURT:  Okay.  But the chart that is at Page 66 of

24  what was furnished in the PowerPoint, do you dispute those

25  numbers that are contained there?  That since February 1,

1   2019, --

2            MR. WARD:  I'm sorry, Your Honor.  What page was that?

3            THE COURT:  66.

4            MR. WARD:  66.

5            THE COURT:  That since February 1st, 2019, there have

6   been 16 representations about EHT, all made by Brand Partners?

7   Whether Brand Partners or agents or not, assume they're agents.

8   That's quite significantly down from what was happening before.

9            MR. WARD:  Your Honor, what I would say about that is:

10  First of all, I haven't -- I haven't seen this before, so I'm not

11  sure about the numbers, but what they're talking about is our

12  evidence.  So we put into the record over a hundred

13  representative examples of the posts from the Brand Partners, and

14  they're acting as if that's -- those are the only statements

15  made.  But the truth is that the claims continued to be made

16  after the FTC informed Neora that it was under investigation and

17  after the FTC sued Neora.

18            And I would also say that some of this content is still

19  on the Internet, Your Honor, of the EHT press release that they

20  issued.  It's still up on the Internet.

21            THE COURT:  Well, I -- Let me.  I'm just going to --

22  Since you raised that, I'm going to say that I think that

23  citation in your brief at Page 25 is unfair.  I looked at that

24  because I was surprised at that and I went and looked at it.  And

25  what that means is that it is a historical document that is still

1    available.  You can't get rid of documents from the Internet.  If

2    you're making a representation on your own website and you want

3    to stop making it, you can stop making it, but you can't erase

4    the Internet.  And that press release is there as a historical

5    document.  I don't see that the fact that it is still present is

6    a continuing representation.  What are they to do to make it go

7    away?

8              MR. WARD:  I understand what you're saying, Your Honor.

9              THE COURT:  Okay.

10             MR. WARD:  I think, however, that the Defendants were

11   responsible for that and other content similar to it going up on

12   the Internet.  And the -- It could be taken down.  I don't know

13   that ---

14             THE COURT:  I don't know how you do that.

15             MR. WARD:  I don't know that this is -- This is not a

16   Wayback Machine, Your Honor.  This content is still accessible so

17   that if people do research, the Brand Partners for Neora and the

18   company often tell people, "Go out and do your own research on

19   EHT."  And, of course, we've shown ---

20             THE COURT:  Okay.  But I mean if you -- I had a case

21   involving child pornography and the jury wrote me a note

22   requesting that as part of the relief in the case, that I

23   withdraw this information from the Internet, and I didn't know

24   how to do that and I don't know how anybody else can do it.  You

25   can stop making representations, but you can't erase the

 1   historical record from the Internet.

 2         Do you know of a way to do that?

 3         MR. WARD:  I think that there's certainly a distinction

 4   there, Your Honor, but I think if a website makes certain

 5   representations, it can be changed.  And if a document on the

 6   Internet was put up by your PR firm, it could be taken down.

 7         I think that what you're referring to, Your Honor, if I

 8   understand correctly, is that some things that are up on the

 9   Internet, there will be a record somewhere of it.  It might be in

10   a Wayback Machine.

11         THE COURT:  Well, I hear what you're saying about the

12   Wayback Machine.  I'm just -- I'm not familiar with how a press

13   release that is issued on Day A is gone on Day B because you want

14   it to be.  I just don't know how to do that.  Well, I don't want

15   to waste time on this.

16         MR. WARD:  You're quite right, Your Honor.  I mean that

17   is -- that is one of the points that their PR firm ---

18         THE COURT:  Well, the issue -- Look, the issue with

19   respect to EHT is, in my view, two-fold.  First of all, are the

20   Defendants responsible for what the BPs are saying?  And (2) are

21   they continuing to say it?

22         If the last representation about EHT was made three or

23   four years ago, you're going -- and I agree and I find that the

24   Defendants are responsible for whatever misrepresentations were

25   made about it, if you convince me that they're saying that a

69

 1    person won't get CTE or Alzheimer's if they take EHT, you're

 2    likely to win on that being an actionable misrepresentation, if

 3    it's made by someone whose statements are attributable to the

 4    Defendants.  But if the last time anybody said that was three or

 5    four years ago, you're going to have to convince me that there's

 6    a reasonable risk to the public that such a statement will be

 7    made the day after our case is over, if I don't enjoin them.

 8          MR. WARD:  Yes, Your Honor.  Under the *Cornerstone*

 9    *Wealth* factors, you're absolutely right.

10          THE COURT:  And I don't -- I don't hear the Defense

11    attempting to defend the merits of these representations about

12    what EHT can do.  Mr. Florence wants me to put this in the

13    category of "Eat your Wheaties and you won't get a cold."

14          He knows, you know, and I know that if there are

15    misrepresentations that EHT will prevent people from getting CTE,

16    that's going to be actionable if it's made by a person whose

17    misrepresentations are attributable to them, and then the only

18    issue is going to be how recently and by whom were such

19    statements made so I decide whether to grant injunctive relief.

20          You've don't have to do much to convince me that

21    statements like that are false.

22          MR. WARD:  Absolutely, Your Honor.  And that's why we

23    do believe that the liability is clear because these statements

24    were made both by the Defendants in setting the stage and

25    building -- building these up as the themes to sell EHT to the

1    public, and then the Brand Partners took it from there and spread

2    it on social media.

3         And I would say he did mention one thing that I just

4    wanted to clarify.  It sounds like Your Honor understood this,

5    but he said that their expert looked at all the claims, and we

6    dispute that.  Their expert definitely did not look at all the

7    claims.  Their expert looked at the claims that were on a certain

8    piece of paper that was printed up by the company that had some

9    of those FDA type of claims on it, some of the more generalized

10   claims about well-being.

11        But the claims that we're talking about, there's ample

12   evidence in the record that they were made, and they were made

13   very intentionally.  I mean to say in a flyer that EHT is the

14   solution to brain damage, that's a totally uncorroborated claim,

15   Your Honor.  There's no substantiation at all for that.  Our

16   experts have attested to it.  Defendants' expert doesn't have

17   anything to say about that.  Defendants' expert refused to

18   express an opinion on whether or not those type of claims about

19   Alzheimer's, Parkinson's, concussions and CTE could be

20   substantiated.  She said nothing about that.  She only wanted to

21   talk about the other claims, but those claims are, you know,

22   whether or not they're subject to FDA rules.  They're not the

23   claims at issue in this lawsuit.

24        And so that's why we brought our *Daubert* motion against

25   their expert because she doesn't offer any relevant testimony on

1    the claims at issue, and she's not qualified to express an

2    opinion about marketing or advertisement, particularly since she

3    didn't review the evidence showing that the claims had been made.

4              And I would say that, Your Honor, also the exhibit

5    showing the posts about the rodent study, I think Defendants are

6    misdirecting the -- the issue on that.  The -- What that shows is

7    that they didn't have substantiation.  And, of course, they knew

8    that from the outset.

9              When they got the rights from Signum to distribute EHT,

10   Signum gave them all the research.  They knew there were no human

11   trials.  They knew they didn't have substantiation.  They worried

12   about it.  They exchanged e-mails about it.  And this rodent

13   study that came out, that -- that's just, again, something that

14   doesn't substantiate these type of claims.

15             Their Brand Partners, there's a couple of them that

16   posted in response to that and made claims that they admit

17   crossed the line, but there are numerous other examples in the

18   records, Your Honor, that you can look at and see the kind of

19   claims that their Brand Partners were making.  And those claims

20   utterly lack substantiation, and they were very material because

21   they go to, you know, very frightening diseases that we're all

22   concerned about and we all wish there was a cure.  But it's

23   simply not fair to make a 160 million dollars telling people that

24   you've got the answer when you know you don't.

25             THE COURT:  Okay.  All right.  Thank you.

```
 1              MR. WARD:  Thank you, Your Honor.

 2              THE COURT:  All right.  Mr. Florence, I know you'd like

 3     to have a rebuttal but you spoke about three times as long as

 4     they did, so I'm not giving you one.

 5              MR. FLORENCE:  Thank you, Your Honor.

 6              THE COURT:  All right.  I know it would be brilliant,

 7     Mr. Florence.

 8              MR. FLORENCE:  It would be eloquent.

 9              THE COURT:  All right.  I'm denying all Motions for

10     Summary Judgment.  The Court will consider these matters upon a

11     full evidentiary record where the Court can hear the testimony,

12     observe the persuasiveness of the witnesses, and make an informed

13     judgment based upon all the evidence.  So all Motions for Summary

14     Judgment are denied without prejudice.  That moots the objections

15     and motions to strike evidence that was submitted.

16              Now I want to talk about the *Daubert* motions.  I --

17     First, I want to talk about the motions to strike the submissions

18     by the FTC of declarations.  These were submitted, obviously, in

19     connection with the Motion for Summary Judgment.  I'm assuming,

20     now that I've denied the Motions for Summary Judgment, that the

21     witnesses would be appearing, including Ms. Miles and Ms. -- Is

22     it "Boggess" or "Boggess"?

23              MS. ROLLER:  Your Honor, it is Ms. Boggess.  And

24     because of professional obligations, Ms. Boggess will not be

25     available to testify.
```

1          THE COURT:  Okay.  So the issue of her declaration is

2     moot.

3          Ms. Miles, I assume, will be testifying as a numbers

4     cruncher, according to the FTC.

5          MS. ROLLER:  That is correct, Your Honor.

6          THE COURT:  All right.  I take it from the briefing on

7     this that the Defense position is that Ms. Miles did not crunch

8     the numbers properly.  Is that right?

9          MS. KU:  Your Honor, our position is not just that she

10    did not crunch them properly but that she does not qualify as a

11    1006 witness either for various reasons.

12         THE COURT:  Why?

13         MS. KU:  For one, in order to qualify as a 1006

14    witness, you have to be able to show that you provided the

15    underlying documents.  In this case, they say that the documents

16    are, in fact, our own data.  But the problem is that our own data

17    is being manipulated and utilized in a way to generate their

18    calculations; that we don't know how that was done.

19         THE COURT:  Okay.  You can take her deposition.  I'm

20    going to permit you to do that.  Otherwise, your motion to strike

21    her is denied.  So if you want to take her deposition of how she

22    manipulated the numbers, -- I'm not using "manipulated" in a

23    pejorative -- then you can.

24         And the FTC is directed to arrange for that.

25         My strong inclination with respect to all the other

 1    motions to strike, Coughlan, Vandaele and Kurzer, is to deny all

 2    of those.  Let the Court hear the evidence and objections in

 3    connection with the testimony, and I'll either hear it at trial

 4    or I won't.  The chances are I'll hear it.  And then if I

 5    conclude it's not appropriate for the Court to consider it or I

 6    don't find it persuasive, then that will be the way I will

 7    determine it.

 8            I'll hear any comments on that.  Otherwise, that will

 9    be my ruling.  Anybody want to be heard on that?

10            Okay.  All right.  Now let's spend a few minutes

11    talking about the trial.  I had to make one adjustment in the

12    schedule that I had provided to you all that I assume you have

13    now received.

14            Does anyone have any issues with respect to planning

15    for and proceeding with the trial on the schedule the Court has

16    provided?

17            MR. FLORENCE:  Your Honor, we do not.  I do want to

18    make a comment that we were doing a little bit of back-channeling

19    research regarding whether an opinion that was reversed ---

20            MS. KU:  I'll go -- I'll go ahead, Your Honor.  I just

21    wanted to say earlier you had mentioned that there was a parallel

22    rule to the one in the Ninth Circuit --

23            THE COURT:  Right.

24            MS. KU:  -- in the Fifth Circuit and, indeed, there is.

25    It's 41.3 that does affect the precedential value of a panel

1    decision that's been vacated by an en banc court.

2            In our position, we would say that the relevance of the

3    citation is not diminished in the sense that we're saying that

4    that does -- has been stated to be the case.  There are other

5    Fifth Circuit cases that we could point to that actually do go

6    ahead and cite to similar cases that have been situated in that

7    regard.

8            For example, in *U.S. v. Brown*, the citation is 167 F3d

9    538, Footnote 1.  There they just -- they cite to a case that has

10   had a panel -- that's a panel decision that was vacated by an

11   en banc court, and then they give the subsequent history.  The

12   point being that our position here is not that that has

13   precedential value so much as to control this Court but that it

14   goes to inform the Fifth Circuit law that has existed and has

15   formed what we should consider to be relevant here.

16           THE COURT:  Okay.

17           MS. KU:  We will say that the *Torres II* holdings are

18   largely relied on by us in this -- in our brief.

19           THE COURT:  Okay.  All right.  No problem.  I wasn't

20   finding fault with you in citing it.  I am more familiar with

21   this than I would be otherwise because for all the times I've sat

22   with the Ninth Circuit, which is many over almost 15 years, I was

23   on a panel where I was the dissenter.  The only time I've ever

24   been a dissenter and the case went en banc and my opinion, which

25   I thought was pretty darn good, which is the same way the Court

1    came out, was all for naught.

2          All right.  Any -- Any other matters with respect to

3    the trial?

4          MS. ROLLER:  Your Honor, we had two sort of logistical

5    questions.

6          THE COURT:  Okay.

7          MS. ROLLER:  First, is Your Honor interested in hearing

8    opening and closing or would you prefer to dispense with that?

9          THE COURT:  So I'm going to let you use your time as

10   you would like.  I hope it's obvious that I am not ignorant of

11   what the case is about.  So you may -- If you think it's helpful

12   and productive, you may open and choose not to.  That will be

13   fine.  I don't have a strong preference.

14         MS. ROLLER:  Thank you, Your Honor.

15         Our second question is about Your Honor's openness to

16   remote testimony.  We have a couple of witnesses, one of whom is

17   on the older side and would prefer not to travel, and the other

18   of whom may not be able to physically be present.  This is Tator

19   and Mastrianni.  I don't know how Defendants would feel about

20   that but just in general, taking Your Honor's temperature on the

21   possibility of remoteness.

22         THE COURT:  Yeah.  I don't -- I don't have a strong

23   view about not doing that.  I have done that on occasion.  I

24   would -- If there's a strong objection that I find compelling

25   that there's some reason to believe that Cross Examination, for

1  example, cannot be fruitful or productive that way or there's a

2  concern that the witness might be coached because of the

3  circumstances, I allowed it and disallowed it.  It all depends on

4  the circumstances, but I'm not structurally opposed to it, if

5  it's in such a way that I can see and hear and we've got a good

6  wireless connection.  I mean I would be in favor of that,

7  affirmatively in favor of that, more than I would be in a jury

8  trial because I'm used to seeing people testify remotely, and I

9  don't have a problem with it.

10         So I think you should assume that there should be

11  a presumption in favor of doing so.  And if the opponent has a

12  strong reason other than just generally not liking it, you can

13  say so.  And I will take seriously an argument that, "This is a

14  very important witness and we cannot effectively cross-examine

15  them unless they're here live," but don't throw that argument

16  around as to just anybody.

17         MR. FLORENCE:  Your Honor, as it relates to these two

18  particular witnesses, we would certainly not have an objection to

19  accommodating them.  There are other witnesses where our position

20  may be different.

21         THE COURT:  Yeah, that's fine.  I would anticipate that

22  would be true as well, and I assume you all will be accommodating

23  of each other in that respect.

24         But, please, do a check.  You know, people think it's

25  all working fine and then we cue it up and I can't hear and I

1    can't see.

2            And I've said this for 22 years:  This courtroom is

3    haunted.  Before we got new technology, when I was a lawyer

4    sitting right where you are, Mr. Florence, all of my at that time

5    primitive technology all went south.  And I looked up at Judge

6    Maloney, who's sitting -- who was sitting where I am sitting

7    right now, and he said -- put his glasses down at the end of his

8    nose and said, "Move along!"

9            So every time something goes wrong in here, I remember

10   that and never say, "Move along."  But there's something wrong in

11   here that surfaces when no one could predict it.  So just make

12   sure if you're relying on technology, that you check it out

13   before I come out here and we waste our time.

14           Kate, do you want to be the timekeeper or do you want

15   them to keep their own time?

16           LAW CLERK KATE MARCOM:  I can keep it.

17           THE COURT:  Okay.  Okay.  So you all can keep your own

18   time as well, but Kate's going to be the official timekeeper for

19   the Court.

20           MR. FLORENCE:  Your Honor, we have one matter that we

21   anticipate needing to address with the Court --

22           THE COURT:  Okay.

23           MR. FLORENCE:  -- at some point and that is the

24   propriety of protecting the confidential business information of

25   Neora.  We are mindful of what the Court recently said regarding

1    sealing of records.  We do have a young attorney, that that -- we

2    think that that would be an opportunity for that young attorney

3    to make an argument that we think is important.

4         THE COURT:  Well, I don't want to waste time during the

5    trial.  I'm going to give you during the trial, without further

6    proof, the opportunity to claim that something is confidential.

7    I'll hear if that is disputed.  If it's disputed, I will

8    determine it later.  Even if it's not disputed, you all need to

9    know that every time I go to a judge conference where there are

10   appellate judges of all kinds there, this is the No. 1 subject on

11   which we get fingers wagged at us because when cases go up on

12   appeal, they can't do their jobs because they can't get access to

13   the stuff they need to review to review the record, and that's

14   the fact.

15        And so I don't have the time or ability to review every

16   designation of confidentiality for substance, but things that are

17   old are not going to be treated as confidential.  So you all need

18   to be sparing in your designations.  You need to figure out what

19   is really confidential, and then you've got to come up with some

20   methodology so the Court of Appeals can do its job.

21        MR. FLORENCE:  Thank you, Your Honor.

22        MS. KU:  Your Honor, if I may ask --

23        THE COURT:  Yes.

24        MS. KU:  -- a housekeeping matter.  With respect to the

25   deposition of Ms. Miles, would it be all right for us to request

1  the documentation that we believe is necessary in order to take

2  that deposition and that that be provided to us within a

3  reasonable time before so that we can prepare sufficiently?

4           THE COURT:  Well, I think you should tell them what you

5  want and they will answer.  I suspect the answer is going to be,

6  "You already have it; it's your own materials, and there isn't

7  anything else for us to give you."  That's what I expect this

8  dispute to be about.  And then when somebody comes to the Court

9  on a motion, I will be referring it to the Magistrate Judge.

10          MS. KU:  And lastly, with regard to objections that are

11  raised, how is that counted in terms of the time per party?

12          THE COURT:  So if you're talking, your clock is

13  running.

14          MS. KU:  Thank you, Your Honor.

15          THE COURT:  That's a good way to keep objections down

16  to a minimum.  If the other side's clock is running, that is

17  going to maximize the number of objections.  So if you're

18  talking, your clock is running.

19          Now if that is abused, if there is reason for me to

20  adjust it, you can ask me to adjust it, but the presumption will

21  be that if you're talking, your clock is running.

22          Anything else?

23          Okay.  You all can have water.  If you -- If you all

24  want to be eating lunch in the courthouse during the break, one

25  side can use the Jury Room and I'll find another place for --

1    Usually it's this side that's closer that uses the Jury Room.

2              Do you all want me to find you a space?

3              MR. FLORENCE:  That would be terrific.

4              THE COURT:  Okay.  But -- This is off the record.

5              (An off-the-record discussion was held between the

6    Court and counsel.)

7              THE COURT:  All right.  Anything else?

8              Okay.  So I'm going to give you all a little bit of

9    extra information about me in a bench trial.  I haven't had one

10   in quite a while.

11             In a jury trial, I rarely ask questions and keep myself

12   out of the way of the lawyers.  In a bench trial, I often ask

13   questions.  So you should not be surprised at that.  And that's

14   the exception to:  If I'm talking, my clock is not running.  Your

15   clock is running.  I will be making -- As a general proposition,

16   I don't think that is going to unduly affect your time, but I'll

17   ask Kate to keep track of my clock separately.  I'll allocate it

18   as I deem appropriate.  But if it is unduly taxing one side or

19   the other, I'll take care of that.

20             Now we have to finish when I said we would.  So it is

21   conceivable that we may have to run longer on a certain day if,

22   for whatever reason, we don't look like we're making progress

23   with the hours that I have assumed.  I put enough fudge in there

24   for us, I think, to finish as scheduled.  But if something is up,

25   then I may have to have you work longer or earlier than I

1    anticipated.

2         MR. FLORENCE:  Does the Court anticipate post-trial

3    briefing?

4         THE COURT:  I don't know.  Maybe.  Probably.

5         MR. FLORENCE:  We had proposed 25 pages.  I think we

6    both agreed that we spilled a lot of ink in this case already.

7         THE COURT:  Yes, you have.  And I would rather tell you

8    what I want than have you tell me what you think I want.  So I'll

9    tell you what I want, what I want briefing on, and how much

10   briefing I want.  There are a lot of dead trees in this case.

11        MS. KU:  Your Honor?

12        THE COURT:  Yes.

13        MS. KU:  May we have two more logistical questions?

14        THE COURT:  Sure.

15        MS. KU:  With regard to depo designations, would you

16   prefer that we read them into the record or that they be tendered

17   to you in just a document?

18        THE COURT:  That's -- That's a fair question.  If -- If

19   you all would like me to be reading in off hours, I'll do that.

20   I mean that might -- If that's what you meant.  Do you -- Do you

21   mean -- Well, I'll explain what I mean, Ms. Ku.

22        So let's say you have the deposition of the head of

23   Marketing of Neora, and there are a hundred pages of deposition

24   testimony of both of you and you marked the transcript with

25   objections, if you have objections.  I can either have you read

1    that or I can take that home and read it in the evening, and I

2    will put in the record my ruling on the objections.

3          So I can commit to doing that, if it's not where I'm

4    committing to reading a thousand pages every night.  I won't be

5    able to do that.  But if it's in the range of 100 pages or less,

6    I can do that.

7          MS. KU:  Thank you.

8          THE COURT:  So I can read it myself or the other option

9    is for you just to give it to me and have me read it right here

10   because I can read faster than you can have someone read it.  I

11   don't really see the point -- No.  It's -- It's -- You know, a

12   Shakespearian actor reading this is not going to be more

13   convincing than me reading it myself.  That sometimes works for

14   the jury but that's not going to work with me.  So it's most

15   efficient for me to read either while I'm sitting up here during

16   your allocated time or, as I said, with the limitation of a

17   hundred pages or less, I can read it in the evening, as you like.

18         MS. KU:  Okay.  And then with regard to exhibits, you

19   have in your Scheduling Order reference to gum labels, and I know

20   that the FTC had asked us about using electronic labels.  And

21   maybe there is a possibility for us to use those as opposed to

22   the ones that you actually stick on there.  I don't know if the

23   FTC is still interested in that, but I thought I would just

24   mention it.

25         THE COURT:  I don't know -- I really don't know about

1    the situation as it relates to a record going up on appeal.  If

2    all the exhibits have come in electronically, that's probably

3    fine.  That's up to you to confirm that.  But if you want to mark

4    your -- If that's fine and if you want to mark your exhibits

5    electronically only and have me looking at them only on the

6    computer and you provide them in a way that doesn't take my law

7    clerk an undue amount of time to put them on the computer, like

8    on a flash drive, that's fine.  So that's up to you all.  You

9    work that out.  I can look at them that way.  I mean I'll have an

10   extra computer up here to do that.

11              MS. KU:  Understood, Your Honor.  Thank you.

12              THE COURT:  Okay.  All right.  Any other questions?

13              Okay.  Off the record.

14              (An off-the-record discussion was held between the

15   Court and counsel.)

16              MS. ROLLER:  Your Honor, if I may clarify.

17              THE COURT:  Sure.

18              MS. ROLLER:  Will Your Honor be back in time for the

19   Pretrial Conference on the 11th?

20              THE COURT:  That, I think, has already been rescheduled

21   because the answer is "no."  The answer is:  No, I will not.  So

22   that isn't going to happen.

23              What kinds of things would I need to rule on at a

24   Pretrial Conference in a bench trial?

25              MS. ROLLER:  Your Honor, the parties have exchanged

1    exhibit objections per the Court's Scheduling Order, deposition

2    designations and objections, and there may be motions *in limine*

3    as well.

4            THE COURT:  Okay.  Well, I'm just going to give you

5    this piece of advice:  It sounds odd to a jury when I have

6    discussed with them after a trial what a motion *in limine* is but

7    it sounds really odd to me when I discuss a motion *in limine* with

8    me where I listen to what I'm not supposed to know and then

9    decide if I should know it.  That's a bizarre concept which I

10   think is silly.  So I'm not granting any of those.  You should

11   object that I should not consider it, but it makes no sense for

12   me to hear that in advance and spend my time on that with one

13   exception:  If there is -- And I'll use an example that has come

14   up in connection with the *Daubert* issues.

15           If there is a survey that you claim should not be

16   considered and you want me to rule on that in advance, that's an

17   example of something that makes sense for me to rule on in

18   advance because, otherwise, you all are going to allocate your

19   time improperly because you won't know what's coming in.  So

20   that's an example of that.  The problem is:  I don't have any

21   time to give you for that before we start unless somehow you want

22   to talk about some of that right now, without being prepared.

23           MS. ROLLER:  If Your Honor would be open to it, we

24   would renew as a -- as a motion *in limine* our -- the section of

25   our Daubert motion and a section of our summary judgment response

1    that seeks to exclude the LRW survey.

2              THE COURT:  Okay.

3              MR. FLORENCE:  Your Honor, we would ask that we take

4    this up because there are two surveys.  They are sponsoring

5    evidence through a 2015 draft survey that we object to and,

6    likewise, they object to our 2022.  I propose and suggest that we

7    take it up at the outset of the -- at the outset of the hearing.

8              THE COURT:  Of the trial.

9              MR. FLORENCE:  Of the trial.  Excuse me.

10             THE COURT:  Well, I -- I don't see how we can do it in

11   the next six minutes.  And I'm -- I'm really not sure why you

12   thought -- And this may be on us.  I'm not suggesting it's on

13   you.  I don't know if we just slipped up and didn't tell you that

14   Pretrial was not going to happen, but it's not going to happen,

15   and I don't have any days before the trial starts for me to give

16   you to rule on that.  So I think we're just going to have to take

17   it up.

18             Now you're at -- you're at some risk that I may exclude

19   something that you're bringing a witness for and vice versa.  So

20   you better be prepared both ways.  If there are things like that

21   that you want to take up at the beginning, we can, but I would

22   prefer to take it up in -- in context.

23             MR. FLORENCE:  Sure.

24             THE COURT:  And if you say to me, "Look, Judge, I need

25   an extra half hour because I've got to -- given a ruling that I

1   didn't anticipate, because of this issue which you didn't take up

2   in advance," I'll listen to you.  I'm not making a commitment,

3   but I'll listen to you.

4           MR. FLORENCE:  Okay.  Thank you, Your Honor.

5           MS. ROLLER:  Thank you, Your Honor.

6           THE COURT:  Okay.  All right.  Okay.  Kate will be out.

7   So if you have questions about court procedure, the best person

8   to contact is my Courtroom Deputy, Alicyn Anthony, because my

9   other law clerk is brand new and hasn't had a trial yet.  So I

10  would suggest that you call Alicyn if you have any other

11  questions.  If there is really an emergency that needs someone's

12  attention, call Alicyn and she can get the duty judge or I'm

13  giving you permission to contact the Magistrate Judge in my

14  absence.  And I'll let the Magistrate Judge know that in an

15  emergency where I can't be reached, that the Magistrate Judge can

16  be contacted by you directly.  Okay?

17          All right.  Anything else?

18          Okay.  Thank you.  All right.  You all may be excused.

19  Thanks so much.

20          MS. ROLLER:  Thank you, Your Honor.

21          MR. FLORENCE:  Thank you, Your Honor.

22          MS. KU:  Thank you, Your Honor.

23          MR. WARD:  Thank you, Your Honor.

24          (Hearing adjourned at 3:25 PM.)

25

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court for

the Northern District of Texas, do hereby certify that pursuant

to Section 753, Title 28, United States Code, that the foregoing

is a true and correct transcript of the stenographically-reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the regulations of

the Judicial Conference of the United States.

        Dated this 30th day of September, 2022.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER