## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-01979-M |
| | ) | |
| v. | ) | |
| | ) | |
| NEORA, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF FEDERAL TRADE COMMISSION'S POST-TRIAL BRIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

I.   DEFENDANTS FALSELY PROMISE SUBSTANTIAL INCOME. .................................... 1

II.  DEFENDANTS GIVE BPS THE MEANS AND INSTRUMENTALITIES TO MISLEAD OTHERS. ...................................................................................................................... 4

III. DEFENDANTS OPERATE AN ILLEGAL PYRAMID SCHEME. ...................................... 5

    A.  What *Koscot* Says ................................................................................................ 6

    B.  What *Koscot* Does Not Say................................................................................. 8

    C.  The *Koscot* Test Is Satisfied Here: Neora BPs Have the Right to Receive Rewards for Recruitment Unrelated to Ultimate User Sales ................................................ 10

IV.  DEFENDANTS MAKE MATERIAL MISREPRESENTATIONS ABOUT EHT. ............... 16

    A.  The Standard for Deception Is Met....................................................................... 16

        1.  Defendants Made the Challenged Claims.................................................... 16

        2.  Defendants' Claims Are Likely to Mislead Reasonable Consumers.......... 19

        3.  Defendants' Claims Are Material. ............................................................... 20

    B.  Defendants' Counterarguments Lack Merit.......................................................... 20

V.   DEFENDANT OLSON IS INDIVIDUALLY LIABLE. ................................................... 23

VI.  INJUNCTIVE RELIEF IS WARRANTED..................................................................... 23

VII.   CONCLUSION............................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671 (N.D. Tex. 2015) .............................. 24

*Am. Soc. of Mech. Eng. v. Hydrolevel Corp.*, 456 U.S. 556 (1982) ............................................. 25

*Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205 (10th Cir. 2022) ....................................................... 24

*FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014) ...................................................... passim

*FTC v. Commerce Planet, Inc.*, 642 F. App'x 680 (9th Cir. 2016) ................................................ 4

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) ................................................. 23

*FTC v. Educare Centre Servs., Inc.*, 433 F. Supp. 3d 1008 (W.D. Tex. 2020) ........................... 27

*FTC v. Equinox Int'l Grp.*, No. CV–S–990969HBR (RLH), 1999 WL 1425373 (D. Nev. Sept.

14, 1999) ................................................................................................................................ 10, 28

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ...................... 8, 12, 24, 28

*FTC v. Fleetcor Techs., Inc.*, No. 1:19-cv-05727, 2022 WL 3273286 (N.D. Ga. Aug.

9, 2022) .......................................................................................................................................... 22

*FTC v. Fortune Hi-Tech Mktg.*, No. 5:13-cv-123-KSF (E.D.K.Y.) ............................................. 28

*FTC v. Fowler*, No. 8:16-cv-01397 (M.D. Fla.) ......................................................................... 28

*FTC v. Freecom Comm'cns, Inc.*, 401 F.3d 1192 (10th Cir. 2005) ............................................... 6

*FTC v. John Beck Amazing Profits*, 865 F. Supp. 2d 1052 (C.D. Cal. 2012) ............................. 25

*FTC v. Johnson*, 156 F. Supp. 3d 1202 (D. Nev. 2015) ......................................................... 6, 25

*FTC v. Nat'l Bus. Consultants, Inc.*, 1990 WL 32967 (E.D. La. Mar. 20, 1990) .......................... 7

*FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008) ....................................... 23

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010) ....................................................................... 8

*FTC v. QT, Inc.*, 448 F. Supp. 2d 908 (N.D. Ill. 2006)...................................................................23

*FTC v. Ragingbull.com*, No. 1:20-cv-03538-GLR (D. Md.) .........................................................28

*FTC v. Sales Slash*, LLC, No. CV15-03107 (C.D. Cal.) ...............................................................28

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) ...............................................23

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009).........................................................................24

*FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711 (5th Cir 1982) ...................................................26, 27, 28

*FTC v. Trek All.*, No. CV-02-970 (C.D. Cal.).............................................................................28

*FTC v. Vemma Nutrition Co.*, No. CV-15-01578-PHX-JJT, 2015 WL 11118111 (D. Ariz. Sept.

    18, 2015).................................................................................................................... passim

*FTC v. Wellness Support Network,* No. 10-cv-04879-JCS, 2013 WL 5513332 (N.D. Cal. Oct. 4,

    2013)..................................................................................................................................23

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) .........................................................................27

*Ger-Ro-Mar, Inc. v. FTC*, 518 F.2d 33 (2d Cir. 1975) ...............................................................13

*Goodman v. FTC,* 244 F.2d 584 (9th Cir. 1957)..............................................................7, 24, 25

*In re Amway*, 93 F.T.C. 618 (1979), 1979 WL 198944.................................................................13

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984) ......................................................................4

*In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106 (1975), 1975 WL 173318 ...................... passim

*Johnson v. Big Lots Stores, Inc.*, No. CIV.A. 04-3201, 2008 WL 1930681 (E.D. La. Apr. 29,

    2008)..................................................................................................................................18

*Kraft, Inc. v. FTC,* 970 F.2d 311 (7th Cir. 1992)........................................................................23

*Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006 (5th Cir. 1998)...................................................24

*Northside Realty Assocs. v. U.S.*, 605 F.2d 1348 (5th Cir. 1979)................................................24

*Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980)....................................................................10

*POM Wonderful, LLC, v. FTC*, 777 F.3d 478 (D.C. Cir. 2015) .............................................. 20, 23

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) .................................................. 22

*SEC v. Chen*, No. 2:15-CV-07425-RGK (PLAx), 2016 WL 7469683 (C.D. Cal. Dec. 8, 2016). 10

*Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884 (S.D. Tex. 2011) ... 17

*Standard Distrib. v. FTC*, 211 F.2d 7 (2d Cir. 1954) .................................................................. 25

*Sw Sunsites, Inc. v. FTC*, 785 F.2d 1431 (9th Cir. 1986) ........................................................... 24

*TDC Elecs., Inc. v. Jack B. Harper Contractor*, No. CIV. A. 91-2407, 1992 WL 319490 (E.D.

    La. Oct. 27, 1992).................................................................................................................... 18

*Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629 (5th Cir. 2016) ......................................... 8, 9, 10, 13

*United States v. Cornerstone Wealth*, 549 F. Supp. 2d 811 (N.D. Tex. 2008)............................ 27

*United States v. Com. Recovery Sys., Inc.*, 179 F. Supp. 3d 728 (E.D. Tex. 2016)..................... 26

*Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776 (9th Cir. 1996)........................................ 10, 12, 15

*Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739 (D. Utah 2004) ........................................... 12

**Statutes**

15 U.S.C. § 52 ............................................................................................................................. 23

15 U.S.C. § 55 ............................................................................................................................. 23

Section 5 of the FTC Act ............................................................................................................ 4

Section 13(b) of the FTC Act...................................................................................................... 26

**Treatises**

Manual Complex Lit. § 11.493 (4th ed. rev. 2022) .................................................................... 18

The FTC proved at trial that Defendants' business is built on lies. First, Defendants lie about how much money BPs will make—and give BPs the means and instrumentalities to spread those lies. Second, the entire structure of their business opportunity is a lie, because it is an illegal pyramid scheme that makes it impossible—by design—for participants to profit from customer sales alone. Recruiting is the only path to meaningful rewards; that is why 96% of Brand Partners ("BPs"), unable to find enough recruits, lose money. And third, Defendants lie about EHT. Injunctive relief is necessary and proper to put a stop to all of these lies.

## I.    DEFENDANTS FALSELY PROMISE SUBSTANTIAL INCOME.

The trial evidence demonstrates that Neora and its CEO Jeffrey Olson have told—and continue to tell—BPs that they will likely make a substantial income. Those claims are not true.

To prove deception under Section 5 of the FTC Act, the FTC must prove that: (1) there is a representation that is (2) likely to mislead consumers, meaning that it is false or unsubstantiated, and (3) the representation is "material," meaning "likely to affect the consumer's conduct or decision." *See In re Cliffdale Assocs., Inc*., 103 F.T.C. 110, 164-65 (1984). Showing actual deception is not required. *FTC v. Commerce Planet, Inc*., 642 F. App'x 680, 682 (9th Cir. 2016). At trial, the FTC proved all three elements.

First, Defendants have undisputedly claimed that BPs will likely make substantial income from the Neora business opportunity,[1] often in company-produced marketing materials[2] and

---

[1] *See, e.g.*, Exs. 30, 186 (Success From Home magazines); Ex. 38 (BP Aana Camp's video on earning $500-$1000 monthly income); Ex. 189 at 20:20-20:40 (BP Puya Ghandian stating hundreds of BPs are "earning a six-figure income"); Ex. 246 (Co-CEO Heisz stating Neora's goal is to "explain how someone can make 500 a month"); Ex. 471 (BP stating $150K bonus was "celebrated on Facebook" to show false earnings expectations); Ex. 542 & Ex. 543 at 7:54-7:56 (video claiming BPs can make $500-$1000 a month).

[2] *See, e.g.*, Ex. 621 (Neora mini-magazine featuring numerous lifestyle testimonials); Ex. 689, Disc 1, Track 3 at 1:56-2:15 (Neora training audio discussing vacations and dream car earnings); Ex. 722 at 4:15-5:40 (Neora video instructing BPs to post about bonuses and luxury cars on

statements made by Olson himself.[3] Thus, the Court need not even reach the issue of

Defendants' responsibility for BP statements to find that the FTC has proved this element.[4]

Examples of recent representations made directly by Defendants and highlighted at trial include:

- A 2020 Neora marketing video stating, among other things, that BPs could earn "special rewards such as a luxury car bonus or incentive trips," Ex. 849 at 1:47-1:54;

- The 2020 Neora Jumpstart Roadshow training presentation, Ex. 36, that Neora executive Amber Olson Rourke testified she approved for use at multiple Neora events, 6A Tr. 23:9-17 & Ex. 544, and which included, among other things, statements about $100 to $10K monthly recurring income, *id*. at 23:18-22;

- A 2020 Neora marketing video with many lifestyle and income representations titled, "Better with Neora," Ex. 830, which Olson testified was provided to BPs to share and was also shared on Neora's YouTube page, 3A Tr. 40:7-41:11;

- Jeff Olson's 2020 book entitled, "Neora Rhythm: The Slight Edge + The Ten Core Commitments," Ex. 629, which Olson testified is sent to all BPs and instructs them to use misleading materials, such as the "Better with Neora" video, to market the business opportunity, 3A Tr. 19:12-20:1; 40:7-16; and

---

social media); Ex. 724 at 2:55-3:00 (similar instructional video); Ex. 725 at 19:40 (Neora promotional video with BPs holding $25,000 to $500,000 checks); Ex. 726 at 0:40-1:02 (Neora promotional video claiming thousands of BPs earned luxury car bonuses); Ex. 834 at 17:10-17:20 (Neora conference video stating BPs would earn a six-figure income "if you can just get two new contacts a day"); Ex. 851 at 19:33-19:55 (Neora video discussing many "hundreds of people" earning $50K to $1.5M bonuses); Ex. 863 (Neora Facebook post describing millionaires and six-figure salaries); Ex. 865 (press release on "Million Dollar Club"); Ex. 866 (Twitter post on "Million Dollar Club"); Ex. 867 at 0:01-0:47 (Neora event with claims of earning millions); Ex. 875 (Neora blog post on $41,000 monthly bonuses).

[3] *See, e.g.*, Ex. 443 at 0:01 to 0:36 & Ex. 872 at 4:16-24 (video with Olson stating "we've had huge incomes generated" for "tens of thousands"); Ex. 444 at 0:18-0:29 (video with Olson stating "we have people who've earned . . . great incomes, six-figure incomes"); Ex. 854 at 1:47-1:58 (video with Olson stating he's never worked with anyone who hasn't become "financially independent"); Ex. 835 16:20-16:43 (Olson stating at Neora conference, "Here, you can be very part-time, . . . and we pay for your vacation").

[4] Nevertheless, BPs *are* Defendants' agents for the purpose of promoting the business opportunity, *see infra* ___; Defendants are thus responsible for BPs' misleading claims that consumers who joined and stayed with Neora could earn substantial income. *See, e.g.*, BP representations *supra* n.1; Ex. 836 & Ex. 837 (video on "How to turn a one-time $500 investment into a recurring $500 monthly income."); Ex. 861 (Instagram post with image of $375K bonus check stating, "Could this be your story? Why, YES IT CAN!"); Ex. 862 (Facebook post sharing Million Dollar Club photos).

- A 2019 Neora blog post on "Million Dollar Club" top earners, which was still live on the internet at the time of trial. 3B Tr. 24:4-13.

The second element—that the claims were likely to mislead due to their falsity—is also undisputed. Defendants admitted that most Neora BPs make nothing.[5]

The FTC also has proved the third element. Defendants' income claims are presumed material, because the ability to earn an income is the central characteristic of a business opportunity. *E.g.*, *FTC v. Freecom Comm'cns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005).[6]

Defendants' only response is that some of their illegal income claims are older, and that their compliance program should somehow insulate them from liability. Defendants are wrong. On the first point, the above examples show that Defendants have continuously made false income claims during and despite this litigation *challenging those very claims*. And second, Defendants' compliance argument is both legally invalid[7] and, in any event, not borne out by the evidence at trial. The argument is largely based on the uncorroborated testimony of Defendants' employees that—even if found to be credible—still does not help Defendants. For example,

---

[5] *See, e.g.*, 3A Tr. 34:17-25 (Olson's testimony that most BPs do not earn any trips, six-figure incomes, luxury car bonuses, or even an iPad); Dkt. 306, 56:22-57:8 (Co-CEO Heisz's testimony that more than 50% of brand partners make no money from Neora); Ex. 546 (showing that as of Dec. 14, 2021, 76.3% of BPs earned $0).

[6] Indeed, in the words of Neora's own internal survey, "Compensation is still [the] biggest draw" for BPs. Ex. 670; *see also, e.g.*, 6A Tr. 7:12-11:8, Ex. 502 & 636 (executive meeting notes stating extra income "seem[s] attainable, hundreds to thousands extra a month"); 6A Tr. 14:20-16:21 & Ex. 673 (Neora's 2015 BP survey that the top ranking, highly compensated .08% of BPs are happy, while the other 99.2% of BPs are less satisfied); Dkt. 302 at 83:11-84:6 (Neora is marketed as a "solution" to credit card debt and the need for "additional income."); 6A Tr. 123:8-125:4 & Ex. 832 (current high-ranking BP Jennifer Givens Neora video training, saying that "what people care about is how to earn their money back").

[7] *See FTC v. Johnson*, 156 F. Supp. 3d 1202, 1207 (D. Nev. 2015) ("Defendants have not identified any authority holding that establishing a commercially reasonable monitoring program is some sort of safe haven or affirmative defense to a violation of the FTC Act. In fact, courts have clearly held otherwise.") (citing cases).

Neora's Compliance Director, Sandra Davis, testified to facts showing a culture of *non*-compliance and *non*-enforcement of policies purportedly prohibiting income claims.[8] Witness Puya Ghandian, a high-ranking BP, acknowledged that he made income claims in recruiting BPs, Dkt. 305 at 38:3-39:6 & 44:5-12; recently (in 2020 or 2021) described Olson at a Neora training event as "the Millionaire Maker," *id.* at 94:8-95:9; and made a recent (2021) social media lifestyle or income claim in violation of Neora's policies, *id.* at 93:18-7. Ghandian has conducted hundreds of trainings and appeared in hundreds of marketing videos for Neora and has never been asked to stop. *Id.* at 75:13-76:3, 98:6-8, 108:2-6.

Defendants' liability on Count II is therefore clear:  Defendants directly, continuously, and very recently told BPs they would likely make substantial income from the Neora business opportunity, which Defendants admit is false, and which was material to hundreds of thousands of consumers' decisions to join—and persist in—that opportunity.

## II.    DEFENDANTS GIVE BPS THE MEANS AND INSTRUMENTALITIES TO MISLEAD OTHERS.

Courts have "stressed the fact that one who 'places in the hands of another a means of consummating a fraud in violation of the Federal Trade Commission Act is himself guilty of a violation of the Act.'" *Goodman v. FTC,* 244 F.2d 584, 591 (9th Cir. 1957) (quoting *C. Howard Hunt Pen Co. v. FTC*, 197 F.2d 273, 281 (3d Cir. 1952)); *see also FTC v. Nat'l Bus. Consultants, Inc.*, 1990 WL 32967, at *9 (E.D. La. Mar. 20, 1990). This theory of liability is distinct from liability predicated on assisting and facilitating the deceptive or unfair schemes of others, *e.g.*,

---

[8] *See, e.g.,* 3B Tr. 51:19-23 (no mandatory compliance training for BPs); 3B Tr. 61:9-62:3 (Neora's knowledge that income claims are a frequent BP violation); *id.* at 62:5-12 (violations sometimes exist online for years before a BP is contacted about them); *id*. at 47:21-48:4, 131:18-132:19 (Neora has only a two-person compliance department); *id*. at 64:15-22. (a BP would have to "ignore at least three or four communications" about a violation before they would even be considered for account suspension).

*FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156-57 (9th Cir. 2010), and is routinely found where defendants have, as here, disseminated materials containing deceptive income claims, *e.g.*, *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 530-31 (S.D.N.Y. 2000) ("Defendants distributed and caused to be distributed Five Star marketing material" including "income claims and offers of 'free' vehicles," thus "prov[ding] participants with the means and instrumentalities to deceive others[.]"); *FTC v. Vemma Nutrition Co.*, No. CV-15-01578-PHX-JJT, 2015 WL 11118111, at *7 (D. Ariz. Sept. 18, 2015) ("Vemma provides the 'means and instrumentalities' for Affiliates to deceive consumers by providing them with . . . materials containing false or misleading income representations.").

The evidence at trial showed that Defendants expressly told BPs to make income claims in their official 2020 Jumpstart Roadshow presentation, told BPs to show the misleading 2020 "Better With Neora" video at parties, and told BPs in the 2020 Neora Rhythm booklet to use their misleading magazines as a prospecting tool. *See supra* p.2. These and other examples show that Defendants not only placed misleading representations in BPs' hands, they actively encouraged BPs to spread those false claims. Thus, liability on Count V is clear.

## III.    DEFENDANTS OPERATE AN ILLEGAL PYRAMID SCHEME.

The FTC has proven that Defendants operate a pyramid scheme in violation of Section 5 of the FTC Act. In a pyramid, participants pay "money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive[,] in return for recruiting other participants into the program[,] rewards which are unrelated to the sale of product to ultimate users." *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1182 (1975), 1975 WL 173318, at *59; *see Torres v. S.G.E. Mgmt., LLC*, 838 F.3d 629, 639 (5th Cir. 2016) (en banc) ("*Torres II*") (adopting *Koscot* test). Such schemes are "inherently deceptive because their very structure

conceals the fact that those at the bottom of the pyramid will be unable to recoup their investment." *Torres II*, 838 F.3d at 639. In other words, where recruitment, and not retail, is the only path to the promised success, only those at the top will have enough recruits to earn real money, while the rest are trapped supporting those at the top. *See, e.g.*, *id.* at 640 (pyramid schemes "depend on" recruitment, so "those who profit" do so "only by virtue of the participation of downline investors . . . who lose money"); *Koscot*, 86 F.T.C. at 1181-82, 1975 WL 173318, at *59 ("[T]he right to sell product in an entrepreneurial chain is also likely to prove worthless for many participants, by virtue of the very nature of the plan."); *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 885 (9th Cir. 2014) (illegal pyramids "focus [] on recruitment" and pay rewards "in exchange for recruiting others, rather than simply selling products").

The first *Koscot* factor is undisputed here: to join Neora's business opportunity, a BP must pay for a $20 Enrollment Kit or an Enrollment Pack that costs $199 to $1,000. 4A Tr. 61:13-20; 4B Tr. 39:14-23. This purchase provides the BP the right to receive rewards for recruiting new BPs and selling products. Ex. 1423 §§ 1.01, 1.03. The only disputed question is thus whether the FTC has proved the second prong: that BPs have the right to receive rewards for recruiting that are unrelated to ultimate user sales. It has.

### A.  What *Koscot* Says

*Koscot*'s second prong asks what rewards participants have a "right to receive," and whether those rewards are "unrelated to ultimate user sales." The word "right" is important because it prescribes that the test is concerned, not with what payments participants *in fact* receive, but with what they have a *right* to receive, which is determined by a company's compensation plan. That is why every federal court applying *Koscot*—including the Fifth Circuit in *Torres II*—has focused its analysis on the defendant's compensation plan, before or even in

lieu of considering operational data.[9] Such data is not generally available to participants and so cannot affect their incentives, which are the heart of the pyramid inquiry. *See BurnLounge*, 753 F.3d at 887 (second prong satisfied "because BurnLounge incentivized recruiting participants, not product sales"); *Vemma*, 2015 WL 11118111, at *3 ("incentives tied to [making] sales to ultimate users" are "a critical aspect of the second *Koscot* prong"). And the word "receive" reflects that *Koscot* cares about the *participant*—here, the Brand Partner—and what money the company pays *out* to *them*, *not* what money is paid *in* to the company.

On the question of whether such rewards are "unrelated to ultimate user sales," *BurnLounge*, the leading post-*Koscot* case, speaks to the word "unrelated," while another leading case, *Vemma*, speaks to the definition of "ultimate user." Specifically, *BurnLounge* holds that the word "unrelated" in the second prong of *Koscot* "does not require that rewards be *completely* unrelated to product sales." 753 F.3d at 885. The fact that rewards have some customer volume requirement, in other words, does not save them. *Id.* at 886; *see also Omnitrition*, 79 F.3d at 782. Instead, courts determine whether such sales requirements are secondary to the company's overall "focus . . . on recruitment," such that "rewards were paid in exchange for recruiting others, rather than simply selling products." *BurnLounge*, 753 F.3d at 885. In *BurnLounge*, for example, participants were "required to sell [products] to receive" bonuses, yet the "[r]ewards for recruiting were [nevertheless] 'unrelated' to sales to ultimate users because BurnLounge incentivized recruiting participants, not product sales." *Id.* at 884, 887. That is the case here, too.

In *Vemma*, moreover, the Court relied on the opinion of the FTC's expert, Dr. Stacie

---

[9] *See, e.g.*, *Torres II*, 838 F.3d at 639; *BurnLounge*, 753 F.3d at 885; *Vemma*, 2015 WL 11118111, at *3; *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) (no mention of company data); *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980) (same); *FTC v. Equinox Int'l Grp.*, No. CV-S-990969HBR (RLH), 1999 WL 1425373 (D. Nev. Sept. 14, 1999) (same); *SEC v. Chen*, No. 2:15-CV-07425-RGK, 2016 WL 7469683 (C.D. Cal. Dec. 8, 2016) (same).

Bosley, in holding that participants are not "ultimate users" under *Koscot* if they are trained by the defendants and incentivized by the compensation plan to buy product to qualify for rewards. 2015 WL 11118111, at *3-4. Where, as here, "there is no way to unbundle" participants' consumption of "products as ultimate users from their desire to remain qualified for bonuses," they are not ultimate users. *Id.* at *4.

In addition, *Koscot*, *BurnLounge*, *Vemma*, and decades of other federal pyramid cases have considered other factors that assist in determining whether participants have the right to receive recruitment rewards, including whether the company (1) focuses on recruitment rather than retail, including rewarding recruiting more richly than sales and providing no "meaningful retail sales opportunities"; (2) has a low success rate, such that most participants lose money; and (3) makes misrepresentations, including promises of unrealistic incomes from recruitment. *See, e.g.*, *Koscot*, 86 F.T.C. at 1179, 1975 WL 173318, at *58; *Omnitrition*, 79 F.3d at 782, 788; *BurnLounge*, 753 F.3d at 883; *see also* Dkt. 287 ¶ 88 & nn.2-7 (citing additional authorities). As the evidence discussed below shows, all of those factors are present here.

## B.  What *Koscot* Does Not Say

Defendants' theory of pyramid law relies on two words that do *not* appear in the *Koscot* test—"revenue" and "collapse." With regard to revenue, Defendants argue that *Koscot* requires the FTC to show that Neora's *revenues* come primarily from sales to BPs, not PCs. But this is antithetical to *Koscot*'s text, which explicitly concerns what *rewards* participants have a right to *receive*—money paid *out* of the scheme, not money paid *in*. And *no* federal case has ever made the source of a company's revenues a point of proof. That makes sense: a company's general operational revenue is immaterial to the reason pyramid schemes are prohibited in the first place: that their structure harms individual consumers by making it impossible for those at the bottom,

who necessarily make up the majority, to earn money. *BurnLounge* is not to the contrary: the part of the opinion Defendants cite, Dkt. 268 ¶ 16, merely discusses an FTC advisory letter to point up the defendants' misuse of that letter, which makes the separate point that internal product consumption by participants is not dispositive of a pyramid scheme. 753 F.3d at 887-88. [10]

Similarly, the *Koscot* test says nothing about a company's collapse—indeed, the word "collapse" never appears in *Koscot*. Other leading pyramid cases also never mention collapse. *See, e.g.*, *BurnLounge*, 753 F.3d 878 (evaluating whether rewards were related to recruitment); *Omnitrition*, 79 F.3d at 781-83 (similar). It is thus unsurprising that Defendants can cite no case requiring a plaintiff to show existing, imminent, or inevitable collapse. This, too, fits with the reasoning behind pyramid law: even when a company may appear to be sustaining itself or growing, participants are nevertheless harmed because they are losing money and unable to succeed at the business opportunity. *See* 1A Tr. 54:19-55:8. And as a practical matter, if injunctive relief could be granted only if a company has already or will imminently collapse, such relief would be ineffective in protecting consumers. *See Koscot*, 86 F.T.C. at 1182, 1975 WL 173318, at *60 ("[A] Federal remedy" should "recognize the serious potential hazards of entrepreneurial chains . . . without the time-consuming necessity to show occurrence of the very injury which justice should prevent.").

Defendants' theory is thus based on the mere fact that some pyramid cases *mention* collapse in their discussion of the harms pyramid schemes may cause. *See* Dkt. 268 ¶¶ 7-22. But contrary to Defendants' argument, those cases *do not* treat collapse as an element of proof. In

---

[10] Defendants' other cases are equally inapposite. In *Five-Star Auto Club*, the court decided only earnings claims—no pyramid claim was charged. 97 F. Supp. 2d at 532. And in *Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739, 745 (D. Utah 2004), the court never considered the source of the company's revenue. To the contrary, it emphasized that the existence of "retail sales does not mitigate the unlawful nature of a pyramid scheme." *Id.* at 744.

*Torres II*, for example, the court evaluated whether RICO's causation requirement could be satisfied by classwide proof of a pyramid scheme. 838 F.3d at 634. The court noted that, in a pyramid scheme, "[t]he promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." *Id.* at 639. The plaintiffs could thus present common proof that the defendant "tak[es] money from downline recruits . . . who will never recoup their payments, and funnel[s] the money to those at the top of the pyramid," such that "the vast majority of the unwitting [participants] would lose money." *Id.* at 636, 640. Although the court mentioned that a pyramid scheme could ultimately collapse, thereby further harming participants, the common proof it required was that the majority of participants would lose money because rewards were paid for recruitment—*not* that the pyramid scheme would ultimately collapse. *Id.* at 639-41. Defendants' other cited cases, *see* Dkt. 268 ¶ 9, likewise impose no requirement to prove collapse, and in fact, like *Torres II*, actually contradict Defendants' argument. [11]

### C. The *Koscot* Test Is Satisfied Here: Neora BPs Have the Right to Receive Rewards for Recruitment Unrelated to Ultimate User Sales

Evidence at trial, beginning with the Compensation Plan itself, showed that BPs have the right to earn rewards from recruitment—the company's focus—and not product sales. As Dr. Bosley testified, the Compensation Plan as a whole is designed to reward big recruiters, while

---

[11] *In re Amway* actually *disregarded* the argument that the company was "doomed to failure," in favor of evaluating whether "[r]ecruiters received compensation based on the fact of recruiting." 93 F.T.C. 618, 698-99 (1979), 1979 WL 198944, at *57-58. And in *Ger-Ro-Mar, Inc. v. FTC*, 518 F.2d 33 (2d Cir. 1975), the court's mention of "recruiting saturation" went to whether the FTC had proved its asserted "potential injury" theory; here, the FTC asserts no such theory, as Defendants' scheme has caused *actual* injury to at least 96% of BPs. *Id.* at 36-37; *see also* Dkt. 197 at 32-34 & n.40 (distinguishing other purported "collapse" cases).

making it impossible to earn a profit from customer sales alone. 1A Tr. 60:4-12, 65:13-89:6. Most rewards are "locked" behind a recruitment threshold that few BPs will pass, meaning those who fail to get past that threshold will likely earn nothing. *Id.* The Compensation Plan, and Neora's training material, also emphasize that BPs must recruit at least three BPs, and do so quickly, to maximize their returns. 1A Tr. 61:21-62:5, 67:16-68:6, 96:11-19, 104:11-21. Indeed, Defendants say explicitly that recruiting is the only way BPs can earn back the money they paid for their Enrollment Packs and monthly orders. They tell BPs: "Your goal is to build a large organization," Ex. 720 at 1:30; "1. Recruit! 2. Recruit! 3. Recruit!," Ex. 717 at 22:21-50, Ex. 730 at 43:38-43; and "Recruiting is the lifeblood of your business," Ex. 718.[12] By contrast, they provide paltry training on retail selling. Ex. 673 at 31, 60; Ex. 622 ¶ 118.

And while BPs who recruit large downlines can earn lavish rewards, retail-based rewards with *no* recruitment requirement are both low-paying and hard to attain. The Personal Sales Commission, for instance, is not activated unless a BP sells more than $300 *each month*, which most BPs never accomplish once, let alone for multiple months. 1A Tr. 72:5-19; Ex. 1442 at 5. The Personal PC Bonus requires maintaining at least 6 PCs *each month*, which most BPs also never achieve—52% of BPs never make *a single sale* to a PC during their *lifetimes*. IA Tr. 74:2-16; Ex. 1442 at 6; Ex. 622 ¶ 52. And the PC First Order Bonus pays only on the PC's first purchase, meaning any subsequent purchases are not rewarded. 1A Tr. 73:8-15; Ex. 1442 at 6. Notably, it is entirely possible for a BP to make significant sales but earn *nothing at all* (e.g., by selling less than $300 or having fewer than 6 PCs in a month), while the BP's *upline* profits handsomely from those same sales. 1A Tr. 99:7-11, 100:11-14; 1B Tr. 8:15-9:4. In other words,

---

[12] Other instructional materials similarly focus on recruitment. *See, e.g.*, Ex. 544; Ex. 645; Ex. 646; Ex. 714; Ex. 715; Ex. 721 at 00:09; Ex. 732; Ex. 839 at 4:48-58, 7:33-8:15; Ex. 841; Ex. 843 at 17:18-43; Ex. 844 at 25:11-19, 28:16-29:6 & 29:15-20; Ex. 851; Ex. 856; Ex. 860.

the BPs who *recruited* make the money—not the BP who actually made the sale. Finally, if success at Neora were based on being a strong salesperson, high-earning BPs at the top of the pyramid should have many customers. But tellingly, that is not the case: *nearly half* of high-ranking BPs have *five or fewer* PCs. Ex. 673 at 44. It is equally telling that Neora was unable to put forward a *single BP*—either as a live witness, or from their expert's data—who made substantial income without recruiting.

The second factor demonstrating a pyramid scheme, participant losses, is also undisputedly present here. Because it is so difficult to make sales, and also difficult for BPs who *do* make sales to make money on them, 96% of BPs lose money. 1B Tr. 5:6-14; Ex. 447 at NEORA_DISC 1058045 (showing that 15,669 of 352,528, or 4.4% of BPs, made a profit). Even putting aside expenses, Neora's own documents and witnesses say that about 70% of BPs earn *nothing*, never make a sale, and never recruit. 3A Tr. 105:11-106:3; 4A Tr. 73:13-15; Ex. 546. By contrast, the top 212 recruiters received more than 50% of the company's total rewards. Ex. 546. These characteristics are indicative of a pyramid scheme because, where recruitment is the only way to earn meaningful income, the "structure itself is going to leave nearly everyone in loss," as most people do not have enough recruits to earn recruitment rewards and cannot make money from sales. 1B Tr. 9:18-10:5. Finally, the misrepresentation factor is also present. Because the actual success rate is so low, Neora must induce BPs to join with false promises of incomes that almost nobody can achieve. *See supra* pp. 1-4.

Although Neora's rewards and rank qualifications each have some retail-sales component, *BurnLounge* and *Omnitrition* make clear, as explained above, that such requirements are not enough to render a reward "related" to ultimate user sales under *Koscot*. Moreover, that requirement is easily circumvented by relying on a BP's own product purchases, or purchases by

12

BPs in her downline, "without a single dollar in ultimate use sales" to PCs. 1A Tr. 60:13-15; *see* 4B Tr. 53:1-54:8. The recruitment requirements for such rewards and ranks, on the other hand, cannot be circumvented by selling more product: they are absolute. Thus, "[t]he fact that the rewards were paid for recruiting," as opposed to for sales to ultimate users, "is shown by the *necessity of recruiting* to earn cash rewards," *BurnLounge*, 753 F.3d at 887 (emphasis added), while the retail-sales "requirement" is illusory.

Contrary to Defendants' arguments, moreover, rewards paid on BPs' *own* purchases, and their downline BPs' purchases, are not "ultimate user sales" under *Koscot*. A participant's "intent in purchasing [company] products must be viewed in light of [the company's] program design as well as its training and marketing materials." *Vemma*, 2015 WL 11118111, at *3. As "Dr. Bosley correctly stated in her [*Vemma*] report, an ultimate user under the second *Koscot* prong is limited to one who would have purchased a product even if not for the income opportunity." *Id.* In other words, where "there is no way to unbundle" participants' consumption of "products as ultimate users from their desire to remain qualified for bonuses," they are not ultimate users. *Id.* at *4. That is true here: BPs are trained and incentivized to buy product to advance in rank and earn rewards, even though personal purchases may seem optional on paper. For example, Defendants instruct BPs to maintain an auto-ship order, Ex. 234; Ex. 723 at 8:22-26; Ex. 844 at 23:19-22; Ex. 832 at 25:45-51; Ex. 841 at 13:50, and *require* an ADO to earn the 3UR Free product credit, Ex. 1442 at 4; 1A Tr. 68:16-69:6. Neora also openly acknowledges the practice of "buying rank," where participants load up on inventory to qualify for higher ranks and higher rewards. Ex. 630; Ex. 882; Ex. 884; Ex. 887. It is thus unsurprising that BPs buy three times as much product as—and buy four times longer than—PCs do. Ex. 878. Because BPs are not buying purely out of a desire for the product, they cannot be "ultimate users." As a result, most of

Neora's rewards, which can be based solely on BP purchases, are not related to ultimate user sales under *Koscot*.

Neora's 2015 company survey confirms this, finding that nearly 70% of BPs joined Neora because of the "potential to earn" "extra income" or "primary income," and to pursue the "entrepreneurial" opportunity. Ex. 673 at 13; *see id.* at 33. To advance in the business, BPs made "high initial investment[s]" in Enrollment Packs, and they considered the ADO a "requirement"—not an option. *Id.* at 27-30. And they simultaneously struggled with a "lack of customers" because the products were "expensive" and "not exciting." *Id.* at 28.

Defendants' LRW survey purporting to contradict these findings should be accorded no weight: it suffers from methodological defects, including a meager response rate, insufficient weighting, improperly worded questions, exclusion of BPs most likely to be dissatisfied with Neora, and none of the safeguards for representativeness that Dr. Vandaele employed in the one other MLM survey that he designed. 5B Tr. 132:12-145:7; 6A Tr. 14:23-20:25; 5A 145:1-153:17. Moreover, the "lack of a witness with personal knowledge of" the survey design and administration—Drs. Coughlan and Vandaele acknowledged having no involvement with the survey and knew little about how it was conducted [13]—also "reduces the trustworthiness of the survey and thus limits the weight that the Court will accord it." *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 892 (S.D. Tex. 2011). Finally, the fact that the LRW survey was "conducted in anticipation of litigation" and under counsel's direction undermines its

---

[13] Drs. Coughlan and Vandaele did not participate in any aspect of the survey and did not even know about it until counsel told them just days before their reports were due—suggesting it was *counsel's* idea to include the survey in their analyses. 5A Tr. 126:20-128:11; 6A Tr. 13:20-17:19. The experts had only one "brief" conversation with individuals at LRW who could not provide "a lot of detail" about the survey, and that took place—in Dr. Vandaele's case—only *after* submitting his expert report. 6A Tr. 17:9-18:A; 5A Tr. 130:15-131:15; 128:12-130:14; 6A Tr. 13:20-14:22.

objectivity. Manual Complex Lit. § 11.493 (4th ed. rev. 2022); *see Johnson v. Big Lots Stores, Inc.*, No. CIV.A. 04-3201, 2008 WL 1930681, at *17 (E.D. La. Apr. 29, 2008) (interviews "conducted at the request of a party for litigation rather than in the normal course of business" are less reliable). By contrast, Neora's 2015 survey was prepared in the ordinary course of business, which is the "strongest indicator of trustworthiness." *TDC Elecs., Inc. v. Jack B. Harper Contractor*, No. CIV. A. 91-2407, 1992 WL 319490, at *3 (E.D. La. Oct. 27, 1992).

Defendants have only one other source of evidence that BPs buy product simply because they like it: the unsupported and unreliable opinions of Drs. Vandaele and Coughlan. Dr. Vandaele's belief—that BPs who buy product without ever recruiting or selling must have joined Neora purely to enjoy the products, 5A Tr. 33:16-34:5, 66:1-19—has no support and is entitled to no credence. It is based on the plainly absurd assumption that the absence of *success* means the absence of effort or desire. 5A Tr. 66:8-9. Indeed, Dr. Vandaele admits he did not analyze any incentives in Neora's Compensation Plan or other company materials—the very evidence that would shed light on BPs' motivations. 5A Tr. 167:19-168:21. Dr. Coughlan's opinion is equally unworthy of credence. Unlike Dr. Bosley, who has an extensive record of peer-reviewed studies on MLMs and pyramid schemes, 1A Tr. 47:4-49:20, Dr. Coughlan's MLM work has never appeared in peer-reviewed journals. Instead, her work is largely promulgated and funded by the same MLM industry group—the DSA—that filed an amicus brief supporting Defendants in this case. *See* Ex. 1000 at 98-101 (published work), 101-102 (unpublished work), 105 & 111-114 (DSA). Her scattershot opinions are based on assumptions and methodologies that she has never used in academic work (or on no methodology at all).[14] This is especially true of her

---

[14] *See, e.g.*, 6A Tr. 86:1-15 ("never conducted research on consumer perception of advertising"), 91:5-11 ("no, I did not apply a methodology" to income claims); 6B Tr. 4:6-9 ("no particular reason" for choosing assumption); 6:25-7:23 (analysis based on "unlikely" facts selected to

opinion that *all* BP product purchases are ultimate user sales. 6A Tr. 125:5-126:2. That is based

on the discredited LRW survey, purchase data omitting BPs' biggest purchases, and her bizarre

choice to consider "mandatory" costs as BPs' *only* business expenses—disregarding Neora's

urging that BPs buy to qualify for rewards. Ex. 1000 at 19 & n.40 (data "is without Enrollment

Pack purchases"); 6A Tr. 89:4-91:4 ("mandatory" costs never used this way in academic work);

99:22-100:3 (does not consider training relevant). Defendants have thus proffered no competent

evidence that rewards based on BP purchases are related to end-user sales.

In sum, the evidence proves that Defendants operate a pyramid scheme: They offer BPs

the right to receive rewards for recruitment and do not meaningfully reward retail sales. Their

Compensation Plan and operational practices incentivize recruiting over retailing; the majority of

BPs lose money; and Defendants lure BPs with promises of success that the supposed retail

opportunity could never provide.

## IV.   DEFENDANTS MAKE MATERIAL MISREPRESENTATIONS ABOUT EHT.

### A.  The Standard for Deception Is Met.

To prove liability on Counts III and IV, the EHT claims, the FTC must satisfy the same

standard as for Count II: that a representation was made, that it was likely to mislead, and that it

was material. All three elements are met here with regard to both counts.

1.  <u>Defendants Made the Challenged Claims.</u>

Defendants claim EHT is scientifically proven to prevent and treat concussions, CTE,

---

produce "rich" rewards); 22:23-23:15 (never done academic work comparing companies'
compliance to each other or government); 24:1-19 (does not know how compliance emails were
selected and never analyzed such documents in her academic work); 26:5-8 (relied on
unrepresentative sample of compliance cases); 28:25-29:6 (opined about resignation process with
no "evidence about how that process worked in practice"); 36:3-6 (opinion based on "anecdotal
examples about people not reading agreements").

Alzheimer's and Parkinson's. *E.g.*, Exs. 922, 924, 928, 930, 932, 933, 935, 939 (recent EHT posts). [15] Defendants began making these claims in February 2015—when Olson acquired the rights to EHT—and never stopped. 2 Tr. 29:4-8, 31:1-7, 32:8-18, 34:15-35:24 & Exs. 164, 169.

Even before launching Nerium EHT, Defendants promoted Signum's ME Sports product to build "buzz" about EHT that would "live forever" on the Internet. 3A Tr. 50:21-55:1 & Exs. 514, 516; 5B Tr. 19:15-24; Dkt. 302 at 146:5-148:13 & Ex. 513 at NEORA_DISC 0686130. Defendants issued a press release promoting ME Sports, and paid former NFL players to attend a press event for EHT as part of Brain Injury Awareness Month. 2 Tr. 32:8-33:9, 34:15-35:24 & Ex. 169; 5B Tr. 18:24-19:24; Dkt. 302 at 143:6-11, 155:1-25. Having audited the ME Sports website in 2014, Defendants knew it contained unsubstantiated claims about EHT's effects on brain injuries and disease, but Defendants left the website up and promoted ME Sports while preparing their own product launch. 2 Tr. 35:25-37:25 & Ex. 195; 5B Tr. 14:20-18:3; 6A Tr. 14:2-19 & Ex. 520; Dkt. 302 at 167:23-169:6 & Ex. 522.

In April 2015, at Defendants' Get Real conference in San Jose, Signum's CEO Max Stock gave a presentation on EHT to thousands of BPs, claiming that EHT could have prevented the CTE experienced by former NFL player Junior Seau. 2 Tr. 38:6-23; 3A Tr. 57:16-58:25 & Ex. 825 at 18:00-19:00; Ex. 711; *compare* Dkt. 1 ¶ 61 *with* Dkt. 40 ¶ 61. Joining Stock on stage, Olson told the BPs, repeatedly, that EHT is "Princeton University's best shot at it," Ex. 825 at 26:29-26:53, and added that even "those things you can't say, it does." *Id.* at 27:56-28:01.

---

[15] In evaluating advertising claims, courts distinguish between "efficacy claims" about a product's benefits, and "establishment claims" about scientific support. *POM Wonderful, LLC, v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015) (cleaned up). Both types of claims are evaluated under the same "net impression" standard applicable to earnings claims. An advertisement conveys a claim if "at least a significant minority of reasonable consumers would likely interpret the ad to assert the claim." *Id.* (cleaned up).

At trial, Defendants insisted that they learned their lesson at the April 2015 Get Real conference. But five months later, Defendants invited Max and Jeff Stock back to the stage at the September 2015 Get Real conference in Dallas, where they doubled down on the medical claims. 2 Tr. 38:24-40:15 & Ex. 826; *compare* Dkt. 1 ¶ 85 *with* Dkt. 40 ¶ 85. Olson introduced the Stocks, embraced them, and raved about their "beautiful evolving relationship" with Nerium. Ex. 826 at 00:00-00:45. Addressing thousands of BPs, Jeff Stock said EHT had been tested in "model systems" and found to be "dramatically beneficial" for Alzheimer's and Parkinson's. He did not mention that the tests were in rodents rather than humans. *Id.* at 7:19-7:54. Speaking next, Max Stock described brain injuries and diseases like concussions, CTE, and Alzheimer's, and claimed that EHT "acts directly to prevent this from happening." *Id.* at 9:40-11:10. He urged BPs to share stories about EHT with "athletic directors from football programs," and to review and share stories from Signum's Facebook page about people EHT had helped, supposedly including a Princeton football player who had suffered a stroke, and an electrician with a traumatic brain injury. *Id.* at 14:05-14:18, 14:58-16:01. The Stocks' presentation was videotaped, livestreamed, and posted on YouTube. 2 Tr. 39:12-15 & Exs. 826-828.

In December 2015 and March 2016, with Signum's assistance, Olson and his team provided flyers to BPs, the UFC cage fighting league, and a veterans organization, promoting Nerium EHT as protection against "serious head trauma," and the "solution" to "brain damage." 6A Tr. 12:4-14:1 & Ex. 526; 2 Tr. 40:19-44:19, 46:6-47:21, 77:17-78:4 & Exs. 173-74, 179, 228-29; Dkt. 302 at 178:2-181:13. The flyers attributed these claims to decades of research at Princeton. Exs. 179, 229, 526.

Unsurprisingly, BPs got the message. They flooded social media with claims that EHT prevents or treats concussions, CTE, Alzheimer's and Parkinson's. The record includes more

than 100 representative BP posts from 2015 through 2022, including several new posts collected by the FTC's investigator just *a week before trial*. 2 Tr. 85:9-91:18 & Exs. 739-824, 920-41. Obviously, the BPs did not invent these claims on their own – instead, they repeated what Defendants had told them, with Olson's approval. For example, BP Cory Redding, a former NFL player, announced he was taking EHT to protect his brain from concussions suffered during his football career. Ex. 755. When alerted to Redding's post, Olson responded, "Great  Work.. Thanks !!" 3A Tr. 55:2-57:15 & Ex. 458.

Defendants do not deny they made these statements. Instead, they argue that they also made some *non*-deceptive EHT claims, and that some EHT documents included disclaimers. But the existence of ads making *other*, ostensibly lawful EHT claims does not help Defendants, because under the FTC Act, "even if other advertisements contain accurate, non-deceptive claims, a violation may occur with respect to the deceptive ads." *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496-97 (1st Cir. 1989); *see also, e.g., FTC v. Fleetcor Techs., Inc.*, No. 1:19-cv-05727, 2022 WL 3273286, at *10 n.8 (N.D. Ga. Aug. 9, 2022). And because Defendants' fine-print disclaimers are absent from most of the challenged ads and are not "sufficiently prominent and unambiguous to change the apparent meaning of the claims" even when they appear, those disclaimers cannot cure the deception. *See Removatron*, 884 F.2d at 1497; *Fleetcor*, 2022 WL 3273286, at *10. Thus, the first element of deception is clearly satisfied.

2. <u>Defendants' Claims Are Likely to Mislead Reasonable Consumers.</u>

Defendants' claims that EHT prevents or treats concussions, CTE, Alzheimer's or Parkinson's, and that Princeton research backs this up, are unsubstantiated, and thus likely to mislead reasonable consumers. Substantiating health-related claims demands competent and reliable scientific evidence. *See, e.g., POM Wonderful*, 777 F.3d at 491, 495; *FTC v. Direct*

19

*Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010); *FTC v. Nat'l Urological Grp.,* 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008). [16] Here, the FTC's experts, Drs. Tator and Mastrianni, testified that: (1) randomized, placebo-controlled, double-blind human clinical trials are required to substantiate the challenged claims about brain injuries and disease; and (2) no such evidence exists. 2 Tr. 95:25-100:2, 100:20-101:12; 3B Tr. 31:23-35:12, 43:3-46:8. [17] Defendants' expert, Dr. Kurzer, did not disagree with these conclusions. 4B Tr. 122:6-123:25. [18] Thus, the second element of deception is met.

3.   Defendants' Claims Are Material.

The challenged claims about EHT involve significant health concerns and are therefore presumed material. [19] As a result, the third element of deception is also satisfied.

**B.   Defendants' Counterarguments Lack Merit.**

Defendants' attempts to avoid liability for the EHT claims fall short. Defendants first insist they are not liable for their BPs' claims, but that is contrary to established principles of agency under the FTC Act and federal common law. "The law is clear that under the FTC Act, a principal is liable for misrepresentations made by his/her agents (i.e., those with the actual or

---

[16] Under the FTC Act, dietary supplements, such as Defendants' EHT supplements, fall within the statutory definitions of "food" and/or "drug." 15 U.S.C. §§ 52, 55; *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1266 & 1272 (S.D. Fla. 1999). In a case under the FTC Act, FDA rules regarding dietary supplements are inapplicable. *See, e.g., FTC v. Wellness Support Network,* No. 10-cv-04879-JCS, 2013 WL 5513332, at *10 (N.D. Cal. Oct. 4, 2013).

[17] EHT and supplements containing it have never been tested in humans, as Defendants have known all along. 2 Tr. 27:9-15, 44:20-46:5; 3A Tr. 52:18-54:7, 59:15-60:4 & Exs. 170, 516.

[18] As Drs. Tator and Mastrianni testified, they reviewed "Appendix B" (a document Defendants produced to the FTC) *only* for the research studies it lists, *not* for product claims. 2 Tr. 101:13-102:5, 106:19-22, 107:7-14; 3B Tr. 38:12-39:3. *See FTC v. Wellness Support Network*, No. 10-cv-04879-JCS, 2014 WL 644749, at *9 (N.D. Cal. Feb. 9, 2014) (finding FTC's expert on substantiation was not required to verify that defendants made the advertising claims at issue).

[19] *See, e.g., Kraft, Inc. v. FTC,* 970 F.2d 311, 322-23 (7th Cir. 1992); *Nat'l Urological Grp.,* 645 F. Supp. 2d at 1190-91; *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 960 (N.D. Ill. 2006).

apparent authority to make such representations) regardless of the unsuccessful efforts of the principal to prevent such misrepresentations." *Five-Star Auto Club*, 97 F. Supp. 2d at 527.[20] "The essential element of an agency relationship is the right of control." *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 692 (N.D. Tex. 2015) (quoting *In re Carolin Paxson Advert., Inc.,* 938 F.2d 595, 598 (5th Cir. 1991)); *see also Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998) ("It is the right of control, and not the actual exercise of control, which is determinative."). The inquiry does not turn on contractual labels such as "independent contractor." *ADT*, 145 F. Supp. 3d at 692 (holding company's sales representatives were its agents despite being classified as independent contractors).[21]

Here, Defendants unquestionably have the right to control their BPs, who comprise their entire sales force. 3A Tr. 10:20-21; 4A Tr. 72:25-73:3. Among other things, Defendants have the right to enroll, reject, suspend, or terminate BPs, and to control what products BPs sell, where and to whom they sell them, and what claims they make. 3A Tr. 11:3-10; 3B Tr. 60:4-8; 4A Tr. 84:4-10, 118:19-120:8; 4B Tr. 32:21-37:14, 38:4-44:1; Ex. 1423 ¶¶ 1.01, 1.16, 3.03, 3.04, 4.02-4.03, 7.09, 7.12, 9.19, 9.24, 11.02, 11.06, 12.06-12.07. Under those circumstances, then, BPs are Defendants' agents, with actual authority, and "[a]nything that occurs during the sales pitch … is clearly within the scope of the agency, as it is the central purpose of the principal-agency relationship here." *ADT*, 145 F. Supp. 3d at 692. Additionally, BPs have apparent authority because Defendants hold them out publicly as their sales force and require consumers to make purchases through them (with Defendants collecting the money), including over $150 million in

---

[20] *See also FTC v. Stefanchik*, 559 F.3d 924, 930-31 (9th Cir. 2009); *Sw Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438 (9th Cir. 1986); *Goodman,* 244 F.2d at 593.

[21] *See also Northside Realty Assocs. v. U.S.*, 605 F.2d 1348, 1353-54 (5th Cir. 1979); *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1212 (10th Cir. 2022).

EHT sales to date. 3A Tr. 97:2-4; 4A Tr. 72:25-73:3; 84:4-10; 6A Tr. 13:19-14:1 & Ex. 526; Ex. 735-737. Given the agency relationship, Defendants are legally responsible for their BPs' misrepresentations. *See, e.g., Am. Soc. of Mech. Eng. v. Hydrolevel Corp.*, 456 U.S. 556, 565-68 (1982) (applying apparent authority under federal antitrust law).

As with their income claims, Defendants also invoke their compliance program to attempt to avoid liability for the EHT claims, but that "program" cannot save them because it has not stopped their violations of the FTC Act. *See, e.g., FTC v. John Beck Amazing Profits*, 865 F. Supp. 2d 1052, 1075-76 (C.D. Cal. 2012); *Johnson*, 156 F. Supp. 3d at 1207; *Goodman,* 244 F.2d at 592; *Standard Distrib. v. FTC*, 211 F.2d 7, 13 (2d Cir. 1954). In particular, Defendants claim to use software that "crawls" through social media to identify non-compliant claims so they can be removed. 3B Tr. 54:17-55:2. But those efforts are clearly ineffective because the FTC's investigator easily identified numerous deceptive EHT posts on Facebook just a week before trial. 2 Tr. 88:21-91:18 & Exs. 920-41. The record thus establishes that Defendants' misconduct is ongoing, warranting injunctive relief.

Contrary to Defendants' assertion, the relevant provisions of the FTC's proposed order filed herewith (Sections IV-VIII) do *not* require Defendants to perform human clinical trials; they only require Defendants to adequately substantiate any disease- or health-related claims. [22] Thus, the simplest way for Defendants to comply would be to stop making such claims unless they have real scientific evidence.

---

[22] Section IV would prohibit claims that a product cures, mitigates, or treats brain injury or diseases, or any disease unless such claims are non-misleading and adequately substantiated. Section V would prohibit false or unsubstantiated claims about health benefits, and Section VI would prohibit misrepresenting scientific proof. Section VII requires Defendants to preserve evidence that they rely upon to substantiate disease- or health-related claims. Section VIII excludes from the proposed order certain claims approved by the Food and Drug Administration.

## V.    DEFENDANT OLSON IS INDIVIDUALLY LIABLE.

The FTC is entitled to an injunction against an individual who "had the authority to control the unlawful activities or participated directly in them." *United States v. Com. Recovery Sys., Inc.*, 179 F. Supp. 3d 728, 736 (E.D. Tex. 2016). Olson did both. He testified that he "can have the final say . . . [a]s the owner and CEO" of Neora, 3A Tr. 10:2-3, thus establishing his authority to control. And the evidence shows that he personally made deceptive income claims and promoted Neora's pyramid scheme. *See, e.g.*, *supra* n.3. That is all that is required.

## VI.    INJUNCTIVE RELIEF IS WARRANTED.

The Court should enter a permanent injunction to prevent further harm from Defendants' legal violations, all of which are both ongoing and longstanding. As this Court has previously recognized, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes federal courts to issue a permanent injunction when the facts "giv[e] rise to a fair inference of a reasonable expectation of continued violations absent restraint." *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir 1982) (internal quotation marks omitted); *see* Dkt. 82 at 7-10. This standard is obviously satisfied where the conduct is ongoing, but evidence of "past conduct can [also] give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive." Dkt. 82 at 12-13 (collecting cases).

Thus, even where the conduct *has* entirely ceased, courts still may enter an injunction after evaluating, as non-exclusive factors: [1] the "egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of his conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations." *FTC v. Educare Centre Servs., Inc.*, 433 F. Supp. 3d 1008, 1014-15 (W.D. Tex. 2020) (quoting *United States v. Cornerstone Wealth Corp.*, 549 F.

23

Supp. 2d 811, 816 (N.D. Tex. 2008) and collecting cases). Importantly, any "changes made by defendants after suit was filed" or as a result of government intervention "do not remove the necessity for injunctive relief." *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974).

The evidence demonstrates that Defendants' deceptive conduct is ongoing—Defendants continued to make egregious income claims during the pendency of this lawsuit, *see supra* Section I, Neora continues to operate as a pyramid scheme, *see supra* Section III, and the FTC introduced social media posts from just two weeks before trial claiming that EHT treats dementia, Alzheimer's, and concussions, *see supra* Section 4.B—which is enough by itself to establish "a reasonable expectation of continued violations." *Sw. Sunsites*, 665 F.2d at 723.

Moreover, as the evidence at trial confirmed, every one of the *United States v. Cornerstone Wealth* factors is present here: Defendants (1) act egregiously by promising innocent and desperate people a comfortable living and proven protection against devastating diseases, and encouraging others to spread such lies; (2) have persistently violated the law for more than a decade, including throughout this lawsuit; (3) act knowingly and intentionally; (4) make only empty assurances against future violations, as they operate an ineffective compliance program and are financially incentivized to continue spreading false claims and operating an illegal pyramid; (5) refuse to admit their conduct was wrongful; and (6) have an ongoing business that presents ample opportunities for future violations. Significantly, moreover, despite the recurrent, egregious and intentional nature of the violations, Olson expressed no remorse, testifying instead that Neora's conduct and his own would not change. 3A Tr. 72:20-74:1. On top of that, Defendants' ineffectual attempts at compliance were made only in response to this action—including when the FTC began its investigation in 2016, filed this lawsuit in 2019, and notified Neora of non-compliant posts just *a week* before trial. Thus, the evidence shows that

24

Defendants will continue to violate the FTC Act "absent restraint," making an injunction necessary and proper. *Sw. Sunsites*, 665 F.2d at 723.

To remedy Defendants' ongoing violations, the Court should enjoin future violations and order fencing-in relief barring Defendants from the practices that enabled their current violations. The FTC's proposed order (filed herewith) includes its proposed relief, which tracks the relief that has been entered in similar cases.[23] Very briefly, Section I of the FTC's proposed order prohibits Neora and Olson from operating any multi-level marketing program ("MLM"). A ban is appropriate and necessary where Defendants' ten-year course of illegal conduct and lack of remorse demonstrate that they cannot be trusted to run a legal MLM. And, contrary to Defendants' argument that this provision would destroy their business, Ms. Heisz testified that they could restructure and continue to operate. 4B Tr. 30:20-31:6. Sections II-III would restrain Defendants from further violations of the law regarding pyramid schemes and earnings claims; Sections IV-VIII, discussed *supra* Section IV.B, concern Defendants' misleading product claims; Section IX is a consumer notice provision; and Sections X-XIV contain reporting and monitoring provisions to help ensure Defendants' continued compliance with the order. If helpful to the Court, the FTC would gladly provide further briefing on the appropriate form of injunctive relief.

## VII.   CONCLUSION

For the foregoing reasons, the FTC respectfully requests that this Court find in favor of the FTC on all Counts and enter its proposed order.

---

[23] *See, e.g., Vemma*, No. CV-15-01573-PHX-JJT (D. Ariz.); *BurnLounge*, No. CV-07-3654-GW (FMOx) (C.D. Cal.); *FTC v. Fortune Hi-Tech Mktg.*, No. 5:13-cv-123-KSF (E.D.K.Y.); *FTC v. Trek All.*, No. CV-02-970 (C.D. Cal.); *FTC v. Equinox Int'l Corp.*, No. CV-S-99-0969 (D. Nev.); and *Five-Star Auto*, No. CIV99-1693 (S.D.N.Y.) (bans on multi-level marketing schemes); *FTC v. Fowler*, No. 8:16-cv-01397 (M.D. Fla.) & *FTC v. Sales Slash*, LLC, No. CV15-03107 (C.D. Cal.) (prohibitions against deceptive product claims); *FTC v. Ragingbull.com*, No. 1:20-cv-03538-GLR (D. Md.) (customer notice and prohibition against earnings claims).

Respectfully Submitted,

Dated: November 23, 2022

/s/ *Rachel F. Sifuentes*
KATHARINE ROLLER
GUY G. WARD
LISA W. BOHL
RACHEL F. SIFUENTES
SAMANTHA DENNY
Federal Trade Commission, Midwest Region
230 S. Dearborn, Suite 3030
Chicago, Illinois 60604
Tel: (312) 960-5605
Fax: (312) 960-5600
Email: kroller@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

26