**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:20-cv-01979-M |
| | § | |
| NEORA LLC, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On October 17–24, 2022, the Court commenced a non-jury trial in the above-entitled

matter.  During the proceeding, the Court received evidence and heard sworn testimony.  Having

considered the evidence, testimony, and oral arguments presented during the trial, along with

post-trial submissions and the applicable law, the Court now enters the following findings of fact

and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  Any finding of fact

that should be construed as a conclusion of law is hereby adopted as such.  Any conclusion of

law that should be construed as a finding of fact is hereby adopted as such.

**I.     BACKGROUND**

On November 1, 2019, Plaintiff Federal Trade Commission ("FTC") filed a Complaint

against Signum Biosciences, Inc., Signum Nutralogics, Neora, LLC, and Jeffrey Olson, in the

United States District Court for the District of New Jersey.  The case was then transferred to this

District, where Neora, LLC ("Neora") is headquartered.  ECF No. 25.

The FTC brought suit under § 13(b) of the FTC Act, alleging violations of §§ 5(a) and 12

of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with Neora's health supplement multi-

level marketing business.  Compl. (ECF No. 1) ¶¶ 1, 4.  Shortly after filing the Complaint, the

FTC settled with Signum Biosciences, Inc. and Signum Nutralogics (collectively, "Signum"),

which stipulated to a permanent injunction prohibiting them from making misleading statements

regarding the health benefits of eicosanoyl-5-hydroxytryptamide ("EHT").  Accordingly, the two

remaining defendants are Neora and Jeffrey Olson, individually and in his capacity as Chief

Executive Officer of Neora (together, "Defendants").

The FTC seeks a permanent injunction under § 15 of the FTC Act, which requires proof

that Defendants are violating or are about to violate the Act.[1]  The FTC asserts five violations of

the FTC Act: (1) operation of an illegal pyramid scheme; (2) false earning claims, by

misrepresenting the potential income Brand Partners could earn; (3) false or unsubstantiated

efficacy, by misrepresenting the efficacy of EHT and/or Neora EHT; (4) false establishment, by

misrepresenting that the effectiveness of EHT and/or Neora EHT has been scientifically

established; (5) means and instrumentalities, by furnishing Brand Partners with the means and

instrumentalities to mislead others.

## II.   FINDINGS OF FACT

The following facts have been established by a preponderance of the evidence.

### A.  The Neora Model

Defendant Neora, LLC is a direct selling, multi-level marketing company ("MLM")

based in Farmers Branch, Texas.  ECF No. 297 at 7.  Prior to January 2019, Neora was known as

Nerium International, LLC ("Nerium"), which was founded in 2011.  Defendant Jeffrey Olson is

Neora's founder and CEO.

---

[1] In August 2021, the Court granted Defendants' Motion for Judgment on the Pleadings as to the FTC's § 13(b) claim for monetary relief and the recovery of sums for individual consumers, on the grounds that such relief is foreclosed by the Supreme Court's decision in *AMG Capital Management, LLC v. Federal Trade Commission*, 141 S. Ct. 1341 (2021).  ECF No. 82.  Accordingly, the only remaining relief sought by the FTC is a permanent injunction.

Neora sells beauty and wellness products in the categories of skin care, hair care, wellness, and weight management through independent distributors called "Brand Partners" or "BPs."[2]  Once enrolled with Neora, a BP is entitled to a product discount, as well as the opportunity to sell Neora's products, and recruit, train, and mentor other "downline" BPs.[3]  The ability of BPs to sell Neora's products to consumers is also referred to by the parties as the "business opportunity."  In contrast to BPs, "Preferred Customers" or "PCs" and "retail customers" or are customers who purchase Neora products and do not participate in Neora's business opportunity.[4]  A Retail Customer pays full retail price for Neora's products; in contrast, a PC can buy product at a discounted price, either at a slightly reduced "one-time" price, or at a more substantial discount if the PC signs up for a monthly recurring delivery, referred to as a "SmartShop Order," or "SSO."[5]  In addition, there are incentive programs available to PCs for product discounts on future purchases.[6]

### 1.  BP Enrollment

To enroll as a BP, an applicant must fill out the Independent Brand Partner Application and Agreement (the "Agreement"), pay a fee, and identify his or her "Sponsor," *i.e.*, the BP who

---

[2] *See* ECF No. 297 at 7; Ex. 1445; Tr. 5-B (ECF No. 322) at 60–68.  Specifically, Neora's products consists of skincare, including the Age IQ line and Neora's bestselling product, the Age IQ Night Cream; "wellness" products, including EHT Brain Formula, Youth Factor Complete Vitality Complex, and Energy+ and Sleep+ Wellness Chews; the ProLuxe haircare line; and NeoraFit, a line of supplements and protein powders directed towards weight management. *See* Tr. 5-B at 60–68.

[3] *See, e.g.*, Ex. 1423 § 1.03 (2021 Policies and Procedures) ("Brand Partner Obligations and Rights.  A Brand Partner is authorized as an independent contractor to sell Neora's products and services and to participate in Neora's Compensation Plan. A Brand Partner may sponsor new Brand Partners into Neora.").

[4] *See* Ex. 1338 (PC and retail customer Applications).

[5] *See* Ex. 1338; Tr. 1-A (ECF No. 314) at 62–63; Ex. 1442 at 15 ("SmartShop Order (SSO): A pre-selected product order that is scheduled to be created, paid and shipped at a specific time each month. SmartShop Orders allow products to be purchased at a discounted price.").  SSOs were previously referred to as an "Auto-Delivery Order" or "ADO." *See, e.g.*, Tr. 5-A (ECF No. 321) at 62–63.  On average, a PC will receive about a 30% discount on product as opposed to a retail customer.  Tr. 4-A (ECF No. 319) at 58.

[6] *See, e.g.*, Tr. 4-A at 57-58; Tr. 5-B at 78–80; Ex. 1036 ("Neora Preferred Customers Reward Program" flyer).

introduced the applicant to Neora.[7]  The minimum amount an applicant must pay to participate in the business opportunity is a one-time fee of $20 to purchase an "Enrollment Kit," which contains various training, marketing, and other business tools to "help share Neora's products and grow your business."[8]  Applicants may also elect to purchase a "Product Pack," through which prospective BPs can purchase Neora products in various bundles, ranging in price from $199 to $1000.  The Agreement states that Product Packs are "exclusive to new Brand Partners at up to 50% retail prices," and the applicant "can select one pack, multiple packs, or no packs—this is your business, your way!"[9]  In completing the Agreement, the applicant agrees to be bound by the Neora Terms and Conditions, Policies and Procedures Manual ("P&Ps"), Spam Policy, and Brand Partner Compensation Plan.[10]

---

[7] Ex. 1050 ("2021 Agreement"); Tr. 4-A at 74.  The record contains additional older versions of the Brand Partner Application and Agreement form.  *See* Exs. 663, 687, 1137, 1341.  The Court will rely primarily on the 2021 version of the Application and Agreement; the Court will note any differences with prior versions to the extent they are relevant.

[8] *See* 2021 Agreement at 1.  The Enrollment Kit includes a personal e-commerce website, an online business center, a copy of *The Slight Edge*, by Olson, a Neora Success Planner, product brochures, digital marketing materials and training, social media training, and a 30-day free trial to Neora Edge, a "social media digital marketing tools, product sampling system," which afterwards costs $29.95 per month.  *Id.*  The Policies and Procedures Manual states that the $20 fee "is not a service or franchise fee, but rather is strictly to offset costs incurred by Neora for educational and business materials required for a Brand Partner of Neora."  Ex. 1423 at 2; *see also* Tr. 4-A at 62 ("Q. Okay. Why does the company charge $20? A. To cover the costs of that, of what they get.  Q. Do you make money on that?  A. No, we do not.").  Neora's Policies and Procedures also refer to the Enrollment Kit as a "Brand Partner Launch Kit."  *See, e.g.*, Ex. 1423 at 2.

[9] *See* 2021 Agreement.  The parties and witnesses also occasionally use the term "Starter Pack," which the record indicates can refer to both the $20 Enrollment Kit, or the more expensive Product Packs.  *E.g.*, Tr. Vol. 1-B (ECF No. 315) at 109 ("Q. And according to this table, what percentage of Brand Partners purchased Starter Packs that cost $199 and up? A. Eighty-seven percent."); Tr. 3-A (ECF No. 317) at 10 ("Q. To become a Brand Partner, a person has to buy either a Starter Kit or an Enrollment Packs right? A. The only requirement is to -- the Starter Kit. Q. And that cost $20? A. Yes."); *id.* at 29 ("Q. And the Starter Kit is the $20 one we talked about earlier. A. Now, yes.").

[10] *See* 2021 Agreement.  The record contains the 2021 versions of the Policies and Procedures Manual (Ex. 1423) and the Compensation Plan (Ex. 1442), as well as prior versions of both documents.  *See* Ex. 1419 (2011 P&Ps); Ex. 1420 (2015 P&Ps); Ex. 1421 (2017 P&Ps); Ex. 2 (2019 P&P); Ex. 1422 (2019 P&Ps); Exs. 604, 1285 (2011 Compensation Plan); Exs. 603, 1286 (2012 Compensation Plan); Exs. 602, 1287 (2014 Compensation Plan); Ex. 1288 (2015 Compensation Plan); Exs. 601, 700, 1289 (2016 Compensation Plan); Exs. 533, 1290, 1291 (versions of the 2017 Compensation Plan); Exs. 600, 1291 (2019 Compensation Plan); Exs. 1, 437 (2020 Compensation Plan).  The record also contains multiple versions of the 2021 Plan.  *See* Exs. 245, 1069, 1442, 1444.  The Court will primarily rely on the 2021 versions of the P&Ps and Compensation Plan contained in Ex. 1423 ("2021 P&Ps") and Ex. 1442 ("2021 Comp. Plan"), respectively; the Court will note any differences with prior versions to the extent they are relevant.

### 2. Policies and Procedures

The P&Ps sets forth rules, regulations, policies, and procedures with which BPs must comply. Section One of the P&Ps, "Brand Partner Status," explains that the only requirements to becoming a BP are the completion of the Agreement and purchase of a "Brand Partner Launch Kit," *i.e.* the Enrollment Kit; no other purchases are required.[11] Section 1.11 of the P&Ps describe the status of BPs as independent contractors as follows:

> A Brand Partner is an Independent Contractor. A Brand Partner is not a franchisee, joint venture partner, business partner, employee, or agent of Neora, and Brand Partner is prohibited from stating or implying, either orally or in writing, otherwise. A Brand Partner has no authority to bind Neora to any obligation. Neora is not responsible for payment or co-payment of any employee benefits. A Brand Partner is fully responsible for their own liability, health, disability, and workmen's compensation insurance. Brand Partner sets Brand Partner's own hours and determines how to conduct Brand Partner's business, subject to the Agreement and the Procedures & Policy Manual.

Ex. 1423 § 1.11.

The P&Ps provide that a BP may sponsor other BPs who apply to join Neora's business opportunity. Generally, the sponsoring BP is referred to as the applicant BP's "upline"; conversely, the applicant BP is the sponsor's "downline."[12] Upline BPs are responsible for ongoing training of any downline BPs they sponsor, and are to ensure that each new BP receives, has access to, and understands the Agreement, Neora's P&Ps, and the Compensation Plan.[13] The P&Ps specify that "[a] Brand Partner will be compensated only for the generation of sales volume, not for sponsoring new Brand Partners into the Company."[14]

---

[11] 2021 P&Ps §§ 1.01–.02.
[12] The Compensation Plan refers to the "Genealogy Tree" in describing Neora's overall structure of how and where BPs are placed relative to one another. *See, e.g.*, 2021 Comp. Plan at 15–16. In this structure, "Downline . . . refers to the Brand Partner(s) below another Brand Partner in the genealogy," and "Upline . . . refers to the Brand Partner(s) above a new or existing Brand Partner in the genealogy." *Id.*; *see also* Tr. 1-A at 62 ("So if I recruit people under me and those people recruit people under them, that would be my downline. The person who recruited me is my upline. And, of course, they might have people above them as well, and that would be upline to them.").
[13] 2021 P&Ps §§ 3.01, 3.03.
[14] 2021 P&Ps § 3.01.

Section 9 of the P&Ps contains policies governing the purchase and sale of products, including, *inter alia*, a restriction on stockpiling, including for the purpose of qualifying for additional compensation[15]; the "70% Rule," requiring that to qualify for commissions or bonuses, a BP must certify that he or she "has sold to non-Brand Partner consumers or used at least 70% of all products previously purchased"[16]; the "Retail Sales Rule," requiring that BPs must make sales to non-BP customers to maintain active BP status[17]; a prohibition on the use of e-commerce sales platforms, such as Amazon or eBay, to sell products[18]; and rules relating to PCs, including a requirement that PCs must personally opt-in to recurring orders, and disciplinary action, including termination, may result if a BP submits a PC order without the customer's consent.[19]   The P&Ps state that no product purchase is required for an applicant to become a BP, "although purchases or sales of products may be required to advance in the Compensation Plan."[20]

The P&Ps also include restrictions on claims or statements that BPs may make, which fall into two general categories.   First, the P&Ps prohibit BPs from making any claims regarding

---

[15] 2021 P&Ps § 9.03 ("Stockpiling Prohibited. The success of Neora depends on sales to the ultimate consumer and all forms of stockpiling are strictly prohibited including, but not limited to, purchases of products primarily for purposes of qualifying for additional compensation. Neora recognizes that Brand Partner will purchase products for Brand Partner's own use, however, Neora strictly prohibits the purchase of products in unreasonable amounts to attempt to qualify for advancement in the Compensation Plan.").

[16] 2021 P&Ps § 9.04 ("70% Rule.  To qualify for commissions and bonuses, Brand Partner shall certify on the product order form that the Brand Partner has sold to non-Brand Partner consumers or used at least 70% of all products previously purchased. Brand Partners placing telephone orders to Neora are also required to comply with this rule and may be requested by Neora to verify compliance. In its effort to support and enforce the 70% Rule, Neora, on a quarterly basis, will conduct random audit verification follow-ups. Representatives of Neora will contact Brand Partners to further verify compliance with the 70% Rule. Brand Partners should maintain records and be prepared to assist Neora representatives in their task.").

[17] 2021 P&Ps § 9.05.

[18] 2021 P&Ps § 9.27.

[19] 2021 P&Ps § 9.06.  The Agreement contains a similar prohibition.  *See* 2021 Agreement at 3 ("PREFERRED CUSTOMER RULE: A Preferred Customer must personally opt in to the monthly Smart Shop Order Program. Invalid Preferred Customer orders are defined as orders submitted as Preferred Customer orders for qualification purposes without the written authorization from the customer.  If a Neora Brand Partner submits a Preferred Customer order without the customer's consent, the Brand Partner will be subject to disciplinary action, including termination. Preferred Customer orders cannot be paid by or shipped to a Neora Brand Partner for any reason, no exceptions.").

[20] 2021 P&Ps § 9.01.

the Compensation Plan or potential income that BPs may expect to make by participating in the business opportunity, as follows:

### 3.04 Income Claims.

Brand Partner shall truthfully and fairly describe and present the Compensation Plan.  Brand Partner shall not guarantee or estimate compensation, draws, expenses or deductions attributable to the business prospects.   No income projections, including those based solely on mathematical projections or "ideal projections" of Neora Compensation Plan may be made to prospective Brand Partners.   Brand Partners shall not represent Brand Partner's income as an indication of the success assured to others, since income success depends upon many variables.  Commission checks may not be used as marketing materials.  No past, potential or actual income claims may be made to prospective Brand Partners.   Brand partner may not guarantee commissions or estimate expenses to prospects.

2021 P&Ps § 3.04.

Second, the P&Ps restrict the type of statements that BPs may make about Neora's products, as follow:

### 9.24 Product/Services Claims.

Brand Partner shall make no claim, representation or warranty concerning any product or service of Neora, except for those contained in the official Neora materials.   Brand Partner can only promote benefits of Neora products using language contained in the official Neora materials.   Brand Partners may not make any medical, therapeutic, curative or treatment claims regarding any Neora product. Brand Partners may only use "Before" and "After" photos provided by Neora.  The use of any unauthorized "Before" and "After" photos is prohibited.

2021 P&Ps § 9.24 (emphasis omitted).

These restrictions are likewise incorporated into the BP "Code of Professional Ethics," recited at the end of the P&Ps.[21]  The P&Ps further provide that only Neora-produced or

---

[21] 2021 P&Ps § 12 ("AS A BRAND PARTNER, I AGREE THAT: . . . 12.06 I will not make any diagnostic, therapeutic, or curative claims for Neora's products. I will not make any claims not contained in official Neora literature. I will represent only that "each body is unique and responds uniquely to different products," remembering that even my personal experience with the product may be interpreted as an "extension of product labeling claims" if I use those experiences as a sales device.  12.07 I will make no income claims or representations regarding Neora Compensation Plan, remembering that ideal projections of Neora Compensation Plan are unrealistic. No network is grown in a perfect geometric progression and therefore it is impossible to predict incomes. Further, a Brand Partner's success depends on many variables, such as the amount of time committed to his/her business and the degree of organizational ability.").

approved promotional and advertising materials may be used to advertise or promote a BP's business, or sell products or services of Neora in any print or electronic media, including on the Internet, and BPs are required to remove any non-compliant profiles and/or websites immediately; failure to follow these social media guidelines may result in disciplinary actions, including termination.[22]

A BP may be suspended or terminated for violating the terms of the Agreement, the P&Ps, the Compensation Plan, and other documents produced by Neora.[23]  A BP who voluntarily terminates his or her business relationship with Neora has the right "to return for repurchase on commercially reasonable terms currently marketable inventory," including promotional materials, sales tools, and kits in the possession of and purchased by the BP.[24]

### 3. Compensation Plan

The terms of the business opportunity that Neora offers to BPs, including the framework for BPs to earn income and rewards, are set forth in the Compensation Plan.[25]  The Compensation Plan explains that Neora BPs earn income in two ways: first, by building a customer base and earning commissions on sales to those customers, and second, by building a team of BPs and earning "commissions and bonuses based on their product sales to customers and their volume."[26]

---

[22] 2021 P&Ps §§ 7.05–.06.
[23] 2021 P&Ps §§ 4.02–.03.
[24] 2021 P&Ps § 10.06.  The P&Ps define "reasonable commercial terms" as meaning "the repurchase of marketable inventory within twelve (12) months from the Brand Partner's date of purchase at not less than 90% of the Brand Partner's original net cost less appropriate setoffs and legal claims, if any."  *Id.*  In addition, "currently marketable" products do not include opened products, those for which the shelf life has passed, or seasonal, discontinued, or special promotional products not subject to the repurchase obligation.  *Id.*  The Agreement likewise provides that BPs have the right to terminate or cancel their BP position at any time, and after termination, a BP has "the right to return, for repurchase on commercially reasonable terms, currently marketable inventory—including company-produced promotional materials, sales aids and kits."  *See* 2021 Agreement at 3.
[25] *See generally* 2021 Comp. Plan; Tr. Vol. 4-B at 47–48.
[26] 2021 Comp. Plan at 2.

Under the Compensation Plan, eligibility for certain commissions and bonuses is evaluated through consideration of product "volume." "Volume" refers to "[t]he value assigned to a product that is used to determine a Brand Partner's rank qualifications in the Compensation Plan (Qualifying Volume or QV), or to determine the amount of commissions being paid on a product purchase (Commissionable Volume or CV)."[27] Each product sold by Neora has an associated QV and CV figure; for example, the 2022 Neora U.S. Product Price List provides that a BP will earn 80 QV and 69 CV for a sale or purchase of Neora's Age IQ Night Cream.[28]

To be eligible to earn income under the Neora Compensation Plan, a BP must remain "active" each calendar month, which can be achieved in two different ways. First, a BP can remain active by maintaining at least 120 in Personal Qualifying Volume ("PQV") in product sales to personal customers, where PQV refers to qualifying volume generated through a BP's personal product purchases, and any volume from product purchases made directly from Neora by a BP's Retail and Preferred Customers. Second, a BP can remain active by maintaining at least 80 PQV in personal product "SmartShop Volume" ("SSV"), *i.e.*, volume from the BP's own SmartShop recurring orders.

The Compensation Plan organizes the means through which an active BP may earn income or rewards into the following four categories: Rewards for Selling, Product Rewards, Rewards for Team Building, and Rewards for Leadership. The Plan also describes the "1-2-3

---

[27] 2021 Comp. Plan at 16; *see also* Tr. 1-A at 66 ("[W]e often see . . . Qualifying Volume, and that is sort of the amount that you need in order to . . . qualify for rewards. We can think of that is [sic] approximately dollars, although it isn't always exactly a one-to-one in this case."). Neora's expert, Dr. Vandaele, testified that products are each assigned an associated volume so that, regardless of currencies and currency fluctuations, sales of the product will have the same impact on a BP's compensation under the Compensation Plan regardless of whether the sale occurred. *See, e.g.*, Tr. 4-B (ECF No. 320) at 151 ("[Volume is not] a dollar amount. . . . [T]he idea was that there was an arbitrary volume number because that's the same volume number worldwide. So that if a product is $92.00 in the United States and $132.00 in Canada, it's 80 volume in both countries, so that when the comp plan is executed it is uniform.").

[28] Ex. 1441 at 1. The Price List further provides that "CV for individual items can change based on order discount given at point of sale." *Id.* at 2.

Bonus," which a BP is eligible to earn within his or her first sixty days; if BP enrolls two new BPs and three new PCs, each with at least 80 QV, the BP is entitled to a bonus of $50.[29]  With one exception,[30] the remainder of the rewards and bonuses described in the Compensation Plan may be earned at any time during a BP's tenure, and each will be described in turn.

### a.  Rewards for Selling

The Compensation describes five types of "rewards," or income opportunities, that BPs may earn in connection with selling Neora products.  First, BPs can earn a retail profit by selling Neora products either in person or through the BP's personalized Neora website.  If someone buys product through the BP's retail website, the BP earns the difference between the price paid by the customer and the BP one-time price for that item, as listed in the Neora Product Price List.[31]  BPs may also sell Neora products at retail value from the BP's own personal inventory, and earn the difference between the price the BP paid and the suggested retail price.[32]

Second, a BP may earn commissions on retail customer sales and PC enrollment, one-time, and SmartShop orders after meeting a sales threshold, starting at 5% commissions on all sales once the total number of sales exceeds $300.[33]  Third, any active BP may earn a PC First

---

[29] 2021 Comp. Plan at 4.  The Compensation Plan explains that the BPs and PCs, each with associated qualifying volume, must be enrolled within the BP's first 30 days to earn the bonus, but that the bonus can be earned multiple times within the BP's first 60 days.  *Id.*  In prior versions of the Compensation Plan, the 1-2-3 Bonus was called the "Fast Start Qualify" bonus, and previously required that the BP enroll three new BPs to qualify.  *See* Tr. 1-A at 68.

[30] The Director Bonus can only be earned within a BP's first three months.  2021 Comp. Plan at 8.

[31] *See, e.g.*, Ex. 1441.  For each Neora product, the Price List recites five separate prices: the retail price, and a "one time" and "SSO" price depending on whether the purchaser is a BP or a PC.  For example, the 2022 Price List states that Neora's Age IQ Night Cream has a retail price of $120 per bottle.  *Id.*  A PC may make a one-time purchase of the Night Cream for $102, or set up a recurring SmartShop order for the "SSO" price of $92 per bottle.  *Id.*  Similarly, a BP may purchase the Night Cream for a one-time price of $92 per bottle, or $82 per bottle if the BP enrolls in a recurring SmartShop order.  *Id.*  Thus, if a Retail Customer made a one-time purchase of one bottle of the Age IQ Night Cream, the BP would earn the difference between the $120 retail price and the $92 BP one-time price, *i.e.*, a retail profit of $28.

[32] 2021 Comp. Plan at 5.  The P&Ps further state that "[a]lthough Neora provides a suggested retail price as a guideline, [a] Brand Partner may sell Neora products at whatever retail price they and their customers may agree upon, if the price is not below the Preferred Customer price."  *See* 2021 P&Ps § 9.14.  No additional commissions are paid out on sales that the BP makes from his or her personal inventory.  2021 Comp. Plan at 5.

[33] 2021 Comp. Plan at 5.  The Compensation Plan refers to this type of sales reward as "Personal Sales Commissions," or "PSC."  *Id.*  BPs may earn 5% in PSC on sales between $300–$1499; 10% commissions on sales between $1500

Order Bonus ("FOB") for each new, personally enrolled PC who purchases product in their enrollment order; the BP may earn up to 20% of the PC's first order.[34]  Fourth, the BP may earn a Personal PC Bonus ("PPC") depending on the number of PCs the BP has enrolled or maintained for a given month, with a minimum of at least three personally enrolled PCs to receive any rewards or bonuses.[35]  And fifth, the BP may earn the Team PC Bonus based on rewards and bonuses earned by their downline "team" of BPs.[36]  With the exception of the Team PC Bonus, all of the "Rewards for Selling" can be earned without recruiting any BPs.

### b.  Products Rewards

The Compensation Plan describes two "Product Rewards": the 3UR Free program, and the Neora Gives Back points program.  Under the 3UR Free program, a BP can receive up to $140 in product credit per month if he or she has a recurring SmartShop order and enrolls at least three PCs purchasing at a certain level.[37]  In the Neora Gives Back program, by enrolling a new PC or BP with a recurring SmartShop order, a BP accumulates points that may be redeemed for free product samples.[38]

---

[34] 2021 Comp. Plan at 6.  The First Order Bonus is a simplified version of a previous bonus in prior versions of the Compensation Plan, referred to as the "Customer Acquisition" bonus.  Tr. 1-A at 73–74.

[35] 2021 Comp. Plan at 6.  For example, a BP who enrolls or maintains 6 PCs with a minimum 55 QV each, and a total of at least 500 PQV from the BP's personal customers' orders will result in a bonus of $50.  *Id.*

[36] 2021 Comp. Plan at 6–7.  For example, a BP will earn a $200 bonus if he or she has at least personally enrolled three BPs that become 3UR Free qualified in a monthly period.  *Id.*  If those three BPs become PPC Bonus earners— *i.e.*, have personally enrolled at least 3 PCs—the BP will earn a $500 reward.  *Id.*

[37] 2021 Comp. Plan at 4; *see also* Tr. 1-A at 68–69.  Specifically, the BP must have an active personal SmartShop Order of at least 80 QV, and at least three PCs, each with fully paid SSOs, with a total of 210 QV from all of the BP's customers for that month; if so, the BP will receive a credit equal to one-third of all the BP's PC orders, not to exceed $140 per month.  2021 Comp. Plan at 4.  The parties' experts disagree on how to treat the 3UR Free reward for purposes of analyzing the compensation plan; Dr. Bosley characterizes the 3UR Free reward as a reduction in expenses, whereas Dr. Vandaele, in parts of his analysis, treated the credit akin to income, i.e., a cash reward, on the grounds that Neora includes it as income on 1099 forms issued to BPs.  *See* Tr. 1-B at 14; Tr. 5-A at 109.

[38] 2021 Comp. Plan at 8.  To qualify for the Neora Gives Back program, new BPs must be active and generate 200 PQV within their first 30 days, or can qualify as being "Paid As a[n] Elite Brand Partner" or higher.  *Id.*  Information

---

---

*and $2999, and 15% commissions on all sales exceeding $3000.  Id.  In previous versions of the Compensation Plan, the threshold to be qualified to earn commissions was lower, i.e., 200 units, but the BP was only entitled to earn commissions on the sales that exceeded the threshold.  Tr. 1-A at 72–73.  Under the current Compensation Plan, once the BP hits the threshold of $300 in sales, the BP is entitled to earn commissions on the entire amount of sales, not simply the amount in excess of $300.  Id.*

### c.  Rewards for Team Building

The Compensation Plan describes several "Rewards for Team Building," which are based, in part, on a BP's downline "team" of BPs, as well as the BP's "rank."  "Rank" refers to a BP's level of achievement in the Compensation Plan, and is determined by personal and group sales volume, as well as the personal and group volume of BPs in the BP's group.[39]  The Compensation Plan establishes 18 ranks that a BP can achieve.

The first reward based on team building is the BP First Order Bonus; if a newly enrolled BP purchases product at the time of their enrollment, a percentage of that product purchase amount is paid to both the enroller and the first upline enroller, if they are eligible.[40]  Next, a BP may earn a one-time Director Bonus for advancing to the rank of Director within his or her first three months; the bonus size varies depends on the speed of advancement.[41]

---

regarding the Neora Gives Back program is also provided to BPs in a program flyer (Ex. 1071) and in the BP Success Planner.  *See, e.g.*, Ex. 1084 at 33.

[39] *See* 2021 Comp. Plan at 13 (rank qualifications), 15 (definition of "Rank").  BPs begin with the rank of "Brand Partner," and may progress to more advanced ranks once certain volume and team structure benchmarks are met.  *Id.* at 13.  For instance, an active BP can advance to the rank of "Brand Partner Plus" by having one "Active Leg" in his or her "Enrollment Tree"—*i.e.*, by enrolling one new BP into Neora—without having to increase the BP's personal volume.  *Id.*  The Compensation Plan explains that a "leg" is a portion of a BP's organization, starting with one of their "first-level" BPs.  *Id.* at 15.  For example, if a BP enrolls ten BPs into Neora, he or she has ten "first-level" BPs corresponding to ten legs in the BP's enrollment tree.  *Id.*  If any of those first-level BPs themselves enroll a BP, that newly-enrolled, "second-level" BP will become part of the downline leg of the original enroller, and so on.  The Compensation Plan provides that rank advancements are partially based on the total volume generated in each leg, and when a BP enrolls a new BP, the enroller may elect to either create a new leg in his or her tree, or place the new BP under an existing leg, to increase the volume in that leg.  *See id.*  Thus, the Compensation plan distinguishes between a BP's "enrollment tree"—consisting of all first-level BPs that the BP has personally enrolled—and the BP's "placement tree"—where those same BPs may be placed in an existing leg so as to increase the volume of that leg.  *Id.* at 14.  For ranks beyond Brand Partner Plus, the BP must meet certain thresholds for both Leadership Qualifying Volume (based on the BP's downline enrollment tree) and Group Qualifying Volume (based on the placement tree).  *Id.* at 13.  Group Qualifying Volume includes the BP's own personal purchases, but no more than 2000 in PQV from personal purchase can count towards Group Qualifying Volume.  *Id.*; *see also* Tr. 1-A at 80–81.

[40] 2021 Comp. Plan at 8.  Eligibility is based on rank and whether the enrolling BP is in their enrollment month at the time that they enroll the new BP.  *Id.*  Previous versions of the Compensation Plan included a "pack bonus," which awarded the enroller a bonus if the newly-enrolled BP purchased a Product Pack.  *See* Tr. 1-A at 78.

[41] 2021 Comp. Plan at 8.  Specifically, a BP will earn a $200 bonus if he or she advances to Director within two months, and $100 if he or she advances in the third month.  *Id.*

Upon reaching the rank of Elite Brand Partner, which requires at least three active enrolled downline BPs, a BP is eligible to earn Team Commissions, which are based on the commissionable volume generated from product sales made by the BP's team.[42]  If a BP reaches the rank of Premier Director, he or she is entitled to a monthly Lifestyle Bonus, paid in addition to monthly commissions; the bonus starts at $150 per month and increases with rank.[43]  If a BP reaches the rank of Elite Director with at least 15,000 in Group Qualifying Volume, he or she is further entitled to the Luxury Car Bonus, a monthly payment toward a luxury car or the option to take a cash bonus instead.[44]

Even if a BP recruits multiple levels of downline BPs, if there are no purchases by any BPs or PCs in the BP's organization, there will be no compensation or rewards paid to that BP.[45]

### d.  Rewards for Leadership

Finally, the Compensation Plan describes rewards based on leadership.  BPs ranked Elite Director and above are entitled to the "Check Match" bonus, which the Compensation Plan states "is designed to reward you for developing leaders in your organization and working with them to accomplish their goals."[46]  Through Check Match, a BP may earn a percentage of the team commissions paid to BPs in his or her enrollment tree with the rank Team Director or higher. Finally, under the Leadership Bonus, BPs who reach Silver National Marketing Director can earn a percentage of the commissionable volume of his or her entire organization, and under the NMD Generation Bonus, BPs who reach the rank of Platinum National Marketing Director are

---

[42] 2021 Comp. Plan at 9.
[43] 2021 Comp. Plan at 10.
[44] 2021 Comp. Plan at 10.  Additional information regarding the Luxury Car Bonus is provided to BPs in the Luxury Car Bonus Packet.  *See* Ex. 1083.
[45] Givens Depo. (ECF No. 311) at 95:10–23; Tr. 5-A at 43, 80–82; Tr. 6-A (ECF No. 323) at 60–61.
[46] 2021 Comp. Plan at 11.

entitled to a percentage of the commissionable volume based on the number of BPs below them who have reached the National Marketing Director rank.[47]

### 4. Neora Materials & Compliance

Neora creates various types of materials associated with Neora's products and the BP business opportunity, including product guides and brochures, price lists,[48] guides and trackers for organizing selling efforts,[49] approved marketing materials,[50] compliance documents,[51] and videos.[52]  These types of documents are made available to BPs on the "Back Office," a portion of Neora's website that is accessible to BPs, and includes, in addition to the materials prepared by Neora, personalized reports and business information for each BP.[53]  In addition to published materials, trainings, and videos on the Back Office, Neora offers BPs weekly training, leadership

---

[47] 2021 Comp. Plan at 12.

[48] Tr. 5-B at 60; Exs. 1038, 1040, 1037.

[49] For example, Neora provides BPs with a "Success Planner" (*e.g.* Ex. 1084), a "New Brand Partner Game Plan" (Ex. 1042), a "Social Tracker" for tracking social media engagement (Ex. 1055), and guides and training on using social media to grow their business (*e.g.*, Exs. 678, 1064, 1066).

[50] Such marketing materials include social media graphics, reels, video content for social media, marketing videos, and flyers.  Tr. 5-B at 54; *see, e.g.*, Ex. 1036.

[51] Compliance documents are created as a tool to explain Neora's policies and procedures to BPs.  Tr. 4-A at 17–18. Such documents include the *Compliance Corner* newsletter, both the quarterly and monthly email editions.  *E.g.*, Tr. 4-A at 16–18; Exs. 1046, 1048, 1059, 1079 (quarterly edition); Ex. 1026, 1028, 1030, 1033, 1044, 1049, 1085, 1347–74 (email edition).  In the quarterly *Compliance Corner*, Neora covers compliance topics required under regulations promulgated by the Direct Selling Association, as well as Neora's own guidelines.  Tr. 4-A at 16–18.  In addition, the Neora compliance department also sends out shorter, monthly *Compliance Corner* updates via email, intended to address hot topics or trends happening in the field.  *See id.* ("[I]f we're seeing a lot of certain types of violations, we'll cover that [in the monthly edition].").  Other compliance-related documents include the Field Compliance Guide (Ex. 1462) and the P&Ps.  In addition, various selling guides include provisions on compliance; for example, the "Neora Social Selling System," which describes how to use Facebook and Instagram for selling purposes, includes several pages on "Creating Compliance Content."  *See* Ex. 1064 at 14–15 ("Any content involving Neora wellness products should not make any medical claims, should not mention any medical conditions, or claim to replace any prescriptions."); *see also* Ex. 1066 at 3 (Neora Social Selling System Quick Guide) ("9. DO. Be compliant. Check the Neora Policies & Procedures in your Back Office if you are questioning a post, story or video prior to posting.  Never make medical or income claims in your post.").

[52] *See, e.g.*, Exs. 722–24, 443–44.

[53] *E.g.*, Tr. 2 (ECF No. 316) at 129; Tr. 3-B (ECF No. 318) at 13; Tr. 4-A at 76; Tr. 4-B at 23, 34; Tr. 5-B at 42–44. The Back Office is described as a personalized "business account center" for BPs, where they can access marketing and training materials, contact Neora support, and review customer reports.  Tr. 5-B at 42–45.  The Back Office also contains approximately 100 training videos for BPs to watch.  *Id.*

training calls for higher-ranked BPs, specialized training, and the Get Real Conferences, held at least annually.[54]

The main product training documents are the product guides, which are updated whenever Neora launches a new product, or at least annually.[55] The product training guides contain information and details about each product, including what BPs can communicate that the product does, relevant disclaimers that BPs should use, for whom the product is appropriate, and descriptions of each of the key ingredients.[56] For example, the 2021 product guide contains product features, instructions for use, results from clinical trials (for certain products), and ingredient descriptions.[57] In addition, Neora publishes shorter product brochures, which are intended for BPs to hand to prospective customers to learn more about the products; in addition to product information, brochures contain before-and-after photos and client testimonials.[58]

Neora also publishes the "Field Compliance Guide," which is "designed to help [BPs] understand how to properly share Neora's products, business opportunity and demonstrate how to appropriately market your business."[59] For example, for income claims, the 2022 Field Compliance Guide defines what an income claim is, provides best practices regarding making income claims, gives examples of prohibited and acceptable claims, and provides directions on how and when BPs should include mandatory income disclosures when making statements about

---

[54] *See, e.g.*, Ex. 1385.

[55] Tr. 5-B at 46–49; Ex. 1399 (2015 guide); Ex. 1443 (2016 guide); Ex. 1410 (2018 guide); Ex. 1339 (2021 guide).

[56] Tr. 5-B at 47–48.

[57] *See generally* Ex. 1339. For example, for EHT Brain Formula, the 2021 product training guide lists key ingredients and their associated function, instructions for taking EHT Brain Formula once a day in the morning with food, and describes the purported benefits of the supplement to "help[] promote better cognitive function and overall brain health," accompanied by a disclaimer that "[t]hese statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease." *Id.* at 17. Although the product training guide lists clinical trial results for other Neora products—for example, the guide states that in independently conducted clinical trials, 100% of participants had significantly smoother skin texture after using the Age IQ Night Cream—the guide recites no such results for EHT. *Id.* at 4.

[58] Tr. 5-B at 51–52; Ex. 1342 (2016 brochure); Ex. 1343 (2018 brochure); Ex. 1161 (2021 brochure); Ex. 1031 (2022 brochure).

[59] Ex. 1462 (2022 Guide).

income that can be earned through the Neora business opportunity.[60]  The Field Compliance

Guide contains similar guidance for product claims, *i.e.*, guidance on approved claims,

mandatory disclosure statements to accompany any testimonials or product statements made by

BPs, and examples of proper and improper product claims.

The Field Compliance Guide references various disclosure statements, including the

Neora "Full Income Disclosure Statement" and the "Wellness Product Disclosure Statement."

These disclosures are recited in the Field Compliance Guide and also in the "Income & Product

Disclaimers" document, and consist of Neora-approved language for BPs to use in conjunction

with income and product claims.[61]  For example, the Income & Product Disclaimers document

recites the following "Full General Income Disclosure Statement":

> From January 2021–December 2021, Neora had 34,408 Active US Brand Partners.
> An Active Brand Partner is defined as a Brand Partner who: (A)(i) made a sale to a
> customer, or (ii) had a personal purchase in the prior 18 months and (B) was
> registered as a Brand Partner during the entire period January 2021–December
> 2021.
>
> From January 2021–December 2021, 40.1 % of Active US Brand Partners earned
> cash commissions and 59.9% did not earn any cash commissions. The average
> annual gross cash earnings of Active US Brand Partners was $1,358. These figures
> do not include the value of bonuses and commissions paid in free product, which
> were received by 20% of Active [US] Brand Partners. The calculation of gross cash
> earnings does not reflect any expenses paid or the value of any time expended by
> the Brand Partners in making the underlying sales to customers.
>
> Neora™, LLC does not guarantee any level of income for any Brand Partner. The
> actual income of Neora Brand Partners varies depending on each Brand Partner's

---

[60] For example, under "Best Business Practices," the Field Compliance Guide instructs BPs to state realistic results about the potential for BPs to earn "modest supplemental income," be clear that any rewards were the result of the BP earning them, set practical expectations, and use proper disclosures. Ex. 1462 at 2. The Guide contains examples of "SAY THIS . . . NOT THAT," and screenshots of compliant social media posts. *E.g.*, *id.* at 4–5.

[61] *See, e.g.*, Ex. 1463 (2022 Income & Product Disclaimers); Tr. 4-B at 18–20 (testimony of Deborah Heisz) ("If you want to point out an earnings statement, you can point our earnings disclosure which has what we're comfortable sharing about the earnings of Brand Partners in the company."). Both the Field Compliance Guide and the Income & Product Disclaimers document are sent to BPs whenever the Neora Compliance Department reaches out about a violation. Tr. 4-A at 18–19. The record contains previous versions of the Income and Product Disclaimers document. *See* Ex. 24 (2020); Ex. 1024 (2021).

individual goals, expectations, skill, effort, and time commitment as well as market forces beyond the Brand Partner's and/or Neora's control.

Ex. 1463.

The document also includes an Abbreviated General Income Disclosure Statement,[62] a Car Bonus Disclosure Statement,[63] a Trip Disclosure Statement,[64] and Neora Wellness Product Disclosure Statements.[65]  The Field Compliance Guide instructs BPs to include the relevant disclosure statement whenever making an income or product claim.[66]  Neora also maintains a website, in which it posts earnings information and copies of the P&Ps.[67]

Neora has an in-house Compliance Department that addresses violations of Neora's P&Ps, including violations of the policies relating to income and product/services claims.[68]  Neora will also monitor orders of a certain size to determine the purpose of the order, *i.e.*, for consumption or to manipulate the Compensation Plan, and whether multiple BPs are shipping to the same address.[69]  BPs are invited to contact the Compliance Department support team for guidance on making compliant statements.[70]

---

[62] Ex. 1463 ("From January 2021–December 2021, 40.1 % of Active US Brand Partners earned cash commissions and 59.9% did not earn any cash commissions. The average annual gross cash earnings of Active US Brand Partners was $1,358.").

[63] Ex. 1463 ("Qualifying Brand Partners can choose to earn a Car Bonus in cash or an amount to be applied toward a monthly payment on an approved vehicle. Of our 34,408 Active Brand Partners in 2021, 1.9% earned a Car Bonus for one month or more. Brand Partners must meet eligibility requirements to earn the Car Bonus each month.").

[64] Ex. 1463 ("Out of 34,408 Active Brand Partners, 397 earned our incentive trip to Tulum in 2021.").

[65] Ex. 1463 ("These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.); *id.* ("When used in conjunction with a calorie-controlled diet and exercise program. Individual results may vary.").

[66] *See, e.g.*, Ex. 1462 at 4.  For example, the Field Compliance Guide states that BPs should not say "Neora gave me a 5-star, all-expense-paid trip to Tulum!" and instead, a compliant post would say "I worked hard and earned an amazing trip for two to Tulum with Neora!*," accompanied by the Trip Disclosure Statement stating that "Out of 34,408 Active Brand Partners, 397 earned our incentive trip to Tulum in 2021." *Id.* at 4–5.  The Guide also contains guidance on where to place the disclosure statement to be compliant, focusing on the prominence of the disclosure, and its placement in proximity to the relevant income or product claim. *Id.* at 4.

[67] *See, e.g.*, Ex. 149b (Earnings Information website as of May 28, 2021).  The record contains similar earlier Nerium income declarations. *See* Ex. 1428 (2012 Nerium Income Declaration); Ex. 448 (2013 Nerium Income Declaration); Ex. 447 (2017 Nerium Income Declaration).

[68] Tr. 3-B at 47–48, 59–60.

[69] Tr. 4-A at 71–72, 105–06; 2021 P&Ps §§ 1.05, 9.03.

[70] Tr. 3-B at 107–08.

The Compliance Department uses a program named FieldWatch, an Internet-wide monitoring service that constantly searches the Internet, including social media sites such as Facebook and Twitter, for terms relating to Neora's products and brand.[71]  FieldWatch will identify potential violations for the Compliance Department to review; if a violation is discovered, FieldWatch will send at least two notices to the BP, including by text message, requesting that the violation be removed.[72]  If the BP fails to remove the violative claim after the second notice, the violation is escalated and flagged "Neora Review," which will result in the Compliance Department personally reaching out to the BP and the BP's upline to resolve the violation, and delete the improper claim.[73]  In addition to FieldWatch, the Compliance Department will do manual Internet searches to try to find and resolve violations.[74]  The record contains numerous examples of the Compliance Department communicating with BPs to address noncompliant posts and representations since at least 2013.[75]  Neora also tracks repeat offenders; although Neora typically gives a BP an opportunity to correct noncompliant behavior, a BP is eligible for suspension or termination for repeated violations of the P&Ps.[76]

---

[71] Tr. 3-B at 53–55, 92–94.  The terms are updated and revisited for new events and depending on current events, such as the COVID-19 Pandemic.  Tr. 4-A at 24–25.

[72] Tr. 3-B at 54–55.

[73] Tr. 3-B at 56; Ex. 1102, 1104, 1121, 1127 (templates for communications sent to BPs by the Compliance Department to address income and product claims).  For example, testimony was given indicating that a BP was contacted to stop calling Olson "The Millionaire Maker."  Tr. 3-B at 83.

[74] Tr. 3-B at 142.

[75] Tr. 3-B at 56–61; Tr. 4-A at 21–22; *e.g.*, Exs. 15, 17, 22, 1383–84, 1389–90, 1451–62, 1466–68.  Neora's Compliance Officer testified that, for the July to September quarter of 2020, 633 products claims were resolved and 111 income claims were resolved.  Tr. 3-B at 61.

[76] Tr. 3-B at 64–65; 2021 P&Ps §§ 4.02–.03.

### B. Neora in Practice

Neora currently has approximately 30,000 to 35,000 active BPs.[77]  The number of active BPs has remained relatively stable since 2018.[78]  As of trial, Neora has approximately 163,000 PCs.[79]  Over the life of the company, there have been approximately 400,000 BPs and 1.7 million PCs.[80]  Evidence was presented indicating that median tenure for BPs and PCs may be approximately 8 months and 2 months, respectively.[81]

---

[77] *See* Ex. 1463 ("From January 2021 - December 2021, Neora had 34,408 Active US Brand Partners."); Tr. 4-A at 52 ("Q. How many Brand Partners does Neora have in the United States? A. Around 35,000."); Tr. 4-B at 7 ("THE COURT: How many Brand Partners did you have in 2020? THE WITNESS: Approximately 35,000."); Tr. 5-A at 27 ("[T]he number of Brand Partners, for example, 2021, there was 31,000 . . . Brand Partners . . . ."); Demonstrative Ex. 1440F at 4 (In 2021, "Total BPs w/ Product Purchase" is 31,460).

[78] *See* Tr. 5-A at 29–30, 85; Tr. 1-B at 64; Demonstrative Ex. 1440F at 4; Ex. 622 at 2.  If a BP has no activity in their account for 6 months, *i.e.*, has not bought product or made a sale, Neora will terminate the account in accordance with the P&Ps.  Tr. 4-A at 82–83; 2021 P&Ps (Ex. 1423) § 2.02 ("Once a Brand Partner has been enrolled for a complete year, they are subject to termination if there has been no activity on their account within the past six (6) months (180 consecutive-days); . . . . A Brand Partner that does not renew by the renewal date as provided herein shall be deemed to have voluntarily terminated their Brand Partner position relationship with Neora and will thereby lose their Brand Partner position, . . . .").  However, Nerium did not begin this practice until 2017, and thus prior to that time, the total number of BPs was much higher, as it included inactive BPs.  *See* Tr. 4-A at 82–83; Tr. 4-B at 7–8 ("[I]n 2015 we had more than 125,000 [BPs], because we had not yet begun the process of purging Brand Partners who had become inactive.").

[79] *See* Tr. 5-A at 27; Demonstrative Ex. 1440F at 4 (showing the number of Preferred Customers was 163,451 in 2021, 162,122 in 2020, and 162,938 in 2019).

[80] Ex. 1318; Demonstrative Ex. 1440F at 4.

[81] Tr. 1-B at 109–10; Ex. 878 ¶ 15.  The FTC's data analyst, Ms. Miles, calculated tenure based on the number of months between their first and last order.  Ex. 878 ¶ 15.  However, there are certain assumptions in Ms. Miles's calculations that the Court determines renders these calculations less reliable with respect to certain individuals, which thus calls into question the reliability of Ms. Miles's calculation of median tenure as a whole.  First, despite having enrollment date data available (*e.g.*, Ex. 878 ¶ 10), Ms. Miles used the date of first order to calculate tenure of BPs, even though elsewhere Ms. Miles calculates that at least 13% of BPs do not purchase any Starter Pack when they enroll (Ex. 878 ¶ 14), and thus potentially do not make any purchase until some time after enrolling.  Second, and more significantly, many people start as a PC and eventually enroll as a BP to get the more significant discount.  *See, e.g.*, Tr. 3-A at 106; Ex. 1323 (excerpt of Dr. Vandaele's report, indicating in 2021, 30% of newly enrolled BPs switched from being PCs).  Ms. Miles testified that, for such individuals, her calculations would credit all that time— time spent both as a PC and as BP—as time spent as a BP, provided it was under the same "Customer ID," but Ms. Miles did not have any understanding whether PCs who transition retain the same Customer ID.  Tr. 2 at 18–19.

BPs join the Neora business opportunity for a variety of reasons, including: love of Neora products,[82] the ability to earn free product through the 3UR Free program,[83] product discounts,[84] personal development,[85] and additional income.[86]  In April 2022, current and former BPs were surveyed by a third party to understand why BPs joined Neora.[87]  The results indicated that, among current BPs, the top reason for being a BP is to get discounts on product, either by getting a discount on products for personal use, or to earn free product.[88]  In addition, a 2015 BP experience study asked BPs to identify the single reason that best represents why BPs decided to join Nerium; in descending order of response rate, the responses were: extra income, belief in Nerium, entrepreneurial, potential to earn, free product, primary income, and other.[89]

BPs who enroll only for access to product discounts are occasionally referred to as "savings seekers."[90]  Because of the discount, if a BP buys only the $20 Enrollment Kit and then

---

[82] Tr. 5-B at 32–33.

[83] *E.g.*, Tr. 4-A at 62–63 ("I've talked to people who joined just to get the free product, meaning they joined because they wanted to get 3UR Free because they enjoyed our products and they saw it as an opportunity to potentially not have to pay for the product.").

[84] *E.g.*, Tr. 4-A at 63 ("Other Brand Partners join just to get the product, the product at a discount."); Tr. 5-B at 71 (discussing how BPs have access to special sets and discounts only available to BPs); Tr. 3-A at 106–07.

[85] *E.g.*, Tr. 4-A at 63 ("Some of them join because they, you know, they like the personal development aspects of our -- of our business or our company.").

[86] *E.g.*, Ex. 673 at 33 (2015 BP Experience Baseline Study) ("New BPs look to Nerium to solve income needs.").

[87] Ex. 1147 ("LRW Survey") at 1; *see also* Ex. 1142–46 (LRW Survey data).  Although the FTC objected to the admissibility of the LRW survey under Federal Rule of Evidence 703 and hearsay grounds, the Court admitted the survey "for what it is worth."  Tr. 4-B at 147–49.  The survey invited all former and current Neora BPs to participate, with the exception of former Neora BPs who were terminated for cause, and current and former BPs who had not opted in to email communications from Neora.  There were 361 total respondents to the 2022 Survey: 235 current BPs and 126 former BPs.  LRW Survey at 1.

[88] LRW Survey at 2–3.

[89] Ex. 673.  Only a PowerPoint summary of the 2015 study was available at trial, and the underlying data was not presented; Amber Rourke, Chief Sales & Marketing Officer for Neora, did not recognize the study and was not familiar with who conducted it.  Tr. 5-B at 34–35.  The 2015 study states it was offered to a stratified random sample of US BPs.  *Id.* at 4.  There were 2,566 respondents, including 745 "new BPs."  *Id.* at 6.

[90] Tr. 3-A at 18, 106–07 ("Q. What about people who sign up and just buy product? Is that in that 70 percent [of BPs who do not sell product]? A. Yeah. That's a big part of – It's a really big part of our business. It might not be in some other companies, but it's called a 'savings seeker.' And when you can join the company for just $20 as a Brand Partner and then get all the discounts that come with being a Brand Partner and get the ability to do 3UR Free because you can't do 3UR Free legally with PCs but with Brand Partners. There's a lot of people who will decide instead of being a PC, they'll become a BP because they get a deeper discount on products."); Tr. 4-A at 70–71 ("[W]e have Brand Partners who've been buying product for years that have never done anything else and, you know, it's presumptive

buys $300 worth of Neora products, the BP has saved about $30 in product discounts, enough to recoup the cost of the Enrollment Kit.[91]   In addition, some BPs are prior PCs, who convert to BPs to access the bigger discount available to BPs.[92]   In 2021, 3,298 PCs switched to be a BP, representing 30% of all newly enrolled BPs that year.[93]

Consistently, over 90% of Neora's revenues come from product sales; the remaining 10% of revenues come from sales of starter enrollment Product Packs to BPs and upgrades, and non-product sales.[94]   An estimated less than 1% of Neora's product sales are made to Retail Customers.[95]   The majority of Neora's product sales—somewhere between 75 and 80% of sales—are made to PCs.[96]   Sales to PCs are considered ultimate end-user sales, *i.e.*, purchased for personal use without the intent to resell to anyone else.[97]   The data indicates that, as a percentage of total product sales, sales to PCs have been increasing and sales to BPs have been decreasing since 2017.[98]

---

but the only logical conclusion is that those people are savings seekers. And there's other Brand Partners who've flatout said they're not interested in building a business or -- or doing anything other than buying product.").

[91] Tr. 4-A at 70–71.

[92] *E.g.*, Tr. 3-A at 106–07 ("We have a lot of PCs that, after time, convert to Brand Partners because it's just $20 to get the deeper discount that you can get as a Brand Partner.").

[93] *E.g.*, Ex. 1323; Demonstrative Ex. 1440F at 15.  The data provided by Dr. Vandaele indicates that the number of PCs switching to BPs as a percentage of total newly enrolled BPs has increased over time, but has consisted of at least 20% of all newly enrolled BPs since 2017.  Ex. 1323.

[94] Tr. 4-B at 102; Tr. 5-A at 17–18; Ex. 1316; Demonstrative Ex. 1440F at 2.  Non-product sales include Enrollment Kits, fees, subscriptions, such as Neora *Edge*, meetings, promotions, donations, and tools purchases.  Ex. 1316.  In 2021, 95% of Neora's revenues came from product sales; 3% came from enrollment product packs/upgrades, and 2% from non-product sales.  *Id.*; Demonstrative Ex. 1440F at 2.

[95] *See* Tr. 4-A at 56–57.  Neora tracks retail sales made through the Neora website, but has no records of sales made by a BP to a retail customer out of the BP's own personal inventory.  *Id.*

[96] Tr. 4-A at 83, 94, 124; Tr. 5-A at 12–13 ("[W]e had access to what the Preferred Customers were directly buying. And again, just looking at those data in 2021, that amounted to 75%."); Ex. 1316.  The data indicates that, from 2012 to 2021, 59% percentage of all non-enrollment product sales were to PCs.

[97] Tr. 1-B at 33–34.

[98] Ex. 1316.  The data indicates that, from 2017 to 2021, product sales to PCs increased from 66% to 75%; non-enrollment product sales to BPs decreased from 24% to 19%; and enrollment pack and upgrade package purchase decreased from 5% to 3%.  *Id.*

Approximately 19 to 25% of non-enrollment product sales are made to BPs.[99]  For 2021, using PC purchases as a guide, it can be estimated that 65% of BPs' purchases are for personal use; under that same model, 90% of total product sales in 2021—including BPs, PCs, and retail customers—can be estimated to be for personal use.[100]  Approximately 70% of Neora BPs do not sell product or build an organization through recruitment.[101]  From February 2019 to January 2020, 69.4% of all BPs earned no commissions at all.[102]  For that same period, there were seven BPs with the highest rank—Platinum National Marketing Director—who on average earned substantially more in gross rewards.[103]

### C.  EHT and Signum

EHT, a proprietary coffee extract, was developed in the laboratory of Dr. Jeffry Stock, a professor at Princeton University.[104]  Lay evidence was presented indicating that, based on testing, EHT may reduce inflammation in the brains of rats and mice.[105]  Neither EHT nor any product containing it has ever been clinically tested for efficacy in humans.[106]

---

[99] Ex. 1316 ("Net Sales Dollar Percentages" Table).  From 2017 to 2021, product sales to BPs decreased from 24% to 19%.  *Id.*  The data reflects that, from 2012 to 2021, the total percentage of sales to BPs for non-enrollment products was 21% of all sales, and for enrollment packs and upgrades, 14%.  *Id.*

[100] Tr. 5-A at 53–57; Ex. 1322.  Specifically, Dr. Vandaele assumed that each BP's product purchase for ultimate use, *i.e.* personal consumption, in active months of the year equaled the average of total product purchases per active month (excluding Enrollment Pack/Upgrade purchases), up to the average total purchases per active month for the 50th percentile of PCs in the same year.  Ex. 1322.  For the 2012 to 2021 time period, Dr. Vandaele estimated that, on average, 75% percent of total product sales—including BPs, PCs, and retail customers—were for personal consumption, and on average, 43% of purchases by BPs were for personal consumption.  *Id.*

[101] Tr. 3-A at 105–07 ("I think we're 68 or 69, something like that, but pretty much in alignment with the direct sales industry. Of any direct sales company, about 70 percent of the people sign up that don't do anything. . . . And so we have a lot of our 70 percent, who don't do anything, are still buying our products. They're savings seekers."); Tr. 3-B at 22–23, 24–25; Tr. 4-B at 92–93; Tr. 5-A at 165.  Dr. Bosley states in her report that, "[f]or all Brand Partners who enrolled between 2012 and 2020 . . . 74% recruited no Brand Partners, 85% recruited one or fewer Brand Partners, and 89% recruited two or fewer Brand Partners.").  Ex. 622 ¶ 52.

[102] Ex. 546; Tr. 4-B at 92–94.

[103] Ex. 546.

[104] Tr. 2 at 58–59.

[105] Tr. 2 at 61–62.

[106] Tr. 2 at 27.

Princeton owns the patent covering EHT, and licenses it to Signum Biosciences, Inc., the parent company of Signum Nutralogix, Inc.[107]  Dr. Stock's son, Max Stock, is the CEO of Signum Biosciences, Inc., and Signum Nutralogix, Inc.  In 2014, Signum sold and marketed a product containing EHT called "ME Sports," and advertised that EHT could help with chronic traumatic encephalopathy ("CTE"), Alzheimer's disease, and Parkinson's disease.[108]

In February of 2015, Nerium and Signum Nutralogix, Inc. entered into a Sublicense Agreement, through which Nerium obtained the right to develop, manufacture, commercialize, and sell products containing EHT.[109]  Nerium launched its Nerium EHT product—sold as EHT Brain Formula—at the April 11, 2015 "Get Real" Conference.  Max Stock introduced EHT at the conference; during his comments, he referenced former NFL player Junior Seau, who suffered from CTE.[110]

The day after the Stocks' statements at the Get Real Conference, all Neora BPs received an email from Nerium International, with the subject line "Important Note from CEO Jeff Olson."  The email stated, in part:

> We are thrilled to have introduced everyone to Signum Biosciences at Get Real!
>
> Signum Biosciences works with prestigious universities, such as Princeton, to research new technology. Princeton even owns the patent to the EHT molecule we just released.
>
> However, it is VERY important to respect this partnership we have created with Signum Biosciences and use ONLY approved messaging around this relationship and the related discoveries.
>
> . . .

---

[107] Tr. 2 at 63–64.
[108] Tr. 2 at 64; Tr. 3-A at 50.
[109] Ex. 164; Tr. 2 at 28–29.  As discussed previously, Signum Nutralogix, Inc. and its parent company, Signum Biosciences, Inc., were prior Defendants in this case who settled claims with the FTC and stipulated to a permanent injunction.  ECF No. 10.
[110] Ex. 825.

If you have anything posted on social media that does not follow these guidelines, please remove them immediately.

Anyone not following these guidelines will experience immediate disciplinary consequences.

Ex. 1141.

The email linked a document providing approved messaging for Signum Biosciences, SIG-1273, and EHT, including instructions that BPs should not say that EHT "Cures sports repetitive trauma, Cures Alzheimer's disease, Cures Parkinson's disease, [or] Treats ADD, OCD or any other disease."[111]

Max Stock spoke again during the September 12, 2015, Get Real Conference, and was joined by his father, Dr. Stock. During their presentation, Dr. Stock referenced CTE, Alzheimer's disease, and Parkinson's disease, and stated that EHT was shown to be "beneficial" in model systems used to study neurodegenerative disease, including for Parkinson's disease.[112]

## III.   CONCLUSIONS OF LAW

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Under § 13(b) of the FTC Act, "after proper proof, the court may issue a permanent injunction" against "any person, partnership, or corporation . . . violating, or . . . about to violate, any provision of law enforced" by the FTC. 15 U.S.C. § 53(b); *AMG Cap. Mgmt.*, 141 S. Ct. at 1348–49. Section 13(b) "focuses upon relief that is prospective, not retrospective" *AMG Cap. Mgmt.*, 141 S. Ct. at 1348.

The FTC alleges that Defendants violated the FTC Act by making deceptive or misleading product claims in connection with EHT, making false claims about the potential income BPs could earn by enrolling in Nerium, operating as an illegal pyramid scheme, and

---

[111] Exs. 1408, 1418; Tr. 3-B at 3–5; Tr. 5-B at 24–28.
[112] Exs. 826, 868.

providing BPs with the means and instrumentalities to violate the FTC Act.  Pursuant to § 13(b) of the FTC Act, the FTC seeks injunctive relief as necessary to prevent consumer injury and violations of the FTC Act.  The Court will address each Count in turn.

### A. Count 1: Pyramid Scheme

"The operation of a pyramid scheme constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes of § 5(a)."  *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014).  The FTC maintains that Neora is actively violating or is about to violate § 5 of the FTC Act by operating an illegal pyramid scheme, and asks the Court to enjoin Neora from operating as a multi-level marketing company.

### 1. Legal Standard

In *In re Koscot Interplanetary, Inc., et al.*, 86 F.T.C. 1106, 1975 WL 173318 (1975), the Federal Trade Commission established the *Koscot* test for determining what constitutes a pyramid scheme:

> Such schemes are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.

*Id.* at *60 (emphasis in original).

The second element of the *Koscot* test has been characterized as the *sine qua non* of a pyramid scheme.  *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781–82 (9th Cir. 1996) (adopting the *Koscot* standard).  "[T]he presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed."  *Koscot*, 1975 WL 173318 at *60.

Unlike other courts, the Fifth Circuit has never expressly adopted the *Koscot* test to determine the existence of a pyramid scheme. *Cf. Omnitrition*, 79 F.3d at 781 ("We adopt the *Koscot* standard here . . . ."). Instead, the Fifth Circuit has acknowledged the two-part *Koscot* test only twice, in a pair of recent, related decisions.[113] *See Torres v. S.G.E. Mgmt.*, 805 F.3d 145, 153–54 (5th Cir. 2015) (*Torres I*) (citing *Omnitrition*, 79 F.3d at 781–82), *rev'd on other grounds*, 838 F.3d 629 (5th Cir. 2016) (en banc) (*Torres II*).

In *Torres I*, the Fifth Circuit panel vacated the district court's decision certifying a class action for victims of an alleged pyramid scheme, brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. 805 F.3d at 158–59. The panel held that decertification was appropriate because the plaintiffs would have to rely upon individualized proof of reliance as to the fraudulent conduct causing the plaintiffs' injuries, *i.e.*, that the plaintiffs relied on representations that the scheme was not, in fact, a pyramid scheme. *Id.* In doing so, the panel acknowledged the *Koscot* test, as explained by the Ninth Circuit in the earlier *Webster v. Omnitrition International* case. *Id.* at 153–54.

The Fifth Circuit subsequently vacated the panel decision and heard the case en banc on a narrow issue: "whether the Plaintiffs may prove RICO causation through common proof such that individualized issues will not predominate at trial." *Torres II*, 838 F.3d at 635. The en banc Fifth Circuit subsequently affirmed the district court's certification decision, concluding that individual issues did not predominate because if it was proven at trial that defendants operated a fraudulent pyramid scheme, a jury may reasonably infer that the plaintiffs relied on the defendant's implicit representation of legitimacy. *Id.* at 647.

---

[113] Note, however, that the Fifth Circuit has acknowledged the *Koscot* distributorship model in other contexts, albeit none of which addressed the merits of the *Koscot* formulation of its pyramid scheme test. *See, e.g.*, *F.T.C. v. Turner*, 609 F.2d 743, 744 (5th Cir. 1980); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 485 (5th Cir. 1974).

In reaching this conclusion, the majority admitted that "[n]o clear line separates illegal pyramid schemes from legitimate multilevel marketing programs." *Id.* at 639 (quoting *United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 475 (6th Cir. 1999)); *cf. Torres II*, 838 F.3d at 653–54 (Jones, J., dissenting) (criticizing the majority for not providing additional guidance as to the meaning of "illegal pyramid scheme" beyond the *Koscot* definition).  It did, however, discuss the FTC's *Koscot* test, while providing some additional observations:

> By definition, a pyramid scheme operates by taking money from downline recruits . . . who will never recoup their payments, and funneling the money to those at the top of the pyramid. Such schemes depend on "there [being] Peters . . . to rob for the purpose of paying Paul." Those who lose money in a pyramid scheme necessarily do so "by reason of" the fraud because the fraud is necessary to temporarily sustain the scheme, and ultimately causes the scheme's collapse. And, those who profit from a fraudulent pyramid scheme make money only by virtue of the participation of downline investors . . . who lose money.

*Torres II*, 838 F.3d at 640.

Moreover, the majority observed that "[w]hether a multi-level marketing program is fraudulent or legitimate depends on its internal structure."  *Torres II*, 838 F.3d at 643; *see also BurnLounge*, 753 F.3d at 883 ("To determine whether a MLM business is a pyramid, a court must look at how the MLM business operates in practice.").

The panel decision in *Torres I* was vacated on certification grounds, and the en banc decision did not address the panel's characterization of a pyramid scheme; the Court thus finds the *Torres I* commentary about pyramid schemes to be relevant persuasive authority.  In *Torres I*, the panel stated that "the primary factor in deciding whether a business is a pyramid scheme is whether the business focuses exclusively or almost exclusively on *recruiting* as opposed to *sales*."  805 F.3d at 153 (emphasis in original).  The panel also noted that a pyramid scheme can be distinguished from "the many types of businesses organized in a 'pyramid-shaped' hierarchical structure," and that "[a] true pyramid scheme, as that term is used here,

refers to a type of illegal and fraudulent activity, structured in a fashion that it 'must eventually collapse.'" *Id.*

Also relevant to the pyramid scheme inquiry are the FTC's own published guidance regarding multi-level marketing companies. In January of 2004, the FTC issued an Advisory Opinion discussing, in part, the FTC's "analysis of compensation based on personal consumption by members of a multi-level company's sales force." Ex. 114 ("2004 FTC Advisory Op.") at 1. The FTC provided the following guidance:

> Much has been made of the personal or internal consumption issue in recent years. In fact, the amount of internal consumption in any multi-level compensation business does not determine whether or not the FTC will consider the plan a pyramid scheme. **The critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture.**

> A multi-level compensation system funded primarily by such non-incidental revenues does not depend on continual recruitment of new participants, and therefore, does not guarantee financial failure for the majority of participants. **In contrast, a multi-level compensation system funded primarily by payments made for the right to participate in the venture is an illegal pyramid scheme.**

*Id.* (emphasis added).

The 2004 Advisory Opinion further distinguished an illegal pyramid scheme from a legitimate buyers club, which "confers the right to purchase goods and services at a discount" and is distinguishable from a pyramid scheme, in part, because "the purchase of goods and services is not merely incidentally to the right to participate in a money-making venture, but rather the very reason participants join the program." *Id.* at 2.

In January 2018, the FTC released a staff business guidance document, "Business Guidance Concerning Multi-Level Marketing." Ex. 115 ("2018 FTC Guidance"). Although not legally binding, the guidance purported to "assist multi-level marketers" in applying core consumer protection principles to their businesses. *Id.* at 1. In the guidance, the FTC noted that

"[p]roduct that is purchased and consumed by participants to satisfy their own genuine product demand—as distinct from all product purchased by participants that is not resold—is not in itself indicative of a problematic MLM compensation structure," and instead the analysis "involves a comprehensive analysis of a variety of factors." *Id.* at 2.  In doing so, the FTC affirmed its prior 2004 Advisory Opinion, noting that "when evaluating the issue of participants' internal consumption, the FTC staff is likely to consider, among other factors, both (i) whether features of the MLM's compensation structure incentivize or encourage participants to purchase product for reasons other than satisfying genuine demand; and (ii) information bearing on whether purchases were in fact made to satisfy personal demand to consume the product." *Id.* at 2–3.

### 2. Analysis

The first element of the *Koscot* test, whether BPs pay money in exchange for the right to sell a product, is clearly met here; to enroll as a Neora BP and receive the right to sell Neora's products, one must pay a minimum of $20 for an Enrollment Kit.  Accordingly, the Court's discussion will focus on the second element of the *Koscot* test—whether Neora BPs receive rewards for recruiting other participants, unrelated to the sale of product to ultimate users— interpreted through the lens the Fifth Circuit's guidance in *Torres I* and *Torres II*, and other relevant authority.

The Court begins with the Compensation Plan.  The first four rewards or bonuses described in the Compensation Plan—Retail Sales, Personal Sales Commissions, PC First Order Bonus, and Personal PC Bonus—are based entirely on sales to PCs, and thus are unproblematic for *Koscot* purposes; the parties agree that PCs are considered ultimate end users, who purchase Neora product for personal use without the intent to resell.  Likewise, the 3UR Free program requires only that the BP has at least three PCs with a minimum volume to earn the reward of

free product credit for the subsequent month; eligibility for this reward is also based solely on the sale of product to ultimate users.  Eligibility for the Neora Gives Back program requires enrolling a PC *or* a BP, but at least on paper could feasibly be obtained solely by product sales to ultimate users.

The remaining rewards under the Compensation Plan all require some recruitment element.  Specifically, with the exception of the BP First Order Bonus, all rewards require that the BP reach or surpass the rank of Elite Brand Partner, which requires a minimum of three "active legs" on his or her team, *i.e.*, three recruited BPs.  The Court assumes, for purposes of this analysis, that the right to receive these remaining rewards—the Team PC Bonus, the BP First Order Bonus, the Director Bonus, Team Commissions, the Lifestyle Bonus, the Luxury Car Bonus, Check Match, Leadership Bonus, and the NMD Generation Bonus—are earned by BPs in exchange for recruiting other participants into the program.  *See Koscot*, 1975 WL 173318, at *60.  The question thus becomes whether those rewards "are unrelated to sale of the product to ultimate users," so as to make Neora's Compensation Plan problematic under *Koscot*.  *Id.*

In concluding that Neora is operating as a pyramid scheme, Dr. Bosley—the FTC's witness, and the only witness to testify in support of the FTC's pyramid scheme claim—testified that these rewards are unrelated to ultimate user sales, relying on the rewards structure as defined by the Compensation Plan, Neora's operational practices, including training materials, and an analysis of operational data.  In the words of Dr. Bosley, these rewards are "locked" behind a recruitment threshold, such that no matter how many sales the BP makes, if he or she cannot make it past that recruitment threshold, the BP is not likely to earn any money through Neora.[114]

---

[114] Tr. 1-A at 60, 99; Tr. 1-B at 22 ("I find that [Neora] are operating as a pyramid scheme.  The rewards are locked behind recruitment thresholds. You can arrive at those rewards without having any customer sales. You can purchase some of those rewards or fuel them with your own purchases. And the -- Again, the rewards for -- for retail and customer sales are incredibly low.").

Dr. Bosley further testified, based on review of operational data, that the vast majority of participants will lose money; she found 96% of the approximately 400,000 BPs that have been part of Neora have lost money.[115]

Dr. Bosley testified that the FTC provided her with two legal assumptions for her work in this case, both taken from the Ninth Circuit's decision in *BurnLounge*: first, that an ultimate user is limited to a person who would have purchased the product even if not for the business opportunity; and second, that rewards don't have to be completely unrelated to ultimate user sales in order for something to be a pyramid scheme, *i.e.*, that the existence of some sales to ultimate users for consumption does not prevent the plan from being an illegal pyramid scheme.[116] Dr. Bosley also relied on her own third, uniform assumption: that BPs mainly purchase product in pursuit of the business opportunity, and thus none of BPs' purchases for personal consumption qualify as sales to an ultimate end user.[117] Put differently, Dr. Bosley— and, by extension, the FTC—assumes that purchases by BPs are never ultimate user sales.

The Court finds that Dr. Bosley's third assumption is not supported by the evidence, and the FTC provides no other evidence to show that BP purchases should be uniformly treated not as sales to ultimate users. In addition, the Court finds that the FTC improperly discounts the significance of the large volume of sales to PCs when evaluating whether the recruitment-based rewards, discussed previously, are "unrelated to" sale of Neora product to ultimate users. For these reasons, the Court finds that the FTC has not established the second prong of the *Koscot* test, and concludes that Neora is not operating as an illegal pyramid scheme.

---

[115] Tr. 1-A at 60–61.
[116] Tr. 1-A at 58–59; Ex. 622 ¶ 14.
[117] Tr. 1-B at 47 ("I do assume when you are a Brand Partner, you are mainly purchasing product in pursuit of the business opportunity. . . . It is a uniform assumption, yes."). In reaching this assumption, Dr. Bosley relied on her interpretation of the reward structure and incentives as laid out in the Compensation Plan. *See* Tr. 1-B at 38, 45–48.

Regarding the first issue—that Dr. Bosley's third assumption that BP purchases are not end user sales is unsupported by the evidence—the Court will use the BP First Order Bonus as an example.  For this bonus, if a newly enrolled BP purchases product at enrollment, a percentage of that product purchase amount is paid to both the enrolling BP and the enrolling BP's upline.  For *Koscot* purposes, the relevant inquiry is whether this reward is "unrelated to the sale of the product to [an] ultimate user[]," *i.e.*, whether the purchaser of the product (here, the newly enrolled BP) is an ultimate user.  *See* 1975 WL 173318, at *60.  Under Dr. Bosley's assumption, the newly enrolled BP is assumed *not* to be an ultimate user; instead, the purchase is assumed to be for the business opportunity and not for personal consumption.  Put differently, the FTC asks the Court to simply assume that an element of the *Koscot* test is met.

However, the Court finds that Dr. Bosley's assumption is not supported by the evidence. At trial, Defendants presented evidence that some BPs enroll without ever intending to pursue the business opportunity, and are instead savings seekers, looking to take advantage of the biggest product discounts that are available only to BPs.  Defendants provided the LRW Survey, which reported that—for the admittedly small number of BPs who responded—the top reason for being a BP is to get discounts on product, either by getting a discount on products for personal use, or to earn free product.  Evidence was also provided that PCs will convert to BPs in order to access the bigger discount; Dr. Vandaele, Defendants' expert, calculated that in 2021, 30% of newly enrolled BPs had converted from being a PC.  In addition, testimony was provided indicating that there are BPs who consistently buy product at levels below the threshold necessary to qualify for compensation, and thus their purchases cannot be made in pursuit of rewards under the Compensation Plan.[118]  Thus, returning to the BP First Order Bonus, the

---

[118] Tr. 6-A at 62.

evidence suggests that a newly enrolled BP may be joining to pursue the business opportunity (as Dr. Bosley assumes), or may, for example, be joining as a savings seeker, to purchase Neora products for his or her own personal consumption with no intention of reselling the product.

The distinction is material. For the purposes of the *Koscot* analysis in this case, the only relevant sales are purchases by BPs; sales to PCs and retail customers qualify as sales to ultimate users. Thus, the question of whether Neora is operating as a pyramid scheme hinges on whether sales to BPs are sales to ultimate users, and the FTC simply assumes that they are not. The Court by no means suggests that Defendants' evidence is sufficient to predict or speak on the motivations of *all* BPs purchasing product from Neora; it is, however, sufficient to rebut Dr. Bosley's assumption that no BPs purchase product for personal consumption.

The FTC asks the Court to follow the district court's decision in *Vemma*, which found that there was "no way to unbundle the [distributors'] intent to consume Vemma products as ultimate users from their desire to remain qualified for bonuses," and adopted an assumption, also from Dr. Bosley, similar to the one presented here. *See Fed. Trade Comm'n v. Vemma Nutrition Co*., No. CV-15-01578-PHX-JJT, 2015 WL 11118111, at *4 (D. Ariz. Sept. 18, 2015) ("In all likelihood, Affiliates' purchases of Vemma products are incidental to the right to qualify for and obtain bonuses."). The district court further observed that a participant's "intent in purchasing Vemma products must be viewed in light of Vemma's program design as well as its training and marketing materials." *Id.*

The Court agrees with this general premise, but concludes it would be error to disregard or discount other relevant evidence as to BPs' intent in purchasing Neora product, including their own self-reported motivations for being a BP through the LRW survey, anecdotal reports from Neora employees regarding "savings seekers" and BPs motivated by product discounts, and

motivations that can be inferred from the behavior of PCs converting to BPs and their associated spending habits.  This evidence potentially lacks the statistical rigor necessary to speak confidently as to the purchase motivations for all, or even a majority, of Neora BPs, but besides Dr. Bosley's assumption that all BP purchases are in pursuit of the business opportunity, the FTC provide no tangible evidence to the contrary.  The failure to provide such evidence is contrary to the FTC's own 2018 guidance, which observed that, when considering the issue of multi-level marketing participants' internal consumption, the FTC is likely to consider "information bearing on whether purchases were in fact made to satisfy personal demand to consume the product."  *See* 2018 FTC Guidance at 2–3.

Moreover, the Court notes that there is evidence the FTC could have provided, but did not, which could have supported its position.  For example, the court in *Vemma* observed that "evidence that distributors purchase and consume product for the purpose of qualifying for recruitment incentives is evidence of a pyramid scheme."  2015 WL 11118111, at *3.  The FTC speculated that Neora BPs *could* be making such purchases, but provided no evidence to suggest that is the case for the majority of BPs so as to support Dr. Bosley's assumption.[119]  Instead, the FTC provided no evidence from actual BPs or participants, and made no effort to show that Dr. Bosley's rigid theoretical opinions regarding BP purchasing motivations based on the Compensation Plan are borne out in reality.[120]

---

[119] For instance, as discussed in *BurnLounge*, the Ninth Circuit noted that evidence regarding distributor and non-distributor purchasing patterns was indicative of distributor motivations. 753 F.3d at 884–85.

[120] For example, Dr. Bosley applied her "uniform assumption" to the example of a PC converting to a BP, even if the amount of product purchased did not change.  Tr. 1-B at 47 (Q. So in your analysis, if in January they're buying product as a Preferred Customer and would be treated as an ultimate end user under your *Koscot* analysis, then in February, if they convert and become a Brand Partner, under your analysis, none of their purchases count as ultimate end users because now it's all business expense. A. Yes, I do assume when you are a Brand Partner, you are mainly purchasing product in pursuit of the business opportunity. Q. And that's true in your analysis even if the amount of product that they're purchasing doesn't change from their PC days to their BP days. A. It is a uniform assumption, yes.").  Dr. Bosley relied on her interpretation of the Compensation Plan and incentives set forth from the reward

34

The FTC criticizes as unreliable Defendants' evidence that BPs enroll for access to discounts or to earn free product, particularly the LRW Survey. But the FTC makes no attempt of its own to unbundle BPs' intent to consume Neora products as ultimate users from their motivation to participate in the business opportunity. The Court finds that there is a particularly compelling reason to do so here, given the evidence that there exists a legitimate and substantial consumer demand for Neora's products, namely the fact that the vast majority of Neora's product sales—between 75 to 80% of sales—are to PCs, who purchase Neora's products with no incentives tethered to the Compensation Plan.

The magnitude of sales of Neora's products to non-BP consumers distinguishes this case from two cases relied on by the FTC, *Vemma* and the Ninth Circuit's decision in *BurnLounge*. In *Vemma*, the "great majority of Vemma product sales"—in one year, 86% of sales—were to participants in the company's business opportunity. 2015 WL 11118111, at *2–3. Here, the numbers are reversed; roughly 80% of sales are undisputedly to end users, while the remainder— roughly 20% of sales—are to BPs.

Similarly, the Ninth Circuit in *BurnLounge* emphasized the "sharp difference" in purchasing patterns between distributors and non-distributors as supporting evidence that the distributors in that case were motivated by rewards for recruitment, as opposed to product sales. 753 F.3d at 884–85. There, distributors—called "Moguls"—maintained eligibility for cash rewards through sales of packages, and data showed that Moguls bought packages at much higher rates than non-Moguls. *Id.* at 885 ("If package purchases were driven by the value of the merchandise included in the packages rather than by the opportunity to earn cash rewards, one would expect to see comparable numbers of Moguls and non-Moguls buying the same

---

structure in making her assumption; she did not interview any Neora BPs or conduct any surveys. Tr. 6-B (ECF No. 324) at 89–90.

packages."). That is not the case here, where sales of Neora's product are primarily to PCs. In addition, once the company in *BurnLounge* stopped offering the ability to earn cash rewards, revenues plummeted, decreasing from approximately $475,000 to $11,000 from June to August of the same year; the Ninth Circuit found that the "dramatic decline in revenue . . . provides further evidence that the sale of BurnLounge packages was primarily directed at participants who were interested in the Mogul program, where it was possible to earn cash rewards." *Id.* Here, where most Neora consumers do not participate in the Compensation Plan and are not eligible to earn rewards, there is no suggestion that eliminating the rewards program would result in a similar decline of revenues at such a precipitous rate.

The FTC carries the burden to establish the *Koscot* test, and thus it is the FTC's obligation to show that Dr. Bosley's assumption applies, not Defendants' burden to show it does not. Defendants have presented some evidence that BPs purchases are ultimate user sales, whereas the FTC provides only an assumption to the contrary and its cited cases are inapposite. Given that this second element of the *Koscot* analysis hinges on the determination of whether BP purchases are or are not ultimate user sales, the Court declines to adopt a claim-dispositive assumption in light of the evidentiary record to the contrary. Accordingly, the Court concludes that Dr. Bosley's assumption that BP purchases never qualify as ultimate user sales to be unsupported by the evidence, and rejects it.[121]

The FTC's position is far less tenable in the absence of this assumption. In support of its claim that Neora operates as a pyramid scheme, the FTC points to Dr. Bosley's calculation that

---

[121] In concluding thus, the Court is not suggesting that an opposite assumption, i.e., that all BP purchases are end-user purchases, is appropriate; there are clearly instances when a BP enrolls in the business opportunity and purchases product to resell, not for personal consumption. Indeed, the evidence does not support either extreme assumption— i.e., that all BP purchases are end-user purchases, or none. In addition, the Court recognizes that there may be other instances—such as the circumstances presented in *Vemma* or *BurnLounge*—where the assumption adopted by Dr. Bosley would be appropriate and reasonable.

96% of Neora BPs lose money and "walk away poorer than they started, having paid more into the company than they ever got out."[122]  However, that statistic becomes less significant if one acknowledges that many BPs enroll in Neora without any intention of pursuing the business opportunity, and instead are only purchasing product for personal consumption at discount.  Put differently, we may "walk away poorer than we started" after a trip to the grocery store, but because we obtained valuable goods or services in return for our money, that exchange is not characterized as a loss.  Moreover, evidence was presented that, given the discounts, a BP may recoup the cost of the initial $20 Enrollment Kit after ordering at least $300 worth of product; for savings-seeker BPs, who would be purchasing the product regardless of the business opportunity, they recouped their payments through discounts, and thus suffered no loss.[123]

The existence of these types of BPs weigh against the finding of a pyramid scheme, at least as it was characterized by the Fifth Circuit in *Torres II*.  838 F.3d at 640 (characterizing pyramid schemes as, by definition, "operat[ing] by taking money from downline recruits . . . who will never recoup their payments").  On this evidentiary record, it cannot simply be assumed that the 70% of Neora BPs who never made a sale or earned a commission are disappointed victims of an illegal pyramid scheme, simply because he or she never made a sale, recruited another BP, or earned a commission.

As stated, the FTC made no attempt to estimate or separate BPs' purchases for personal consumption versus those in pursuit of the business opportunity, which would be necessary to determine the magnitude of the rewards that implicate *Koscot*: those unrelated to the sale of the

---

[122] Tr. 7 (ECF No. 325) at 22.
[123] Moreover, given that the Product Packs available only to newly enrolling BPs include discounts that are otherwise unavailable, savings seekers BPs may also be purchasing Product Packs at enrollment to take advantage of the decreased prices; it would similarly be improper to characterize those purchases in this context as a "business expense."

product to ultimate users, *i.e.*, purchases by BPs in pursuit of the business opportunity, either to resell or to maintain eligibility for rewards.  Using PC purchases as a basis for comparison, Dr. Vandaele estimated that 90% of total product sales and 65% of BPs' purchases in 2021 were for personal consumption, *i.e.*, ultimate user sales.  Thus, under Dr. Vandaele's calculations, of sales to BPs in 2021—consisting of 19% of Neora's total product sales—only approximately 35% constitute non-ultimate user sales that implicate the second *Koscot* factor.

In its FTC's 2004 Advisory Opinion, the FTC acknowledged that internal product consumption by participants in a multi-level marketing business is not dispositive of whether the plan is a pyramid scheme; instead, the FTC stated that the "critical question" is whether revenues paying the commission to participants are generated from purchases of product "that are not simply incidental" to the purchase of the right to participate.  *See* 2004 FTC Advisory Op. at 1. Here, no evidence was provided indicating that rewards or bonuses to BPs paid under the Compensation Plan are funded primarily by payments made by BPs for the right to participate in the venture, *i.e.*, by the $20 Enrollment Kit fee paid to enroll as a BP, or starter Product Pack purchases by BPs in pursuit of the business opportunity.  Nor did the FTC provide evidence suggesting that Neora is funded primarily by those payments.  *See id.* ("[A] multi-level compensation system *funded primarily* by payments made for the right to participate in the venture is an illegal pyramid scheme." (emphasis added)).  As such, this is not the case where "[a]bsent sufficient sales of goods and services, the profits . . . hinge on nothing more than recruitment of new participants (i.e., fee payers) into the system."  *Id.* at 2.  On the contrary, the evidence established that the vast majority of Neora's revenues come from sales to PCs, *i.e.*, end

users, suggesting there *are* sufficient sales of goods such that Neora's profits do not hinge on the recruitment of new participants.[124]

The magnitude of sales to PCs goes to the second fundamental issue with the FTC's pyramid scheme theory, namely that it disregards the evidence that ultimate user sales are necessarily funding and driving the majority of rewards earned by BPs. Under the Compensation Plan, a BP earns no rewards or bonuses absent purchases by BPs or PCs in his or her downline, and because purchases by PCs constitute approximately 80% of Neora's sales, it is a reasonable inference, supported by the evidence, that those ultimate user sales are the primary source of sales that contribute to reward eligibility.[125] Put differently, because there are a significant number of legitimate paying customers outside of the Compensation Plan's incentives, the business does not depend on there being Peters to rob for the purpose of paying Paul, and there are not *solely* profits simply "by virtue of the participation of downline investors . . . who lose money." *See Torres II*, 838 F.3d at 640.

In addition, although many of the rewards in the Compensation Plan are "locked behind" a wall that requires recruitment to unlock, many of those bonuses can—and the evidence suggests, do—rely at least partially on PC purchases. For instance, for August 2022, of the BPs who qualified for commissions (and thus were participating in the business opportunity), 8% had

---

[124] *See, e.g.*, Tr. 5-A at 21–22, 28–29. In addition, the 2004 FTC Advisory Opinion's discussion distinguishing illegal pyramid schemes from legitimate buyers clubs is also relevant in light of the evidence that some Neora BPs enroll in order to access larger product discounts or earn free product through 3UR Free and qualifying PC purchases. *See* 2004 FTC Advisory Op. at 2 (distinguishing legitimate buyers' clubs from pyramid schemes because "the purchase of goods and services is not merely incidental to the right to participate in a money-making venture, but rather the very reason participants join the program"). The Advisory Opinion further explains that a buyers' club "confers the right to purchase goods and services at a discount," and if "organized as a multi-level reward system, the purchase of goods and services by one's downline could defray the cost of one's own purchases." *Id.* So too in Neora; the purchase of goods by a BP's enrolled PCs can defray the costs of the BP's own purchases through the 3UR Free program. Thus, although Neora is clearly not a buyers' club in the formulation described in the Advisory Opinion—which discusses the club apportioning to its members volume-based discounts received from suppliers—the fact that Neora incorporates characteristics of buyers' clubs that the FTC has previously indicated distinguish legitimate organizations from illegal pyramid schemes is instructive to the Court's analysis.

[125] Tr. 4-B at 30.

9PCs, 5 to 6% of them had at least 6 PCs, and 32% of them received the 3UR Free bonus, which requires at least three PCs.[126]  In addition, each of the BP ranks contains a personal volume requirement that must be met to achieve that rank, but that requirement may be met solely through sales to PCs.[127]  Similarly, Dr. Vandaele calculated that in 2021, of the BPs who received commissions, 76% of them qualified as "active" with PC volume alone.[128]  Thus, although eligibility for those rewards is predicated on recruitment, it is simplistic to say that those rewards are wholly "unrelated" to ultimate user sales in practice, particularly here where PC sales vastly outnumber purchases made by BPs in pursuit of the business opportunity.  *See Whole Living, Inc. v. Tolman*, 344 F. Supp. 2d 739, 745 (D. Utah 2004) ("[T]he fact that the right to receive a commission originates from sponsorship does not necessarily mean that all subsequent commissions are based primarily on recruitment.").  Instead, the consumer demand for Neora's products, as evidenced by the high percentage of revenue from PC purchases, indicates that Neora is largely paying rewards and compensation to participating BPs based on ultimate user sales.  *See* 2018 FTC Guidance at 2 ("[T]he law requires that an MLM pay compensation that is based on actual sales to real customers . . . .").

The FTC does not meaningfully address the magnitude of purchases by PCs, arguing instead that the Court should disregard PC purchases because *Koscot* does not discuss revenues.  ECF No. 331 at 13–14.  For the same reason, the FTC contends that the Court need not consider the potential for the scheme's "eventual collapse."  *Id.*  But such an approach would effectively

---

[126] Tr. 4-A at 100–01.

[127] Tr. 1-B at 78–79; 2021 Comp. Plan at 13.  The Compensation Plan explains that, to satisfy the "personal activity" for each rank qualification, "[y]ou must either have SmartShop Volume (SSV) from a SmartShop order you are placing each month or have enough Personal Qualifying Volume (PQV), generated through purchases from your Retail Customers, Preferred Customers or your personal product purchases."  2021 Comp. Plan at 13.

[128] Ex. 1328; Demonstrative Ex. 1440F at 17.  Admittedly, this calculation does not include the approximately 70% of BPs who never make a sale, but as discussed, the evidence suggests that group includes BPs whose purchases are ultimate user purchases, and thus are not problematic under *Koscot*.

end the pyramid scheme inquiry with a reading of the Compensation Plan and an evaluation of whether it is theoretically possible for a BP to earn recruitment-based rewards without individually making a single sale to an ultimate user.  The Court refuses to slavishly look only to the Compensation Plan in isolation, with blinders on to the actual operational data and internal structure of Neora's business.  *See Torres II*, 838 F.3d at 643.

Instead, the Court must look to how the business operates in practice.  *See BurnLounge*, 753 F.3d at 883; 2018 FTC Guidance at 2.  The fact that 80% of revenues come from ultimate user sales weighs heavily against a finding that Neora focuses exclusively or almost exclusively on recruiting as opposed to sales.  *See Torres I*, 805 F.3d at 153.  It also suggests that Neora is not in danger of eventual collapse, because it does not appear to sustain itself entirely on BP purchases and thus does not depend on the continual recruitment of new BPs for its continued existence.  *See* 2004 FTC Advisory Op. at 1.

Moreover, Neora's training materials and publications do not reveal that Neora is emphasizing recruiting at the expense of sales or BP development. [129]  In making this conclusion, the Court is not blindly counting documents or words, but instead evaluating the materials before it holistically to see whether Neora primarily encourages its BPs to pursue recruitment of BPs in lieu of sales.  Review of the representative materials available to the Court—including Neora's trainings, product guides and brochures, marketing materials, and selling guidance—reveals that, although Neora does reference recruitment and provide training on its Compensation Plan and

---

[129] The Court notes the Compensation Plan and other Neora materials at times use the terms "enroll" and "recruit" in the context of signing up new PCs, as well as new BPs.  *See, e.g.*, Tr. 1-B at 68–69.  Thus, evaluating Neora's publications and trainings for an overemphasis on "recruitment" as a proxy to determining whether Neora is operating as an illegal pyramid scheme is of minimal probative value given that, in this context, "recruitment" can also refer to making customer sales by enrolling new PCs.

how to advance within it, recruitment of new BPs is not overemphasized in such a way so as to suggest that it is the business's primary focus.[130]

In sum, the Court concludes that the FTC has not established the second element of the *Koscot* test. As a result, Neora is not operating as an illegal pyramid scheme, and accordingly, Defendants are not violating § 5 of the FTC Act on this basis.

## B.   Counts 2–4: Income and Product Claims

The FTC argues that Defendants are violating § 5(a) of the FTC Act by making deceptive representations that Neora BPs are likely to earn a substantial income (Count Two), and making misleading or unsubstantiated health claims about EHT (Counts Three and Four). The FTC contends that, for purposes of both the income and product claims, Defendants are legally responsible for misrepresentations by BPs, on the grounds that BPs are Defendants' agents. ECF No. 331. Thus, a threshold issue for Counts Two, Three, and Four is whether BPs are Defendants' agents, such that Defendants are liable for BPs' representations.

### 1.   Preliminary Issue: Agency

The FTC argues that BPs should be considered Defendants' agents as a matter of law. However, the existence of an agency relationship is a question of fact. *See, e.g.*, *Exela Enter. Sols., Inc. v. Nat'l Lab. Rels. Bd.*, 32 F.4th 436, 446 (5th Cir. 2022); *Equilease Corp. v. M/V Sampson*, 756 F.2d 357, 363 (5th Cir. 1985), *on reh'g*, 793 F.2d 598 (5th Cir. 1986). As the

---

[130] For example, the *Neora Rhythm: The Slight Edges + Ten Core Commandments* booklet, which is made available to BPs and contains Olson's philosophy for achieving success, includes "Neora's 10 Core Commitments" and "Neora's 10 Core Values." Ex. 622; Tr. 3-A at 14–18. During trial, the FTC pointed out language in this document stating, "The first step to launching a successful Neora business is to advance in rank to Elite Brand Partner." Ex. 622 at 20. However, reviewing the entire exhibit reveals that recruitment is not the focus of the publication, or even a significant discussion point. For instance, recruitment or team building does not appear in any of Neora's 10 Core Values or 10 Core Commitments. *E.g.*, *id.* at 12–13 ("1. Be Real. . . 2. Be Determined. . . . ."); *id.* at 15–16 ("1. Complete New Brand Partner Training. . . . 2. Two Exposures a Day, Five Days a Week. . . . 3. Share the Products. . . ."). Thus, although it is certainly possible to find references to recruitment and building one's team through Neora's various publications, trainings, and materials, including its copious trainings on the Compensation Plan, recruitment is not emphasized to an extent that it dominates, or even features heavily, above all other topics.

party asserting an agency relationship, the FTC has the burden of proving it exists. *Wood v. Holiday Inns, Inc*., 508 F.2d 167, 173 (5th Cir. 1975).

An agency relationship exists when an individual has either actual authority or apparent authority to act on behalf of another.  Under federal common law, to determine whether actual authority exists, courts examine "the principal's control over the agent" and the "parties' consent to the agent's acting on the principal's behalf." *Christiana Trust v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018) (citing Restatement (3d) of Agency § 1.01 (2006)).  "An essential element of agency is the principal's right to control the agent's actions," and "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."  Restatement (Third) of Agency § 1.01.

In addition, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." *Id*. § 2.03.  Whether a reasonable third party would believe the agent had authority to do a particular act, and whether that belief is traceable to a manifestation of the principal, are questions of fact. *Id.*  Statements by the agent alone do not create apparent authority unless the agent's conduct has been directed by the principal. *Id.*

The Court concludes that there is insufficient evidence of an agency relationship between BPs and Defendants—whether actual or apparent agency—to hold Defendants responsible for any representations Neora's BPs are alleged to have made.

The FTC argues that Defendants control BPs by approving applications, disciplining and terminating BPs, prohibiting BPs from selling competing products, and restricting BPs to using only approved marketing materials.  However, evidence was presented that Neora does not control and has no right to control how much BPs work (if at all), how much they spend on their

pursuit of the business opportunity, or how they exercise their choice of work activities.[131]

Indeed, the Court finds that the fact BPs may elect to completely forgo the business opportunity

and not participate at all is significant; Neora has no ability to enforce performance, let alone

mandate how and when BPs conduct sales. Thus, although Neora provides guidelines and

instructions to BPs on how to conduct their businesses in a legally compliant manner, it cannot

control whether, how, or when BPs choose to conduct business, weighing against a finding of

control. *See Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 889

(S.D. Tex. 2008) ("[T]he right of control . . . includes the power *to set tasks* and to dictate the

means and details of the agent's work to accomplish those tasks . . . ." (emphasis added));

Restatement (Third) of Agency § 1.01 ("[S]etting standards in an agreement for acceptable

service quality does not of itself create a right of control.").

In addition, the FTC does not discuss the consent element, and thus has not established

that Defendants consented to BPs acting as their agents, or vice versa; the P&Ps specify that a

BP is not an agent of Neora and has no authority to bind Neora to any obligation. *Id.* § 1.02

("An agreement between or among parties may positively characterize their relationship as one

of agency or assert a negation of agency."). BPs must agree to the P&Ps to enroll with Neora,

and must agree to any updates or amendments to Neora's policies to continue being BPs.[132]

In support of its theory that BPs have apparent authority, the FTC argues that Defendants

hold BPs out publicly as their sales force and require consumers to make purchases through

them, and thus "[a]ny reasonable customer interacting with a Brand Partner would believe that

the Brand Partner was speaking as a representative of Neora."[133]  However, the FTC relies solely

---

[131] Tr. 3-A at 107; Tr. 6-A at 54–55.
[132] 2021 P&Ps (Ex. 1423) § 1.11; Tr. 3-B at 120–21, 128.
[133] Tr. 1-A at 25–26; ECF No. 331 at 26–27.

on attorney argument for support of this position, and as a result, there is not sufficient evidence in the record from which the Court could conclude what BPs' *customers* believe about BPs' authority vis-à-vis Neora, and whether that belief is based solely on the statements or conduct of BPs, or if it is traceable to a manifestation of Neora. *See id.* § 2.03. For Defendant Olson individually, the record is particularly thin; there is no evidence indicating that a customer would reasonably believe that any given Neora BP has the apparent authority to bind Olson personally, either individually or in his capacity as CEO, let alone any manifestation by him traceable to that belief.

The record contains numerous examples of statements by BPs—in the form of video trainings and social media posts—but as statements by the purported agents, this evidence alone cannot support a finding of apparent agency. Moreover, the fact that BPs sold Neora product does not qualify as a manifestation of Neora's intent. *Id.* § 3.03 ("The fact that one party performs a service that facilitates the other's business does not constitute such a manifestation.").

And although the FTC points to numerous cases finding an agency relationship in circumstances partially resembling these, the issue is a question of fact, and the FTC cannot sidestep its evidentiary burden simply by asking the Court to follow other cases. Moreover, as discussed, Neora permits its BPs considerable flexibility in conducting their businesses, if they choose to do so at all; the record does not contain sufficient evidence suggesting that all BPs conduct their business in similar enough ways as to support the Court making a global pronouncement of apparent authority.[134]

---

[134] For instance, the FTC could have—but did not—argue that only select BPs have apparent authority to act on behalf of Neora, such as the high-ranking BPs who regularly appeared in Neora-produced videos and onstage at Neora's Get Real conferences.

For the foregoing reasons, the Court concludes that the FTC has not carried its burden in establishing that Neora BPs acted with actual or apparent authority on behalf of Neora, and thus has not shown that BPs are not Neora's agents.  As a result, the Court will consider only Defendants' statements for purposes of the FTC's income and product claims.

### 2.  Income Claim

The FTC argues that Defendants are violating § 5(a) of the FTC Act by making deceptive representations that consumers who become BPs are likely to earn substantial income.

A representation is "deceptive" under Section 5(a) when: (1) there was a representation, omission or practice (2) that was likely to mislead customers acting reasonably under the circumstances, and (3) the representation, omission or practice was material.  *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir. 2001); *see also In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 164-65 (1984).  Such representations may be express or implied.  *FTC v. Figgie Int'l, Inc*., 994 F.2d 595, 604 (9th Cir. 1993).

A representation, omission or practice is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."  *FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006).  "Misrepresentations concerning anticipated income from a business opportunity generally are material and likely to mislead consumers because such misrepresentations strike at the heart of a consumer's purchasing decision."  *FTC v. Freecom Comm'cns, Inc*., 401 F.3d 1192, 1203 (10th Cir. 2005).  This includes "ma[king] deceptive use of unusual earnings realized only by a few."  *Nat'l Dynamics Corp. v. FTC*, 492 F.2d 1333, 1335 (2d Cir. 1974).

Courts examine the overall "net impression" created by the challenged representation.  *FTC v. E.M.A. Nationwide, Inc*.,767 F.3d 611, 631–32 (6th Cir. 2014); *Vemma*, 2015 WL

46

11118111, at *6.  The use of a disclaimer may not inoculate the harm of a misrepresentation if, despite the disclaimer, the consumer may reasonably believe that a statement of unusual earning potential represents typical earnings.  *See Vemma*, 2015 WL 11118111, at *6; *see also Removatron Int'l Corp. v. F.T.C.*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression.").

The FTC argues that Defendants have previously represented and are representing that consumers can make a substantial income by joining the Neora business opportunity.  For support, the FTC points to various Neora videos, audio recordings, magazines, live presentations, and social media posts, including videos and photos with high-earning BPs holding oversized checks, showing off luxury cars earned through the business opportunity, emphasizing the potential to earn multi-thousand-dollar "Live Better Bonuses," and celebrating the lifestyles of high-earning BPs through videos and publications like the *Success from Home* magazine.[135] Because it is undisputed that most Neora BPs earn nothing, the FTC contends that these

---

[135] As discussed, the FTC has not established that BPs are Defendants' agents, and thus the Court disregards statements or representations by BPs in evaluating whether Defendants have violated § 5 of the FTC Act by making misleading representations regarding BPs' potential income.  However, even if BPs are considered Defendants' agents for purposes of the income and product claims, the Court concludes that there is no basis to impose liability on Defendants for statements by BPs in light of a rigorous compliance program and proactive efforts Defendants take to curb problematic statements by BPs through training efforts, approved marketing materials, and enforcement of the relevant policies in the P&Ps.  *E.g.*, 2021 P&Ps (Ex. 1423) §§ 3.04, 7.05–.06, 9.24, 12.  In its own Endorsement Guide, the FTC recognized that it is "unrealistic" for an organization to be aware of every statement made by individuals participating in a marketing network, and emphasized the significance of a reasonable training, monitoring, and compliance program in addressing those harms.  Ex. 1425 at 18.  The record is replete with efforts by Defendants to train BPs on appropriate and inappropriate income and product claims, provide compliant marketing materials and guidance, and to institute a proactive compliance program to monitor, find, remediate, and remove non-compliant statements by BPs.  The FTC identifies no specific defects and blind spots in Defendants' compliance program, and the Court agrees with the FTC's own guidance that expecting Defendants to have immediate, complete knowledge of every problematic statement made by Neora BPs globally is unrealistic.  Accordingly, the Court finds that enjoining Defendants and Neora's BPs from making misleading income and product claims would have no effect beyond that which is already being achieved through Defendants' robust and reasonable compliance program, and thus an injunction is not warranted.

representations about potential business income are both misleading and material, and thus violate § 5.

The Court agrees with the FTC that some of its examples of income-based statements by Neora are problematic and misleading as to the amount of money typically earned by a Neora BP, and lack any curative disclaimers or qualifiers.  However, in arguing that Defendants are making misleading income statements, the FTC primarily relies on evidence that is, in the Court's view, somewhat stale in light of other evidence reflective of Neora's recent operational practices.  Such evidence includes exhibits that reflect the Nerium brand, and thus predate the 2019 rebranding to Neora,[136] or reference discontinued programs or rewards.[137]

The FTC does point to examples of alleged misrepresentations made by Defendants from 2019 and 2020, including two marketing videos, including one named "Better with Neora," Olson's *Neora Rhythm* book, a 2020 "Jumpstart Roadshow" training presentation for BPs, and a 2019 Neora blog post on the "Million Dollar Club" of top earners.  In contrast to the earlier examples, however, statements regarding earning potential in these marketing videos are accompanied by a prominent disclaimer stating, in part, that Neora "does not guarantee any level of income for any Brand Partner," and "[t]he actual income of Neora Brand Partners varies," and directing the viewer to a URL to access Neora's full Income Disclosure Statement.[138]

---

[136] *See, e.g.*, Exs. 30 (2016 *Success from Home* Magazine), 186 (2015 *Success from Home* Magazine), 443, 621 (2016 *Nerium Success Report*), 708 (2014), 834 (2016), 835 (2016), 846–47 (2017), 854 (2017), 857 (2015), 865 (2016), 875 (2014); *see also* Tr. 3-A at 44.  In addition, the record contains, and the FTC points to, numerous examples of videos featuring former BPs Mark and Tammy Smith, including lifestyle videos showing off cars and homes earned through their business with Nerium, "top earners" celebratory videos, training videos, Nerium University presentations, and weekly calls.  *See, e.g.*, Exs. 715, 717–19, 722, 724–25, 730–32, 829, 842 (2013), 843 (2013), 851 (2016), 853 (2014), 856 (2016), 867, 881 (2016), 900.  Mark and Tammy Smith left Nerium in early 2018, and thus any materials featuring them necessarily do not reflect Neora's current business practices.  Tr. 5-B at 8.

[137] *See, e.g.*, Ex. 444 (describing Nerium's Young Entrepreneur Program, through which BPs could earn iPads); Tr. 6-A at 20–21 (explaining that the Young Entrepreneur Program was discontinued by 2016).

[138] *See* Exs. 830, 849.

The fact that the FTC relies primarily on older examples of alleged misrepresentations is significant.  Earlier in this case, the Court observed that "allegations of past conduct can give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive." *Fed. Trade Comm'n v. Neora LLC*, 552 F. Supp. 3d 628, 637 (N.D. Tex. 2021).  In addition, the Court recognized the following factors to consider when deciding whether to issue an injunction based on past violations of the law:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* at 637–38 (quoting *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008)).

Thus, although proof of past violations can be relevant to whether an actor "is violating, or is about to violate" the FTC Act, for purposes of awarding injunctive relief, the probative value of these older Neora statements decreases in light of other evidence presented at trial indicating that Neora has updated and revised its policies regarding permissible income and income-related representations in its messaging.  For example, Neora employees testified that Neora no longer describes BPs earning full-time income, and avoids using dollar amounts or terms such as "millionaires' club," "financial freedom," "residual" or "dream" income, or "dream lifestyle."[139]  Instead, Neora now advertises earnings potential through the business opportunity as "modest supplemental income," and consistently uses income disclaimers on its materials.[140]  Since 2016, Neora has stopped using oversized checks to recognize high-earning

---

[139] Tr. 4-B at 18–20; Tr. 6-A at 36.
[140] Tr. 3-A at 32, 83; Tr. 4-B at 15–16, 19–20; Ex. 1462 at 2 (Field Compliance Guide).

BPs, and has stopped using testimonials, lifestyle claims, and success stories, including those promulgated in the *Success from Home* magazines.[141]

Moreover, Neora employees and Olson testified that these changes were adopted to align Neora's practices to signals and suggestions from the FTC regarding permissible and impermissible income claims, and to conform with guidance and suggestions from the Direct Selling Self-Regulatory Council, a self-regulatory body.[142]  The Court notes the FTC has not yet promulgated a formal rulemaking providing guidelines as to how direct selling companies may describe earnings or income opportunities without running afoul of § 5.

With that context, the Court concludes that the FTC has not established that Defendants are violating or are about to violate § 5(a) of the FTC Act by making deceptive income claims, and the *Cornerstone Wealth* factors do not justify issuing an injunction based on Defendants' past violations of the law.  *See* 549 F. Supp. 2d at 816.  Specifically, the Court finds that the passage of time, coupled with Defendants' recognition of and explanation for the prior infractions and associated changes to Neora's practices—namely, lack of FTC guidance on permissible income statements, and prompt adjustments to Neora's practices when "tea leaves" from the FTC materialize—renders any Nerium-era misrepresentations largely irrelevant when assessing whether Neora is *currently* violating the Act.  Instead, the evidence at trial establishes that Defendants aspire to abide by the law regarding permissible income claims, and in the absence of clear guidelines on what the law is, have revisited and revised their practices over time.

The more recent alleged misrepresentations pointed to by the FTC are lesser in number and do not justify an injunction.  The FTC takes issue with Olson's description of his nickname

---

[141] Tr. 3-A at 82–86; Tr. 4-B at 21.
[142] Tr. 3-A at 77–79, 83, 85–86; Tr. 4-B at 15–22.

"The Millionaire Maker" in his *Neora Rhythm* book, but the net impression of the cited passage admits that those types of results are atypical; indeed, Olson states in the same paragraph that "the great majority of people [he has worked with]—who have been offered exactly the same opportunities—have gone nowhere."[143]  Moreover, the more recent 2020 marketing videos contain more tempered descriptions of potential earnings—namely, descriptions like "successful business," "added security," and "extra income for your kids' activities," rather than specific dollar amounts—accompanied by large, clear disclaimers.  No evidence was provided that, despite those disclaimers, a consumer might reasonably believe that those marketing videos promise the potential for significant earnings or a lavish lifestyle.  *See Vemma*, 2015 WL 11118111, at *6.

The Court concludes that there is insufficient evidence that Neora or Olson are making or recently made extensive and routine misrepresentations about the likelihood that a BP would make substantial income.  In the absence of any violations of § 5, the FTC's requested injunction on these grounds is unnecessary.

### 3.   Counts 3 and 4: Product Claims (EHT)

In Count 3, the FTC asserts that Neora violated §§ 5(a) and 12 of the FTC Act by making misrepresentations about the efficacy of EHT—namely, claiming that EHT and/or Neora EHT prevent, reduce the risk of, or treat CTE, concussions, Alzheimer's disease, or Parkinson's disease.  In Count 4, the FTC maintains that Defendants violated §§ 5(a) and 12 of the FTC Act by making claims misrepresenting that the effectiveness of EHT and/or Neora EHT has been scientifically established.  Count 3's efficacy claim and Count 4's establishment claim are both

---

[143] Ex. 629 at 9.

evaluated under the same "net impression" standard applicable to Count 2.  *POM Wonderful, LLC, v. FTC*, 777 F.3d 478, 490 (D.C. Cir. 2015).

The FTC contends that Defendants claim EHT is scientifically proven to prevent and treat concussions, CTE, Alzheimer's disease, and Parkinson's disease.  As evidence of recent violations, the FTC relies exclusively on statements posted on social media by Neora BPs, associating EHT with CTE, Alzheimer's, and other diseases.[144]  However, as discussed, the FTC has not established that Defendants are liable for BPs' misrepresentations.

The FTC's remaining evidence consists of misrepresentations made by Signum in connection with the ME Sports product, including on the ME Sports website, and the Stocks' problematic statements at the April and September 2015 Get Real Conferences.  However, none of the ME Sports materials have been used since 2015, no one at Nerium helped or contributed to the ME Sports websites or marketing materials, and the FTC concedes that the Stocks are not Defendants' agents.[145]  Admittedly, the Stocks made improper efficacy claims at the April and September 2015 Get Real Conferences, but the evidence presented at trial indicates that, prior to the conferences, Defendants instructed the Stocks not to make medical claims on stage, responded with appropriate compliance messaging regarding appropriate statements to make about EHT after the fact, and took steps to avoid such statements happening again, including by preventing Dr. Stock from making any other live presentations sponsored by Neora.[146] Moreover, the FTC does not point to anything objectionable in Neora's current materials regarding EHT, including the packaging, messaging, or training to BPs on appropriate product claims.

---

[144] Exs. 739–824, 877, 920, 920–41; Tr. 1-B at 85–88.
[145] Tr. 2 at 58, 64–66, 68; ECF No. 285 at 6.
[146] Tr. 3-A at 116–19.

In sum, the FTC seeks an order preventing Defendants from claiming that their products cure, treat, or prevent human disease.  There is no evidence before the Court that Defendants are currently making such claims, or are likely to do so in the future.  *AMG Cap. Mgmt.*, 141 S. Ct. at 1348 (§ 13(b) "focuses upon relief that is prospective, not retrospective").  Accordingly, the FTC's request for an injunction on these grounds is denied.

### C.  Means and Instrumentalities Claim

The FTC asserts that the defendants violated sections 5(a) and 12 of the Act through furnishing consumers with the "means and instrumentalities" to mislead others—namely, by disseminating materials misrepresenting: (a) BPs' ability to earn substantial income from participating in Neora's business opportunity (Count II); or (b) the efficacy and scientific basis of EHT and/or Neora EHT (Counts III and IV).

"Those who put into the hands of others the means by which they mislead the public, are themselves guilty of a violation of Section 5 of the [FTC] Act."  *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963); *Vemma*, 2015 WL 11118111, at *7 (evidence presented that Vemma "provides the 'means and instrumentalities' for Affiliates to deceive consumers by providing them with promotional, recruiting and training materials containing false or misleading income representations").

The FTC contends that Defendants have created and promulgated deceptive marketing and training materials about the earnings potential of Neora's business opportunity and about EHT and EHT products, and has provided BPs with those alleged deceptive materials, who could use them to mislead.

First, regarding EHT and Neora's EHT products, the FTC has identified no deceptive marketing and training materials created or promulgated by Defendants that are misleading or

misrepresent the efficacy or scientific basis for statements made in connection with EHT.  The FTC identifies nothing problematic with the EHT Brain Formula packaging, marketing, product guides, or brochures created by Neora, nor the product disclosures that Neora trains its BPs to use on social media posts when discussing wellness products.  Accordingly, Defendants do not provide BPs with the "means and instrumentalities" to deceive consumers about EHT.

So too for the earnings potential of Neora's business opportunity.  As with EHT, the P&Ps provide clear guardrails regarding permissible income statements that BPs must abide by or face discipline and termination, and Defendants provide training, guides, approved marketing, disclosure statements, and suggested language to BPs—including in publications like the Field Compliance Guide—that give BPs direction on how to discuss income and earnings compliantly.  These materials are comprehensive; the Field Compliance Guide, as discussed, contains sample social media posts showing how disclaimer language must feature prominently and in close proximity to the income statement.  The record also reflects that this training is continually reinforced and circulated to BPs, including through *Compliance Corner* updates and when the Neora Compliance Department contacts BPs to address noncompliant posts.

The FTC does not appear to challenge Neora's income disclosure statements, or its requirement that BPs include such disclaimers in statements purporting to make an income claim.  Nor does the FTC quibble with Defendants compliance materials giving guidance on what constitutes an income claim.  Instead, the FTC focuses on three pieces of evidence: a 2020 JumpStart Roadshow training for BPs, Olson's *Neora Rhythm* book, and the 2020 Better with Neora marketing video.  ECF No. 331 at 10.  However, as discussed, the Court has evaluated *Neora Rhythm* and the Better with Neora marketing video, and concludes that the net impression gleaned from those materials is not misrepresentative and does not violate § 5; thus, encouraging

54

BPs to use such materials in pursuing their business likewise does not violate § 5.  Regarding the JumpStart Roadshow presentation, testimony was provided that this presentation was an internal training for already-enrolled BPs hoping to expand their teams.[147]  Although the FTC correctly points out that the presentation recites statements about $100 to $10,000 monthly income, that slide is accompanied by an income disclaimer statement and recitation of typical BP earnings.[148]  The presentation does not encourage or direct BPs to advertise or recruit the Neora business opportunity based on such income figures, and the overall context of the presentation suggests that the reference to supplemental income is part of an overall goal-setting exercise.[149]  Indeed, the presentation later reminds the audience not to make income claims or overpromise.[150]

Overall, the evidence at trial does not establish that Defendants provided BPs with the means and instrumentalities to deceive consumers.  On the contrary, the record reflects a concerted and consistent effort for Defendants to inform and train BPs with the tools and knowledge to sell Neora products without making misleading income or product statements, and to find and correct missteps as they happened.  Accordingly, the Court finds no violation of § 5 of the FTC on a means and instrumentalities theory.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ORDERS** that all of Plaintiff Federal Trade Commission's requests for relief in this case, including its request for injunctive relief, are **DENIED**.  Judgment for Defendants Neora, LLC and Jeffrey Olson is **GRANTED**.  The Court will issue a separate Final Judgment.

---

[147] Ex. 544; Tr. 6-A at 31–34.
[148] Ex. 544 at 11; Tr. 6-A at 31–34.
[149] *E.g.*, Ex. 544 at 23 ("What rank do I want to achieve and when? What income per month do I want to achieve and when? What activities am I going to commit to achieve these goals?").
[150] Ex. 544 at 28.

**SO ORDERED**.

September 28, 2023.

BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE